## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CASSANDRA OSVATICS, on behalf of herself and all others similarly situated,<br><br>13218 Ovalstone Lane<br>Bowie, Maryland 20715<br><br>Plaintiff,<br>v.<br><br>LYFT, INC.,<br><br>Defendant. | Civil Action No.<br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff Cassandra Osvatics, individually and on behalf of all others similarly situated, by her attorneys, Outten & Golden LLP, upon personal knowledge as to herself and upon information and belief as to other matters, alleges as follows:

## INTRODUCTION

1.      The District of Columbia, like other jurisdictions, has a carefully designed framework in place for regulating workplaces to protect employees.  These protections include minimum wage guarantees, expense reimbursement requirements, and – critical to public health and the current pandemic – paid sick leave.

2.      Experts have found that providing paid sick leave is a significant way to reduce the spread of illness.[1]  In the District of Columbia, employers – like Defendant Lyft, Inc.

---

[1]      Claire Cain Miller, et al., *Avoiding Coronavirus May Be a Luxury Some Workers Can't Afford*, N.Y. Times (Mar. 2, 2020), https://www.nytimes.com/2020/03/01/upshot/coronavirus-sick-days-service-workers.html (quoting a Cornell University associate professor of economics as stating, "It's very clear: When people don't have access to sick leave, they go to work sick and spread diseases.").

1

("Lyft") – that are covered by the D.C. Accrued Safe and Sick Leave Act ("ASSLA"), D.C. Code §§ 32-531.01-531.16, are required to provide paid sick leave.

3.  Given the current COVID-19 pandemic, which some experts predict could last for years,[2] the need for paid sick leave is vitally important.  Without it, Lyft forces its drivers into a Hobbesian choice: risk their lives (and the lives of their passengers) or risk their livelihoods. The D.C. Council enacted the ASSLA so that workers would not have to make such a choice.

4.  Lyft in particular has a history of failing to comply with the ASSLA, to the detriment of its drivers and the public.  Though it has claimed to provide paid sick leave to its drivers during the pandemic, the policy has been criticized as "illusory" and a "bait and switch."[3] Lyft's vague and limited paid sick leave does not comply with the ASSLA because it only covers "drivers diagnosed with COVID-19 or put under individual quarantine by a public health agency — [for] an amount determined by the driver's previous activity on the Lyft platform." *Helping Lyft's Driver Community*, Lyft, https://www.lyft.com/safety/coronavirus/driver (last visited May 26, 2020).

5.  The ASSLA, which was first enacted in 2008, requires employers with 100 or more employees to provide not less than one hour of paid sick leave for every 37 hours worked. D.C. Code Ann. § 32-531.02(a)(1).  Under the ASSLA, sick leave may be used for absences resulting in: physical or mental illness, preventive medical care, caring for an ill child, parent, spouse, domestic partner, or other family member, and/or an absence because the employee or

---

[2]  Stephen M. Kissler, et al., *Projecting the Transmission Dynamics of SARS-CoV-2 Through the Postpandemic Period*, Science, May 22, 2020 at 860-68, https://science.sciencemag.org/content/368/6493/860 ("One scenario is that a resurgence in SARS-CoV-2 could occur as far into the future as 2025.").

[3]  Dana Kerr, *Lyft Pulls Bait-and-Switch on Promised Coronavirus Sick Pay, Drivers Say*, CNET (Apr. 8, 2020), https://www.cnet.com/news/lyft-quietly-adjusts-its-coronavirus-sick-pay-policy-for-drivers/.

employee's family member is a victim of "stalking, domestic violence, or sexual abuse." *Id.* § 32-531.02(b).

6.      For these reasons, Plaintiff brings this action against Lyft to enforce the essential rights provided under the ASSLA, on behalf of all drivers who work or worked for Lyft in the District of Columbia for at least 90 days between when Lyft began operating in the District of Columbia[4] and the date of final judgment in this matter (the "Class" or "Class Members").

## PARTIES

*Plaintiff Cassandra Osvatics*

7.      Plaintiff Cassandra Osvatics is an adult individual residing in Bowie, Maryland.

8.      Plaintiff Osvatics has a driver's license issued by the State of Maryland.

9.      Plaintiff Osvatics worked as a driver for Lyft from approximately November 2015 to June 2018.  Plaintiff Osvatics regularly worked between 10 to 15 hours per week for Defendant, with some weeks where she worked over 35 hours per week.

10.     Plaintiff Osvatics spent more than 50% of her time with Lyft working in the District of Columbia.

*Defendant Lyft, Inc.*

11.     Defendant Lyft, Inc. is a Delaware corporation with its corporate headquarters and primary place of business in San Francisco, California.

12.     Lyft does business in the District of Columbia, Maryland, Virginia, and, upon information and belief, in at least 30 other states in the United States.

13.     Lyft is an App-based transportation provider that has been based in San Francisco, California, since 2012.

---

[4]      Upon information and belief, Lyft began operating in the District of Columbia after the enactment of the ASSLA on November 13, 2008.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)

because Plaintiff is a citizen of a different state from Defendant and the amount in controversy

exceeds $75,000.  The Court also has jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d) because this is a class action; Plaintiff Osvatics and, upon information and belief, at

least one class member, is a citizen of a state different from Lyft; and the amount in controversy

exceeds $5,000,000, exclusive of interest and costs.

15.     Defendant is subject to personal jurisdiction in the District of Columbia.

16.     Venue is proper in this District because a substantial part of the events or

omissions giving rise to the claims occurred in this District.  *See* 28 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

*Lyft's Business*

17.     Lyft provides riders with transportation by assigning Lyft drivers to riders using a

mobile phone application (the "Lyft App").

18.     The driver then transports the rider, and the rider pays Lyft for the service with a

credit card via the Lyft App.

19.     Lyft sets the fare to be paid by the rider and communicates it to the rider via the

Lyft App.

20.     Upon information and belief, Lyft pays the driver approximately 80% of the ride

fare plus 100% of any added tip, while Lyft keeps approximately 20% of the fare for itself.

21.     Drivers cannot negotiate a different payment arrangement.

***Plaintiff and Class Members Are Employees.***

22.     The work that drivers perform is in the usual course of Lyft's business – indeed, providing driving services *is* Lyft's business.

23.     Lyft describes itself as "one of the largest and fastest growing multimodal transportation networks in the United States."  *See* Lyft, Inc., Securities and Exchange Commission Form S-1 Registration Statement, at 1 (March 1, 2019) ("S-1 Statement"), https://www.sec.gov/Archives/edgar/data/1759509/000119312519059849/d633517ds1.htm.

24.     As drivers, Plaintiff and Class Members provide or provided the service that Lyft sells to the public.

25.     Lyft states that it participates in the "transportation . . . market," and describes its business as "singularly focused on revolutionizing transportation."  S-1 Statement at 3-4.

26.     Lyft earns money by providing its customers with a ride from point A to point B – a service that is wholly dependent on Lyft drivers, like Plaintiff.

27.     Lyft's "business depends largely on [its] ability to cost-effectively attract and retain qualified drivers."  S-1 Statement at 10.

28.     Lyft does not merely provide a platform, nor is it an uninterested bystander between drivers and riders.  As other courts have found, "Lyft concerns itself with far more than simply connecting random users of its platform.  It markets itself to customers as an on-demand ride service, and it actively seeks out those customers.  It gives drivers detailed instructions about how to conduct themselves.  Notably, Lyft's own drivers' guide and FAQs state that drivers are 'driving for Lyft.'"  *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015); *see also Cunningham v. Lyft, Inc.*, No. 19 Civ. 11974, 2020 WL 2616302, at *10 (D. Mass. May 22, 2020) (explaining that the "'realities' of Lyft's business are no more merely 'connecting' riders

and drivers than a grocery store's business is merely connecting shoppers and food producers,"

but rather "focusing on the reality of what the business offers its customers, the business of a

grocery stores is selling groceries . . . and Lyft's business – from which it derives its revenue –

is transporting riders").

29.     Lyft screens every driver, including Plaintiff, "before they are permitted to drive

on [its] platform, starting with professional third-party background and driving record checks."

See S-1 Statement at 148.  Background checks are performed routinely.  *See Driver*

*Requirements*, Lyft, https://help.lyft.com/hc/en-us/articles/115012925687 (last visited May 22,

2020).

30.     Lyft can terminate the right of drivers to provide driving services for violating one

or more of the rules that Lyft imposes by contract.

31.     Drivers lack business autonomy.  Drivers are not engaged in an independently

established business.  They cannot provide transportation services without the Lyft App and

cannot use contacts made through the Lyft App to solicit private transportation clients.  Drivers

are dependent on Lyft to identify riders for them.  Drivers may not hire employees to assist them

in providing services for Lyft.

32.     Lyft drivers in the District of Columbia are required to display the Lyft emblem when driving for it in the "lower corner of the[ir] rear passenger side window." *Washington D.C. Driver Information*, Lyft, https://help.lyft.com/hc/en-us/articles/115012929787-Washington-D-C-Driver-Information (last visited May 22, 2020).



33.     Upon information and belief, when Lyft approves a driver to work in the District of Columbia, that driver still needs to get separate approval from Lyft to drive outside of Virginia, Maryland, or the District of Columbia. *See Lyft Driver and Vehicle Requirements in Washington, DC*, Lyft, https://www.lyft.com/driver/cities/washington-dc/driver-application-requirements (last visited May 22, 2020).

## If I'm approved to drive in Washington, DC am I approved to drive in other cities?

Requirements to drive with Lyft may vary by region. If you want to drive in a different city, check the requirements and reach out to support to send in the required documents.

34.     Lyft drivers do not need to possess any particular or special skills other than those required to obtain a driver's license.  *See id.* (listing as driver requirements a "Valid Washington, DC, Maryland, or Virginia driver's license," "21 or older," "Pass driver screening," and a "smartphone that can download and run the Lyft Driver app").

35.     By working for Lyft, drivers have not independently made the decision to go into business for themselves.

36.     Lyft has unilaterally determined that drivers are independent contractors while precluding them from taking the usual steps toward promoting and establishing an independent business, such as forming business relationships with Lyft customers or otherwise promoting their services to the public.

37.     Lyft also prohibits drivers from setting or in any way affecting the rates of pay for their own services.

38.     Lyft prohibits drivers from communicating with riders about future ride services.

39.     Lyft is solely responsible for recording drivers' rides, including the time and distance for each ride, the ride fare and added Lyft fees, any tips, and for compiling drivers' rates of pay for each ride.

40.     Lyft controls the terms of employment and maintains uniform policies and terms of service with which all drivers must comply.

41.     For example, Plaintiff used her own car to provide rides for Lyft, which per Lyft policy could not be a two-door car or more than a number of years old.  *See Lyft Driver and Vehicle Requirements in Washington, DC*, *supra* (describing vehicle requirements).

42.     Once drivers pass Lyft's initial requirements, they are able to work for Lyft for an indefinite period of time.  Lyft, however, may shut down drivers' access to the Lyft App for myriad reasons, thus preventing them from obtaining and responding to ride requests.

43.     Drivers perform work for Lyft by logging in to the Lyft App, making themselves available for assignments and visible to Lyft users, which benefits Lyft.  While logged in, drivers typically receive ride assignments quickly, sometimes receiving a new ride assignment before completing the existing ride.

44.     On information and belief, until the beginning of 2018, Lyft required that drivers accept at least 90% of ride assignments to avoid being terminated.  Now, Lyft "use[s] acceptance rates to determine driver eligibility for certain features and help keep passenger wait times short."  *Acceptance Rate*, Lyft, https://help.lyft.com/hc/en-us/articles/115013077708-Acceptance-rate (last visited May 15, 2020).  Lyft calculates drivers' acceptance rates by adding the number of rides a driver completes to the number of rides cancelled by the rider, and dividing that number by the total number of ride assignments shown to the driver.  Lyft explains that a driver's acceptance rate may decrease due to missed assignments, such as when a driver lets the timer count down to zero, and by driver cancellations.

45.     Lyft's manner of assigning rides – including the frequency of ride assignment messages, the very short window within which a driver can accept rides, and the threat of termination for failure to accept the vast majority of rides – prevents drivers from engaging in personal activities while logged into the Lyft App.

46.     For example, Plaintiff took care to log out of the Lyft App at all times when she was not engaged in providing a ride for Lyft or making herself available for the next ride.  When performing work for Lyft that goes beyond those two activities, Plaintiff typically logged out of the Lyft App.  She scheduled her personal activities to minimize the risk of missing ride assignments because of Lyft's systematic pressure on drivers logged into the Lyft App to accept virtually all ride assignments.

47.     Lyft recognizes that drivers' time while logged into the Lyft App is not their own. Specifically, Lyft advises drivers to log out and take a break if they do not plan to accept ride assignments: "If you can't or don't want to accept ride requests, we recommend taking a break." *Id.*

48.     Lyft has continued to classify Plaintiff and Class Members as independent contractors notwithstanding that its classification policy has been the subject of several lawsuits. *See, e.g.*, *Cotter*, 60 F. Supp. 3d 1067.

**Plaintiff and Class Members Regularly Crossed and Cross Interstate Borders as Drivers.**

49.     As Lyft drivers in the D.C. metropolitan area, Plaintiff and Class Members routinely engaged and engage in interstate commerce by transporting riders across state lines in return for compensation from Lyft.

50.     The D.C. metropolitan area encompasses not only the District of Columbia, but also adjacent counties in Maryland and Virginia.[5]

---

[5]     *See, e.g.*, Sharon Feigon, et al., Broadening Understanding of the Interplay Between Public Transit, Shared Mobility, and Personal Automobiles ("Princeton Study") at A-1 (2018), https://orfe.princeton.edu/~alaink/SmartDrivingCars/PDFs/TRB_Jan2018_BroadeningUnderstandingnterplayBetweenPublic.pdf (defining Washington, D.C. as the "District of Columbia; Montgomery and Prince George's counties, MD; Alexandria, Arlington, Fairfax, and Falls Church counties, VA").

51.     Indeed, according to the Princeton Study, peak-hour usage of rideshare apps like the Lyft App in the District of Columbia occur between certain "contiguous corridors" stretching "across the broadest central section of the District . . . which includes Union Station, west to Georgetown and *across the Potomac to Arlington*."[6]

52.     Lyft's D.C. website reflects this reality and includes the entire metropolitan area within its service area.  *See Washington, D.C.*, Lyft, https://www.lyft.com/rider/cities/washington-dc (last visited May 22, 2020).



53.     Given its multi-state scope, residents of the D.C. metropolitan area are especially likely to cross state lines, including for work.

54.     For example, according to recent D.C. Department of Human Resources ("DHR") statistics, nonresidents were a majority of the 35,302 employees in the various "career,"

---

[6]       *Id.* at 13 (emphasis added).

"educational," "excepted," "executive," "legal" and "management supervisory" services of the
D.C. government, broken down as: 16,103 Marylanders, 3,579 Virginians, 429 residents of other
jurisdictions, and 15,191 D.C. residents.[7]

55.     As the seat of the federal government, the D.C. metropolitan area, defined by the
Census Core Statistical Base Area ("CBSA") that includes counties in Maryland, Virginia, and
West Virginia, is home to approximately 282,666 federal employees, over 15% of the entire
federal civilian workforce.[8]  Upon information and belief, many of these hundreds of thousands
of federal workers cross state lines, in one direction or the other, to report to work each day at
myriad federal agencies located in each of the subdivisions constituting the CBSA.

56.     Reflecting the multi-state composition of the District of Columbia's workforce,
pursuant to Lyft's policies and practices a driver can be dispatched for pickups in the District of
Columbia if they have a driver's license from the District of Columbia, Maryland, or Virginia.
*Washington D.C. Driver Information*, Lyft, https://help.lyft.com/hc/en-
us/articles/115012929787-Washington-D-C-Driver-Information (last visited May 22, 2020).

---

[7]     Colbert I. King, *Washington, D.C., Is Run by People Who Don't Even Live There*, Wash.
Post, July 1, 2016, https://www.washingtonpost.com/opinions/a-city-run-by-
nonresidents/2016/07/01/e781bfe0-3f06-11e6-80bc-d06711fd2125_story.html.
[8]     U.S. Office of Pers. Mgmt., Data, Analytics, and Documentation.  Federal Civilian
Employment (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-
documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

> **Valid driver's license**
>
> Drivers without a Washington D.C., Maryland, or Virginia driver's license will not be dispatched for pickups in DC proper.

57.     Similarly, active members of the U.S. military, and their families, stationed in the District of Columbia, Maryland or Virginia can also drive for Lyft in the District of Columbia if they follow certain requirements.  *Id.*

> **Active Military members** and their families stationed in MD, VA or D.C. can drive with Lyft by obtaining a DFHV non-MSA decal. Apply for your free DFHV non-MSA decal here. If you already have your DFHV decal, visit us at the Lyft Hub to get on the road. Bring the following documents with you:
>
> - DFHV non-MSA decal
> - Driver's license
> - Vehicle registration
> - State vehicle inspection issued from DC, VA, or MD

58.     The District of Columbia's major airports are also all located outside of the District of Columbia, requiring travel across state lines to reach them: Dulles International Airport and Reagan National Airport are located in Virginia, and the Baltimore-Washington International Thurgood Marshall Airport ("BWI") is located in Maryland.

59.     These airports are high volume trip origins and destinations for drivers, including Plaintiff.[9]  In fact, according to the Princeton Study, trips from the District of Columbia to the Virginia zip code containing Reagan National Airport was the fifth most frequent destination in the entire study dataset, which included studies of five major metropolitan areas covering tens of millions of rideshare users.[10]

---

[9]     *See* Princeton Study at 19, 23-24.
[10]    *Id.* at 7-8, 23-24.

60.     Thus, Plaintiff frequently took passengers from the District of Columbia and Maryland to the airports in Virginia, and, likewise, frequently took passengers from the District of Columbia and Virginia to BWI, crossing state lines in the process.

61.     Lyft specifically markets airport trips to D.C. riders.  *Washington, D.C.*, *supra*.



62.     Airport business is sufficiently important to Lyft that it also has specific requirements for how Lyft drivers are to conduct themselves there when picking up or dropping off riders.  *See Washington D.C. Airport Information for Drivers*, Lyft, https://help.lyft.com/hc/en-us/articles/115013082588 (last visited May 22, 2020).

63.     Similarly, many Lyft rides, including those Plaintiff performed, originate or conclude at Union Station.

64.     Union Station is a central hub for interstate rail and bus travel.  For example, according to the U.S. Department of Transportation, in 2017, Union Station was the second busiest Amtrak station in the country, registering roughly 5.2 million passengers.[11]

65.     At least six private companies provide interstate bus services at Union Station, including Bolt Bus, Megabus, BestBus, Washington Deluxe, Peter Pan, and Virginia Breeze.[12] Many of these companies provide "daily service" from the District of Columbia to other states, such as New York.[13]

66.     Many more passengers use Union Station for interstate transportation via the Washington Metropolitan Area Transit Authority's ("WMATA") Red Line, which provides direct access to Maryland, and indirect access to Virginia (and other parts of Maryland) through connections to other WMATA lines, such as the Orange, Blue, Yellow, Green, and Silver Lines.

67.     Union Station further facilitates significant interstate travel as a central stop for the Maryland Area Regional Commuter ("MARC") train.  The MARC train has long served as the daily commuter line for over 30,000 passengers.[14]

68.     Thus, Lyft drivers routinely transport people who themselves are engaged in interstate activity.

69.     Plaintiff estimates that, when driving for Lyft, she spent at least 50% of her time in the District of Columbia, at least 20% of her time in Virginia, and at least 20% in Maryland.

---

[11]     U.S. Dep't of Transp., Transportation Statistics Annual Report (2018), https://www.bts.gov/sites/bts.dot.gov/files/docs/browse-statistical-products-and-data/transportation-statistics-annual-reports/TSAR-Full-2018-Web-Final.pdf (last visited May 22, 2020).

[12]     *See Ground Transportation*, Union Station, https://www.unionstationdc.com/Ground-Transportation/ (last visited May 22, 2020).

[13]     *Id.*

[14]     Md. Transit Admin., MARC Growth and Investment Plan (Sept. 2007), https://www.washingtonpost.com/wp-srv/metro/documents/MARC02282010.pdf.

70.     Together, because the D.C. metropolitan area consists of multiple states, drivers from the District of Columbia, Maryland, and Virginia can all drive for Lyft in the District of Columbia, and since the major D.C. airports are in separate states, Class Members routinely crossed and cross state lines in the performance of their work for Lyft.

71.     For instance, because Plaintiff lives in Maryland, she repeatedly began her day of work for Lyft by taking a Maryland resident into the District of Columbia, and ended her day of work for Lyft by returning a Maryland resident from the District of Columbia to Maryland.

72.     Plaintiff's experiences resemble those of other Class Members.

***Lyft Did Not Maintain a Paid Sick Leave Policy and Did Not Provide Notice.***

73.     Lyft did not and does not have a sick leave policy that complies with the ASSLA.

74.     Lyft did not and does not "post and maintain in a conspicuous place, a notice that sets forth excerpts from or summaries of the pertinent provisions of [Subchapter III, Chapter 5, Title 32 of the D.C. Code] and information that pertains to the filing of a complaint under" the same.  D.C. Code § 32-531.09(a).

75.     Lyft did not provide Plaintiff with any paid sick leave during her employment.

76.     As a result, on multiple occasions, Plaintiff drove for Lyft while sick because she relied on hourly and tipped work for her wages and to pay bills.

77.     Plaintiff would have used paid sick leave if Lyft had provided it to her.

## CLASS-WIDE FACTUAL ALLEGATIONS

78.     Plaintiff hereby incorporates by reference all preceding paragraphs as alleged above as if fully set forth herein.

79.     Plaintiff brings her Cause of Action pursuant to Rule 23(b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of all drivers who work or worked for Lyft in

16

the District of Columbia for at least 90 days between when Lyft began operating in the District of Columbia and the date of final judgment in this matter (the "Class" or "Class Members").

80.     Plaintiff is a member of the Class she seeks to represent.

81.     Not included in the Class are the following individuals and/or entities: Lyft's officers and directors and all judges assigned to hear any aspect of this litigation, as well as their staffs and immediate family members.

82.     The Class is so numerous that joinder of all members is impracticable.  The precise number is uniquely within Lyft's possession.  Upon information and belief, the Class consists of at least 100 individuals.[15]

83.     There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members.  Common questions include, among others:

     a.     Whether Class Members are employees or independent contractors;

     b.     Whether Class Members are entitled to paid sick leave under the ASSLA;

     c.     Whether Lyft's classification of drivers as independent contractors was willful;

     d.     The proper measure of damages sustained by Class Members; and

     e.     Whether injunctive and declaratory relief is warranted regarding Lyft's policies and practices.

---

[15]     According to U.S. Census data, the D.C. metropolitan area added nearly 10,000 new rideshare drivers across platforms each year between 2014 and 2017, converting the rideshare sector into a more than $1 billion industry in this region.  *See* Jordan Fischer, *10,000 New Rideshare Drivers a Year: New Census Data Shows How Industry Has Exploded in DC Area*, WUSA (June 28, 2019), https://www.wusa9.com/article/news/local/dc/10000-new-rideshare-drivers-a-year-new-census-data-shows-how-industry-has-exploded-in-dc-area/65-009e37e9-b33b-456f-bab2-3a97aa25aef7 (citing U.S. Census data).

84.     Plaintiff, like other Class Members, was subjected to Lyft's policies and practices that violated D.C. law.  Plaintiff's job duties and claims were and are typical of those of the Class Members.

85.     Plaintiff will fairly and adequately represent and protect the interests of the Class Members. There is no conflict between Plaintiff and the Class Members.  Plaintiff's counsel is experienced in employment class actions and will fairly and adequately represent and protect the interests of the Class Members.

86.     Class treatment would benefit the courts and Class Members.

87.     Class certification is appropriate under Rule 23(b)(3) and/or (c)(4) because common questions of fact and law predominate over any questions affecting only individual Class Members.  Penalties for violation of the ASSLA are provided by statute and can be mechanically calculated, and are relatively small compared to the significant expense and burden of individual prosecution of this litigation.  In addition, a class action is superior to other available methods for the fair and efficient adjudication of this litigation and will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Lyft's practices.

88.     Class certification is also appropriate under Rule 23(b)(2) and/or (c)(4) because Defendant has acted and/or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the Class as a whole.  Class Members are entitled to declaratory and injunctive relief to end Defendant's common, uniform, unfair, and illegal policies and practices.

**CAUSE OF ACTION**
**D.C. Accrued Safe and Sick Leave Act – Failure to Provide Sick Leave**
**(Brought on Behalf of Plaintiff and the Class)**

89.     Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

90.     At all relevant times, Plaintiff and Class Members have been employees and Lyft has been an employer within the meaning of the ASSLA.  D.C. Code § 32-531.01(2), (3)(A).

91.     Plaintiff and Class Members are covered by the ASSLA.

92.     Lyft employed Plaintiff and Class Members.

93.     Lyft violated the ASSLA, in relevant part, by failing to provide Plaintiff and Class Members "not less than one hour of paid leave for every 37 hours worked, not to exceed 7 days per calendar year."  D.C. Code § 32-531.02.

94.     Lyft's violations of the ASSLA are ongoing.

95.     Because Lyft did not and does not "post and maintain in a conspicuous place, a notice that sets forth excerpts from or summaries of the pertinent provisions of [Subchapter III, Chapter 5, Title 32 of the D.C. Code] and information that pertains to the filing of a complaint under" the same, D.C. Code § 32-531.09(a), the statute of limitations for claims against Lyft has been tolled since the enactment of ASSLA, *see id.* § 32-531.10a.

96.     Lyft's violations of the ASSLA have been willful and intentional.

97.     For example, while Lyft has recognized the propriety of providing some form of sick leave for D.C. drivers,[16] it is a sham process and Lyft has otherwise refused to comply with the ASSLA – the D.C. Council mandated means of providing paid sick leave.

---

[16]     Kerr, *supra* note 3.

98.     Due to Lyft's violations of the ASSLA, Plaintiff and Class Members are entitled to recover from Lyft damages including but not limited to lost wages, statutory penalties, compensatory damages, punitive damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.  D.C. Code § 32-531.12(b), (c), (e), (g).

99.     In addition to damages, Plaintiff and Class Members are entitled to injunctive and declaratory relief to correct Lyft's illegal policies and practices.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A.     Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative for the Rule 23 Class and counsel of record as Class Counsel;

C.     Declaratory relief, including a declaration that the practices complained of in this Class Action Complaint are unlawful;

D.     Equitable and injunctive relief, including but not limited to a preliminary and permanent order enjoining Defendant from continuing its unlawful practices;

E.     An order that Defendant institute and carry out policies, practices, and programs that eradicate the effects of past and present unlawful employment practices including regarding sick leave;

F.     Monetary relief, including but not limited to compensation for the value of any paid sick leave denied by Defendant, statutory damages, compensatory damages, and punitive damages;

G.     Pre- and post-judgment interest;

H.     Attorneys' fees and costs to the extent allowable by law;

I.      Payment of a reasonable service award to Plaintiff, in recognition of the services

she has rendered and will continue to render to Class Members, and the risks she has taken and

will take; and

J.      Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 29, 2020                              Respectfully submitted,

_____
Sally J. Abrahamson (Bar No. 999058)
Mikael A. Rojas (Bar No. 1034085)*
Pooja Shethji (Bar No. 1632574)*
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, DC 20001
Tel.: (202) 847-4400
Fax: (646) 509-2097
Email: sabrahamson@outtengolden.com
Email: mrojas@outtengolden.com
Email: pshethji@outtengolden.com

Christopher M. McNerney**
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email:  cmcnerney@outtengolden.com

*Applications for admission pending
** *Pro hac vice* application forthcoming
*Attorneys for Plaintiff and the Proposed Class*