**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CASSANDRA OSVATICS, on behalf of herself and all others similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br>LYFT, INC.,<br><br>                Defendant. | Case 1:20-cv-01426-KBJ |

**LYFT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL INDIVIDUAL ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

ARGUMENT ......................................................................................................... 6

I.      THE FAA REQUIRES ENFORCEMENT OF PLAINTIFF'S AGREEMENT TO
        ARBITRATE HER CLAIM. .......................................................................... 6

        A.      The FAA Requires That Arbitration Agreements Be Strictly Enforced. ............... 6

        B.      The FAA Applies to Lyft's Terms of Service Because They Are Written
                and Involve Commerce. ........................................................................ 7

        C.      There Is a Valid Agreement to Arbitrate Because Plaintiff Assented to the
                Terms of Service. ............................................................................... 8

        D.      The Parties' Arbitration Agreement Covers the Current Dispute. ...................... 10

        E.      The Agreement Requires Individual Arbitration. ....................................... 11

        F.      The FAA's "Transportation Worker" Exemption Does Not Apply Here. ............. 12

                1.      Plaintiff Is Not Part of a "Class" of Workers Engaged in Interstate
                        Commerce. .................................................................................. 14

                        a.      The relevant class of workers is rideshare drivers. ..................... 14

                        b.      Rideshare drivers are not a class of workers engaged in
                                interstate commerce. ......................................................... 16

                        c.      Driving passengers to and from airports or train stations is
                                irrelevant. ...................................................................... 21

                        d.      The sole district court precedent to the contrary is incorrect
                                for numerous reasons. ....................................................... 22

                2.      Section 1 of the FAA Does Not Exempt Contracts With Workers
                        Engaged in the Transport of Passengers Rather Than Goods. ................... 26

II.     THE COURT SHOULD STAY THIS ACTION PENDING ARBITRATION. ............... 28

III.    THE D.C. UNIFORM ARBITRATION ACT ALSO REQUIRES
        ARBITRATION AND A STAY. ...................................................................... 29

CONCLUSION ..................................................................................................... 31

CERTIFICATE OF SERVICE ................................................................................. 32

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. Labor Ready, Inc.*,
   303 F.3d 496 (4th Cir. 2002) ..................................................................................19

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
   513 U.S. 265 (1995) ....................................................................................... *passim*

*Am. Exp. Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) ..................................................................................................6

*Andresen v. IntePros Fed., Inc.*,
   240 F. Supp. 3d 143 (D.D.C. 2017) ........................................................................11

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ............................................................................................6, 28

*Baker v. United Transp. Union, AFL-CIO*,
   455 F.2d 149 (3d Cir. 1971) ....................................................................................19

*Baltimore & O.S.W.R. Co. v. Settle*,
   260 U.S. 166 (1922) ................................................................................................25

*Bekele v. Lyft, Inc.*,
   918 F.3d 181 (1st Cir. 2019) ............................................................................1, 9, 10

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) .........................................................................9

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
   394 U.S. 369 (1969) ...........................................................................................19, 20

*Bhd. of Ry. & S. S. Clerks, Freight Handlers, Express & Station Emp., AFL-CIO*
   *v. Fla. E. Coast Ry. Co.*,
   384 U.S. 238 (1966) ................................................................................................20

*Brunner v. Lyft, Inc.*,
   No. 19-CV-04808, 2019 WL 6001945 (N.D. Cal. Nov. 14, 2019) ......................1, 9

*Camilo v. Lyft, Inc.*,
   384 F. Supp. 3d 435 (S.D.N.Y. 2019) ....................................................................1, 9

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Capriole v. Uber Techs., Inc.*,
No. 20-CV-02211, 2020 WL 2563276 (N.D. Cal. May 14, 2020) ................................. *passim*

\* *Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ...................................................................................... *passim*

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ...................................................................................................7

*Cole v. Burns Int'l Sec. Servs.*,
105 F.3d 1465 (D.C. Cir. 1997) ...................................................................2, 17, 26

*Comedy Club, Inc. v. Improv West Assocs.*,
553 F.3d 1277 (9th Cir. 2009) .................................................................................10

*Cunningham v. Lyft, Inc.*,
No. 19-CV-11974, 2020 WL 1503220 (D. Mass. Mar. 27, 2020), *appeal
pending* (1st Cir. No. 20-1373) .............................................................................22

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ..................................................................................................6

*Eastus v. ISS Facility Servs., Inc.*,
No. 19-20258, 2020 WL 2745545 (5th Cir. May 27, 2020) ...................................17

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) .....................................................................................*passim*

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ..................................................................................................8

*Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*,
374 F.3d 1 (1st Cir. 2004) .......................................................................................16

*Forrest v. Verizon Commc'ns, Inc.*,
805 A.2d 1007 (D.C. 2002) .............................................................................29, 30

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) ....................................................................................................6

*In re Grand Jury Investigation*,
916 F.3d 1047 (D.C. Cir. 2019) ..............................................................................27

iii

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Green Tree Fin. Corp.-Alabama v. Randolph*,
    531 U.S. 79 (2000)............................................................................................13

*Grice v. Uber Techs., Inc.*,
    No. 18-CV-2995, 2020 WL 497487 (C.D. Cal. Jan. 7, 2020) ................................2, 13, 20, 21

*Heller v. Rasier, LLC*,
    No. 17-CV-8545, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020) ......................................2, 20, 27

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019).......................................................................................11

*Hill v. Rent-A-Ctr., Inc.*,
    398 F.3d 1286 (11th Cir. 2005) ......................................................................14, 18

*Jin v. Parsons Corp.*,
    366 F. Supp. 3d 104 (D.D.C. 2019)........................................................................8

*Kowalewski v. Samandarov*,
    590 F. Supp. 2d 477 (S.D.N.Y. 2008)................................................................26, 27, 28

*Lake Shore & M. S. R. Co. v. State of Ohio*,
    173 U.S. 285 (1899).........................................................................................28

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019).....................................................................................10

*LaPrade v. Kidder Peabody & Co.*,
    146 F.3d 899 (D.C. Cir. 1998)............................................................................28

*Lee v. Postmates Inc.*,
    No. 18-CV-03421, 2018 WL 6605659 (N.D. Cal. Dec. 17, 2018)........................................13

*Levin v. Caviar, Inc.*,
    146 F. Supp. 3d 1146 (N.D. Cal. 2015) ...................................................................13

*Lewellyn v. Pittsburgh, B. & L. E. R. Co.*,
    222 F. 177 (3d Cir. 1915)...................................................................................16

*Loewen v. Lyft, Inc.*,
    129 F. Supp. 3d 945 (N.D. Cal. 2015) ...............................................................2, 10, 11

*Louisville & N.R. Co. v. E. Tennessee, V. & G. Ry. Co.*,
    60 F. 993 (6th Cir. 1894) ..................................................................................28

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Magana v. DoorDash, Inc.*,
    343 F. Supp. 3d 891 (N.D. Cal. 2018) ...................................................................13

*Marmet Health Care Ctr., Inc. v. Brown*,
    565 U.S. 530 (2012).......................................................................................................6

*Masurovsky v. Green*,
    687 A.2d 198 (D.C. 1996) ......................................................................................30, 31

*Mendoza v. Uber Techs. Inc.*,
    No. 19-CV-9741, 2020 WL 2563273 (C.D. Cal. Mar. 25, 2020), *report and
    recommendation adopted*, 2020 WL 2563047 (C.D. Cal. May 4, 2020) .........................13, 21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)........................................................................................................6

*New Prime, Inc. v. Oliveira*,
    139 S. Ct. 532 (2019)....................................................................................................20

*Norton v. Lyft, Inc.*,
    No. 19-CV-02025, 2019 WL 4744691 (N.D. Cal. Sept. 13, 2019) ...............................1, 9, 11

*Parker v. K & L Gates, LLP*,
    76 A.3d 859 (D.C. 2013) ...............................................................................................29

*Pearce v. E.F. Hutton Grp., Inc.*,
    828 F.2d 826 (D.C. Cir. 1987).......................................................................................28, 29

*Pennsylvania Pub. Util. Comm'n v. United States*,
    812 F.2d 8 (D.C. Cir. 1987) ..........................................................................................24

*Peterson v. Lyft, Inc.*,
    No. 16-CV-07343, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) ...............................2, 9, 11

*Randle v. Metro. Transit Auth. of Harris Cty.*,
    No. 18-CV-1770, 2018 WL 4701567 (S.D. Tex. Oct. 1, 2018) .....................................27

*Rent-A-Center, W., Inc. v. Jackson*,
    561 U.S. 63 (2010)........................................................................................................1, 11

* *Rogers v. Lyft, Inc.*,
    No. 20-CV-01938, 2020 WL 1684151 (N.D. Cal. Apr. 7, 2020) ..................................*passim*

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Ruiz v. Millennium Square Residential Ass'n*,
    156 F. Supp. 3d 176 (D.D.C. 2016) ..............................................................................8

*Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*,
    390 F.3d 684 (10th Cir. 2004) ....................................................................................16

*Sandler v. iStockphoto LP*,
    No. 15-CV-3659, 2016 WL 871626 (C.D. Cal. Feb. 5, 2016) ....................................9

*Selden v. Airbnb, Inc.*,
    No. 16-CV-00933, 2016 WL 6476934 (D.D.C. Nov. 1, 2016) ...............................8, 9

*Singh v. Uber Techs. Inc.*,
    939 F.3d 210 (3d Cir. 2019)..........................................................................17, 27, 28

*Skrynnikov v. Fed. Nat'l Mortg. Ass'n*,
    943 F. Supp. 2d 172 (D.D.C. 2013) ..........................................................................11

*U.S. v. American Bldg. Maint. Indus.*,
    422 U.S. 271 (1975)....................................................................................................23

*United States v. Standard Brewery*,
    251 U.S. 210 (1920)....................................................................................................14

*United States v. Yellow Cab Co.*,
    332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v.*
    *Indep. Tube Corp.*, 467 U.S. 752 (1984) ..............................................23, 24, 25, 26

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960)....................................................................................................11

*Vargas v. Delivery Outsourcing, LLC*,
    No. 15-CV-03408, 2016 WL 946112 (N.D. Cal. Mar. 14, 2016)...............................19

*Ventura v. Bebo Foods, Inc.*,
    738 F. Supp. 2d 1 (D.D.C. 2010) ..............................................................................23

*Wallace v. Grubhub Holdings Inc.*,
    No. 18 C 4538, 2019 WL 1399986 (N.D. Ill. Mar. 28, 2019) ..................................13

*Walling v. Jacksonville Paper Co.*,
    317 U.S. 564 (1943)..............................................................................................22, 23

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*White v. Four Seasons Hotels & Resorts*,
    999 F. Supp. 2d 250 (D.D.C. 2013) ..................................................................................29, 31

*Wickberg v. Lyft, Inc.*,
    356 F. Supp. 3d 179 (D. Mass. 2018) .....................................................................................2, 9

*Woodland Ltd. P'ship v. Wulff*,
    868 A.2d 860 (D.C. 2005) ..........................................................................................................30

**Statutes**

9 U.S.C. § 1 ............................................................................................................................ *passim*

9 U.S.C. § 2 .....................................................................................................................7, 8, 30

9 U.S.C. § 3 .......................................................................................................................28, 29

52 Stat. 1060,
    Fair Labor Standards Act of 1938 .........................................................................................22, 23

D.C. Code § 16-4404 ....................................................................................................................30

D.C. Code § 16-4406(a) ..........................................................................................................29, 30

D.C. Code § 16-4406(b) ................................................................................................................30

D.C. Code § 16-4407(f) ................................................................................................................31

D.C. Code §§ 32-531.01, *et seq.*,
    D.C. Accrued Safe and Sick Leave Act, ....................................................................................1

**Other Authorities**

*Engaged*, Webster's Collegiate Dictionary (3d ed. 1919) ...........................................................16

Sharon Feigon & Colin Murphy, *Broadening Understanding of the Interplay
    Among Public Transit, Shared Mobility, and Personal Automobiles*, National
    Academies Press (TCRP Research Report, No. 195, 2018) ....................................................15

Texas A&M Transp. Inst., *Transportation Network Company (TNC) Legislation*,
    *available at* https://policy.tti,tamu.edu/technology/tnc-legislation/ ........................................15

## <u>INTRODUCTION</u>

Plaintiff Cassandra Osvatics agreed to resolve any disputes with Lyft in arbitration on an individual basis.  Plaintiff agreed to arbitration when she signed up for Lyft's service in 2015, and she reaffirmed that agreement three more times over the past five years.  Starting in 2015, Plaintiff used Lyft's platform for approximately two and a half years to connect with and provide rides to passengers.  Plaintiff alleges that she and other drivers who use the Lyft platform to find work in Washington, D.C., are employees of Lyft entitled to sick leave under the D.C. Accrued Safe and Sick Leave Act ("ASSLA"), D.C. Code §§ 32-531.01, *et seq*.

Plaintiff's lawsuit belongs in arbitration, as other courts have repeatedly held with respect to claims against Lyft by drivers who use its platform—including claims for sick leave.  The Federal Arbitration Act ("FAA") "requires courts rigorously to enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (citation and internal quotation marks omitted).  Because Plaintiff and Lyft entered into a contract with an arbitration clause, this case must be stayed and plaintiff's claims compelled to individual arbitration.  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010).

Numerous courts across the country applying these principles have repeatedly enforced Lyft's arbitration provision, sending drivers' claims against Lyft to individual arbitration.  *See, e.g.*, *Rogers v. Lyft, Inc.*, No. 20-CV-01938, 2020 WL 1684151, at *8 (N.D. Cal. Apr. 7, 2020); *Bekele v. Lyft, Inc.*, 918 F.3d 181 (1st Cir. 2019); *Brunner v. Lyft, Inc.*, No. 19-CV-04808, 2019 WL 6001945, at *1 (N.D. Cal. Nov. 14, 2019); *Norton v. Lyft, Inc.*, No. 19-CV-02025, 2019 WL 4744691, at *1 (N.D. Cal. Sept. 13, 2019); *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 439

(S.D.N.Y. 2019); *Peterson v. Lyft, Inc.*, No. 16-CV-07343, 2018 WL 6047085, at *6 (N.D. Cal. Nov. 19, 2018); *Wickberg v. Lyft, Inc.*, 356 F. Supp. 3d 179, 182-84 (D. Mass. 2018); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 966-67 (N.D. Cal. 2015).

Plaintiff's complaint suggests that she will try to rely on the FAA exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. That exemption is inapplicable here. *First*, the "class of workers" to which Plaintiff belongs, rideshare drivers, are not engaged in interstate commerce. More than **98%** of the rides provided by rideshare drivers using Lyft do not cross state lines. Instead, "[t]heir work predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself." *Rogers*, 2020 WL 1684151, at *6; *accord Capriole v. Uber Techs., Inc.*, No. 20-CV-02211, 2020 WL 2563276, at *9 (N.D. Cal. May 14, 2020). *Second*, rideshare drivers transport *passengers*, but "section 1 excludes from the coverage of the FAA only the employment contracts of workers actually engaged in the movement of *goods* in interstate commerce." *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1467 (D.C. Cir. 1997) (emphasis added); *see, e.g.*, *Heller v. Rasier, LLC*, No. 17-CV-8545, 2020 WL 413243, at *8 (C.D. Cal. Jan. 7, 2020); *Grice v. Uber Techs., Inc.*, No. 18-CV-2995, 2020 WL 497487, at *8-9 (C.D. Cal. Jan. 7, 2020).

Finally, even if Section 1 of the FAA exempts Plaintiff's arbitration agreement with Lyft, the Court must order arbitration pursuant to D.C. law, which does not contain an exception for agreements with workers engaged in interstate transportation.

The Court should grant Lyft's motion to compel Plaintiff's lawsuit to individual arbitration and stay this action pending any arbitration.

## FACTUAL BACKGROUND

Lyft operates a mobile-based ridesharing platform that enables people who seek rides to certain destinations to be matched with people willing to drive them to those destinations. Declaration of Neil Shah ("Shah Decl.") ¶ 3.  Plaintiff alleges that she provided rides using the Lyft platform from approximately November 2015 to June 2018.  *See* Compl. ¶ 9.

The use of the Lyft App by drivers is governed by the Terms of Service ("Terms"), which is a contract between Lyft and the driver.  Shah Decl. ¶ 8 & Ex. A.  Drivers consent to the Terms electronically through Lyft's smartphone app.  *See id.* ¶¶ 7-9.  Lyft periodically updates the Terms.  *Id.* ¶ 6.  Those updates are communicated to all drivers.  According to Lyft's business records, Plaintiff accepted Lyft's Terms as a driver on four separate occasions:  first on October 4, 2015; again on October 30, 2016 and May 4, 2018; and, most recently, on May 4, 2020.  Shah Decl. ¶ 13.

The most recent, and thus currently binding, version of the Terms of Service is dated November 27, 2019, which Plaintiff consented to on May 4, 2020.  Shah Decl. ¶ 13.  Those Terms (like the previous versions) "set[] forth the entire understanding and agreement between [the driver] and Lyft . . . and supersede all previous understandings and agreements between the parties, whether oral or written."  *Id.*, Ex. A, § 21.  Before consenting to the Terms, Plaintiff saw the updated terms appear on her screen, allowing her to scroll through the entire text of the terms when she opened the Lyft App.  *Id.* ¶¶ 8-9.

Any driver who consented to the Terms dated November 27, 2019 was notified in all capital letters that the Terms contain provisions that govern how claims can be brought and that require drivers to submit claims to arbitration.  Shah Decl. ¶ 7 & Ex. A.  The screen presented to drivers also contained a hyperlink in a different color than the surrounding text that took drivers

3

to the specific section in the Terms containing the arbitration provisions. *Id.* ¶ 7. The following screenshot depicts what Plaintiff would have seen on her screen when prompted to consent to the November 27, 2019 Terms:



*Id.* ¶ 7. As noted above, Lyft's records show that, on May 4, 2020, Plaintiff clicked "I accept" and agreed to be bound by the November 27, 2019 Terms. *Id.* ¶¶ 10-13. Plaintiff's most recent consent came almost two years after she had stopped driving using the Lyft App but just less than a month before she filed her Complaint in this case.

The arbitration provision in the Terms gives drivers the ability to opt out of arbitration within 30 days of first consenting to the Terms. Shah Decl. Ex. A, § 17(j). Plaintiff did not opt out of the arbitration provision. *Id.* ¶ 13.

The arbitration agreement includes several features that help ensure that users of the Lyft platform (riders and drivers) have a simple and efficient means of resolving any disputes:

- **Potential $1,000 minimum award:**  If the user participates in Lyft's optional pre-arbitration negotiation process and the arbitrator issues an award in favor of a user that is greater than "Lyft's last settlement offer," then Lyft will pay the user at least $1,000, even if the arbitral award is smaller.

- **Small claims court option:**  Either party may bring a claim in small claims court as an alternative to arbitration.

- **Flexible consumer procedures:**  Arbitration will be conducted under the AAA's Consumer Arbitration Rules, although drivers may ask the arbitrator to use a different set of AAA rules.

- **Conveniently located hearing:**  Arbitration will take place "in the county in which the Driver provides Rideshare Services."

- **Full individual remedies available:**  The arbitrator can award, if appropriate, "any individualized remedies that would be available in court," including statutory remedies and punitive damages, attorneys' fees, and injunctions that would affect the claimant alone.

Shah Decl. Ex. A, § 17(d)-(f).

Lyft's Terms require individual arbitration of "ALL DISPUTES AND CLAIMS BETWEEN US," including "any dispute, claim or controversy, whether based on past, present, or future events, arising out of or relating to: this Agreement and prior versions thereof . . . , the Lyft Platform, the Rideshare Services . . . [,] your relationship with Lyft, . . . any payments made or allegedly owed to you . . . [,] any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, [or] expense reimbursement."  Shah Decl. Ex. A, § 17(a).  The Terms also provide that claims may be brought "ONLY IN AN INDIVIDUAL CAPACITY" and that the "arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claims."  *Id.* § 17(b).  The Terms further provide that "[a]ll disputes concerning the arbitrability of a Claim (including disputes about the scope,

5

applicability, enforceability, revocability, or validity of the Arbitration Agreement) shall be decided by the arbitrator." *Id*. § 17(a).[1]

## ARGUMENT

I.   **THE FAA REQUIRES ENFORCEMENT OF PLAINTIFF'S AGREEMENT TO ARBITRATE HER CLAIM.**

### A.   The FAA Requires That Arbitration Agreements Be Strictly Enforced.

Congress enacted the FAA to reverse the "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The Act "reflects an emphatic federal policy in favor of arbitral dispute resolution." *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012); *see also Concepcion*, 563 U.S. at 339 (confirming the "liberal federal policy favoring arbitration"). For that reason, the FAA "requires courts 'rigorously' to 'enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted.'" *Epic Sys.*, 138 S. Ct. at 1621 (quoting *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 133 S. Ct. 2304 (2013)). "[T]he Act leaves no place for the exercise of discretion . . . but instead mandates that . . . courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

The FAA applies equally to statutory claims. The FAA "provides no basis for disfavoring agreements to arbitrate statutory claims," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 627 (1985), even if those statutes were designed to "further important social policies," *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 27 (1991).

---

[1] Under the Terms, drivers are entitled to reasonable discovery. Shah Decl., Ex. A, § 17(d). In addition, the arbitrator may award drivers reasonable fees and costs under applicable law, while Lyft relinquishes any right to such fees and costs. *Id.* § 17(e)(5)-(6).

The FAA thus requires arbitration of claims under "statutes ranging from the Sherman and Clayton Acts to the Age Discrimination in Employment Act, the Credit Repair Organizations Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations Act."  *Epic Sys.*, 138 S. Ct. at 1627.

> **B.      The FAA Applies to Lyft's Terms of Service Because They Are Written and Involve Commerce.**

The FAA applies to any "written provision in" a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction."  9 U.S.C. § 2.  The arbitration provision of Lyft's Terms of Service fits that description.  Section 17 of the Terms of Service states that it is an "agreement to arbitrate" that "is governed by the Federal Arbitration Act."  Shah Decl., Ex. A, § 17(a).  As such, Section 17 is a "written provision . . . to settle by arbitration."  9 U.S.C. § 2.

Section 17, moreover, is contained in a "contract evidencing a transaction involving commerce."  *Id.*  The transaction evidenced in the Lyft Terms of Service is the "use of the Lyft application, website, and technology platform."  Shah Decl. Ex. A, at p. 1.  That transaction involves "commerce," which the FAA defines as commerce (1) "among the several States," *i.e.*, interstate commerce; (2) "in the District of Columbia"; or (3) "between the District of Columbia and any State."  9 U.S.C. § 1.  The phrase "involving commerce" reflects "congressional intent to regulate to the full extent of [Congress's] commerce power."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114 (2001); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam).  Thus, to be an activity involving commerce as defined by the statute, the activity need only affect commerce in the District of Columbia or between the states.  *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74 (1995).  Plaintiff plainly alleges that the Lyft App is available for use in the District of Columbia and that she and others used the Lyft

7

App in the District.  *E.g.*, Compl. ¶¶ 32-34, 49-52, 56-71.  That is sufficient to establish that a contract for the use of the Lyft App is a transaction involving commerce for purposes of the FAA.  *See Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 180 (D.D.C. 2016) (even "the fact that the contract involves a transaction occurring entirely within D.C. does not remove it from the FAA's reach").[2]

### C.    There Is a Valid Agreement to Arbitrate Because Plaintiff Assented to the Terms of Service.

The Terms of Service are a valid contract between Plaintiff and Lyft.  "In determining whether an arbitration agreement is a valid contract, a court must apply ordinary state law principles that govern the formation of contracts."  *Jin v. Parsons Corp.*, 366 F. Supp. 3d 104, 106-07 (D.D.C. 2019) (citation and internal quotation marks omitted); *accord First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

A valid agreement to arbitrate was created between the parties here by Plaintiff's electronic assent to Lyft's Terms of Service.  It is well established that contracts can be formed through electronic assent.  The "touchstone" of contract formation over the Internet or through mobile apps remains "[m]utual manifestation of assent."  *Selden v. Airbnb, Inc.*, No. 16-CV-00933, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014)).  As one court in this District has recognized:

> Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider.  Notifications to that effect—be they check boxes or hyperlinks—abound.  To be sure, few people may take time to actually read the user

---

[2] The fact that Lyft's platform is available across multiple cities and states over the Internet also establishes that it involves commerce for purposes of Section 2.  Shah Decl. ¶ 3; *see Allied-Bruce Terminix*, 513 U.S. at 282 (FAA applied to arbitration agreement given "multistate nature" of activities involved in contract).  As explained below, that use of the Lyft App may *affect* interstate commerce does not mean that rideshare drivers are *engaged* in interstate commerce for purposes of the Section 1 "transportation worker" exception.  *Circuit City*, 532 U.S. at 118-19 (the "plain meaning" of the phrase "engaged in . . . interstate commerce" is "narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce'").

> agreements.  But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services.

*Id.* at *5.  Thus, the court in *Selden* enforced an arbitration agreement in Airbnb's Terms of Service even where the sign-up page merely stated that "[b]y signing up, I agree to Airbnb's Terms of Service" and provided a link to those terms.  *Id.*

Here, Plaintiff's assent to Lyft's Terms—and the arbitration and delegation provisions the Terms include—is even clearer than in *Selden*.  Plaintiff agreed to the Terms multiple times over many years, each time being presented with their text.  When Plaintiff agreed to the currently operative Terms, she was presented with the Terms and able to scroll through them before clicking a large purple button at the bottom that said "I Accept."  Shah Decl. ¶¶ 7-9, 13.  That method for obtaining assent is commonly known as a "scrollwrap":  "the user is presented with the entire agreement and must physically scroll to the bottom of it to find the 'I agree' or 'I accept' button."  *Selden*, 2016 WL 6476934, at *4.

The scrollwrap method is considered the best practice for giving users "a realistic opportunity to read" terms of service.  *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 386 (E.D.N.Y. 2015).  Courts therefore regularly enforce "scrollwrap" agreements like Lyft's Terms of Service.  *See Sandler v. iStockphoto LP*, No. 15-CV-3659, 2016 WL 871626, at *2 (C.D. Cal. Feb. 5, 2016) (plaintiffs assented to terms of service because they had to affirmatively click "I agree" next to a scrollable copy of the contract terms in order to complete registration process for use of the website at issue); *Berkson*, 97 F. Supp. 3d at 386, 398-99 (collecting cases).

In fact, every court to consider the issue has found that drivers assented to the arbitration provision in Lyft's Terms of Service using this "scrollwrap" method.  *See, e.g.*, *Bekele*, 918 F.3d at 184-90; *Brunner*, 2019 WL 6001945, at *1; *Norton*, 2019 WL 4744691, at *1; *Camilo*, 384 F. Supp. 3d at 439; *Peterson*, 2018 WL 6047085, at *6; *Wickberg*, 356 F. Supp. 3d at 182-84;

*Loewen*, 129 F. Supp. 3d at 957 (plaintiffs had assented to arbitration with Lyft because "the terms of the TOS were displayed on the screen, [the] [p]laintiffs had the opportunity to scroll through the terms prior to assent, and the delegation provision is expressly contained in the 2014 [Lyft] TOS under a bolded, large font heading relating to arbitration").  Those courts rejected arguments that Lyft's Terms of Service, and the arbitration provision, were somehow unconscionable or otherwise unenforceable.  *See Bekele*, 199 F. Supp. 3d at 298-303 (finding that the 2014 version of the Lyft Terms was not unconscionable under Massachusetts law); *Loewen*, 129 F. Supp. 3d at 965 (finding "low degree of both procedural and substantive unconscionability present in the [Lyft] 2014 TOS" under California law).

Thus, the November 27, 2019 Terms of Service represent a binding contract between the parties, including an arbitration provision subject to enforcement under the FAA.

**D.    The Parties' Arbitration Agreement Covers the Current Dispute.**

Plaintiff's claim falls squarely within the scope of the arbitration provision.  As set forth above, the arbitration provision provides that "ALL DISPUTES AND CLAIMS BETWEEN US . . . SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION SOLELY BETWEEN YOU AND LYFT."  Shah Decl., Ex. A, § 17(a).  On its face, that phrasing covers any claims Plaintiff might bring, including the one at issue here.  Moreover, the arbitration provision expressly encompasses claims relating to "any payments made or allegedly owed," "any . . . state or federal wage-hour law," and "all other federal and state statutory and common law claims."  *Id.*  Those are exactly the kinds of claims that Plaintiff advances in this case.

Even if the arbitration agreement were ambiguous—and it is not—Plaintiff's claim still should be sent to arbitration.  Under the FAA, ambiguous arbitration agreements should be interpreted as granting arbitration.  *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019); *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1286 (9th Cir. 2009).  Here, at the

10

very least, one cannot say "with positive assurance" that Plaintiff's claims are not arbitrable, and thus all "[d]oubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).

Moreover, to the extent Plaintiff disputes that the arbitration provision covers her claim, that dispute is not for this Court to decide because the Terms include a "delegation clause," *i.e.*, a provision referring to the arbitrator the question of whether any particular dispute is covered by an arbitration clause. *Rent-A-Ctr.*, 561 U.S. at 68 (a "delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement"). Such clauses must be enforced under the FAA. *See, e.g., Andresen v. IntePros Fed., Inc*., 240 F. Supp. 3d 143, 149 (D.D.C. 2017) (enforcing delegation clause with respect to claims for violation of D.C. Human Rights Act and D.C. Wage Payment and Collection Law); *Skrynnikov v. Fed. Nat'l Mortg. Ass'n*, 943 F. Supp. 2d 172, 178 (D.D.C. 2013) (enforcing dispute resolution policy clause providing that "[t]he *arbitrator* will resolve all disputes over the . . . arbitrability of all matters presented under" the policy).[3] As numerous courts have held, Lyft's Terms of Service "clearly and unmistakably delegates threshold questions of arbitrability to the arbitrator as a general matter." *Rogers*, 2020 WL 1684151, at *7; *see also Norton*, 2019 WL 4744691, at *1; *Peterson*, 2018 WL 6047085, at *3; *Loewen*, 129 F. Supp. 3d at 954. "In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. 524, 529 (2019).

### E.     The Agreement Requires Individual Arbitration.

Plaintiff purports to bring a class action, but the FAA requires the Court to enforce

---

[3] The Terms state that "[a]ll disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement) shall be decided by the arbitrator, except" in circumstances that are not present in this case. Shah Decl., Ex. A, § 17(a).

Plaintiff's arbitration agreement according to its terms, which prohibit class or representative actions and non-individualized relief.  The FAA therefore requires the Court to order arbitration of Plaintiff's claims on an individualized basis.

Plaintiff agreed that "YOU AND LYFT MAY EACH BRING CLAIMS IN ARBITRATION AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT ON A CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE BASIS ('CLASS ACTION WAIVER').  YOU UNDERSTAND AND AGREE THAT YOU AND LYFT BOTH ARE WAIVING THE RIGHT TO PURSUE OR HAVE A DISPUTE RESOLVED AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING."  Shah Decl., Ex. A, § 17(b).  The Terms further provide that "[t]he arbitrator shall have no authority to consider or resolve any Claims or issue any relief on any basis other than an individual basis . . . .  The arbitrator may award declaratory or injunctive relief only in favor the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claims."  *Id.*

Those terms must be enforced, lest the Court fundamentally alter the nature of the Plaintiff and Lyft's agreement to arbitrate.  *See Epic Sys.*, 138 S. Ct. at 1623 ("[C]ourts may not allow a contract defense to reshape traditional individualized arbitration by mandating classwide arbitration procedures without the parties' consent.").  Accordingly, under the FAA, the parties' agreement providing for individual arbitration is enforceable, and the FAA preempts any state-law rule to the contrary.

### F.    The FAA's "Transportation Worker" Exemption Does Not Apply Here.

Plaintiff's complaint suggests that she will try to rely on the FAA's exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  She alleges, for example, that she personally

drove across state lines to pick up and drop off passengers; she also alleges that she picked up and dropped off, at airports, train stations, and bus terminals, passengers who may have been traveling interstate.  *See* Compl. ¶¶ 49-72.

The overwhelming majority of courts have rejected applying the FAA's "transportation worker" exemption to local drivers on these grounds.  Nearly all district courts have held that the transportation worker exemption does not apply to drivers who use rideshare platforms.  *See, e.g., Rogers*, 2020 WL 1684151, at *5; *Capriole*, 2020 WL 2563276, at *9; *Mendoza v. Uber Techs. Inc.*, No. 19-CV-9741, 2020 WL 2563273, at *4 (C.D. Cal. Mar. 25, 2020), *report and recommendation adopted*, 2020 WL 2563047 (C.D. Cal. May 4, 2020); *Grice*, 2020 WL 497487, at *6-9.  Similarly, numerous courts also have rejected the application of the transportation worker exemption to other drivers who use apps to find work as local delivery drivers.  *E.g.*, *Wallace v. Grubhub Holdings Inc.*, No. 18 C 4538, 2019 WL 1399986, at *3-5 (N.D. Ill. Mar. 28, 2019); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 900 (N.D. Cal. 2018); *Lee v. Postmates Inc.*, No. 18-CV-03421, 2018 WL 6605659, at *7 (N.D. Cal. Dec. 17, 2018); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1154 (N.D. Cal. 2015).

Against this significant weight of authority, Plaintiff has the burden to prove that the transportation worker exemption applies here, *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000), and she cannot meet that burden.  First, Section 1 applies only to *classes* of workers engaged in interstate commerce; the experience of individual drivers is irrelevant. Rideshare drivers as a class are no more engaged in interstate commerce than taxi drivers or other providers of local transportation.  Second, Section 1 applies only to classes of workers who transport *goods*—not those, like rideshare drivers, who transport passengers.

13

1.     **Plaintiff Is Not Part of a "Class" of Workers Engaged in Interstate Commerce.**

a.     **The relevant class of workers is rideshare drivers.**

By its plain terms, Section 1's residual clause exempts only contracts of "any other *class of workers engaged in . . . interstate commerce.*"  9 U.S.C. § 1 (emphasis added).  Section 1 thus does not ask whether any individual plaintiff is personally engaged in interstate commerce. Rather, it asks whether the "class" of transportation workers to which the plaintiff belongs is so engaged.  *Id.*; *see, e.g.*, *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1288-90 (11th Cir. 2005) (stating that "it is apparent Congress was concerned only with giving the arbitration exemption to 'classes' of transportation workers within the transportation industry").

The relevant class has to be defined at the same level of generality as "railroad employees" and "seamen."  After all, the residual clause covers "any *other* class" of workers, 9 U.S.C. § 1 (emphasis added), thus requiring a class analogous to the classes of "railroad employees" and "seamen" expressly identified in the provision.  *See United States v. Standard Brewery*, 251 U.S. 210, 218 (1920) (discussing meaning of "other" clause in a list).  And, as the Supreme Court has held, the scope of the Section 1 residual clause must "be controlled and defined by reference to the enumerated categories of workers":  "seamen" and "railroad employees."  *Circuit City*, 532 U.S. at 115.

Here, the class of transportation workers to which plaintiff belongs is rideshare drivers in the United States—that is, drivers who provide personal transportation to riders as a result of using a "matchmaking" software platform like the Lyft platform—or, at a minimum, drivers using the Lyft platform in the United States.[4]  As Plaintiff's own source shows, such drivers have

---

[4] The Section 1 analysis in this case would be the same regardless of whether the relevant class is defined as rideshare drivers or as drivers using the Lyft platform.

in common the mode of transportation they offer and the fact that such transportation is local and almost always covers only short distances.[5]  Rideshare drivers also have in common the specific way that they provide services using a software platform—a form of business that nearly all states and some localities separately regulate as "transportation network companies."[6]

It does not matter that Plaintiff's complaint focuses on rideshare drivers who use the Lyft platform in the D.C. area.  The relevant "other class of workers" for FAA purposes cannot be limited to drivers in the D.C. area.  The FAA refers to "railroad employees" and "seamen" as a class across the nation—not in specific geographic areas.  As the Supreme Court has explained, an "other class of workers" has to be defined at the same level of generality as the enumerated categories of seamen and railroad employees, *Circuit City*, 532 U.S. at 115, which are national classes.  Moreover, a geographic approach is entirely unworkable.  Allowing plaintiffs to geographically limit the relevant "class of workers" would result in different outcomes under the FAA for workers doing similar jobs in different cities, states, or regions.  Delivery workers in Northern Virginia might be treated differently from workers doing the same kind of work in Richmond; workers in Bethesda might be treated differently from similar workers in Baltimore. That kind of disparity would impermissibly make the enforceability of an arbitration agreement "turn . . . on what, from the perspective of the statute's basic purpose, seems happenstance." *Allied-Bruce*, 513 U.S. at 278.

A geographic approach would also create endless litigation and uncertainty over whether a class is properly defined as rideshare workers in "the DC metropolitan area," "Fairfax County,"

---

[5] *See, e.g.*, Sharon Feigon & Colin Murphy, *Broadening Understanding of the Interplay Among Public Transit, Shared Mobility, and Personal Automobiles* 3, National Academies Press (TCRP Research Report, No. 195, 2018).

[6] *See, e.g.*, Texas A&M Transp. Inst., *Transportation Network Company (TNC) Legislation*, *available at* https://policy.tti.tamu.edu/technology/tnc-legislation/ (noting that "48 states and the District of Columbia have passed some sort of TNC legislation").

"Virginia," the "mid-Atlantic States," or innumerable other possible geographic configurations. There is no principled way for a court to decide which geographic unit is appropriate in each case. It would introduce into the FAA analysis exactly the kind of "complexity and uncertainty" regarding "the enforceability of arbitration agreements in employment contracts" that the Supreme Court has said would "undermin[e] the FAA's proarbitration purposes and breed[] litigation from a statute that seeks to avoid it." *Circuit City*, 532 U.S. at 123 (citation omitted). And it would be inconsistent with the FAA's core purpose of establishing a *national* rule that arbitration agreements should be enforced according to their terms. "Congress did not plainly intend arbitration to mean different things in different states." *Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc*., 390 F.3d 684, 689 (10th Cir. 2004); *cf. Fit Tech, Inc. v. Bally Total Fitness Holding Corp.,* 374 F.3d 1, 6 (1st Cir. 2004) ("Assuredly Congress intended a 'national' definition for a national policy.").

> **b.    Rideshare drivers are not a class of workers engaged in interstate commerce.**

Rideshare drivers in the United States are not a class of workers "engaged in . . . interstate commerce" within the meaning of Section 1 because that class of drivers is engaged in providing local transportation, not transportation across state lines.

The Supreme Court has instructed that the "plain meaning" of the phrase "engaged in . . . interstate commerce" is "narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'" *Circuit City*, 532 U.S. at 118-19. At the time that Congress enacted the FAA (as now), to be "engaged" in an activity meant to be "occupied" or employed" in the activity, *i.e.*, to be doing the activity. *Engaged*, Webster's Collegiate Dictionary (3d ed. 1919); *see also Lewellyn v. Pittsburgh, B. & L. E. R. Co*., 222 F. 177, 185 (3d Cir. 1915) ("Engaged in business' means occupied in business; employed in business."). And because "Section 1

exempts from the FAA only contracts of employment of transportation workers," *Circuit City*, 532 U.S. at 119, the statute asks whether workers in the class are doing a particular kind of interstate commercial activity—*i.e.*, providing transportation.  After all, that is what "seamen" and "railroad employees" did and still do.  *See Circuit City*, 532 U.S. at 115 (residual clause must be interpreted by reference to "seamen" and "railroad employees").

Thus, to be engaged in interstate commerce for purposes of the transportation worker exemption, the class of workers cannot merely be doing work that has some interstate aspect or connection to someone in another state.  A class of workers is "engaged in . . . interstate commerce" for purposes of the transportation worker exemption only if the work that they do, as a class, is interstate transportation—actually moving things across state lines.  As the D.C. Circuit explained, the workers must be "actually engaged in the movement" of things between states.  *Cole*, 105 F.3d at 1467; *see also Singh v. Uber Techs. Inc*., 939 F.3d 210, 220 (3d Cir. 2019) (exemption applies only to workers "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it").  For example, the Fifth Circuit recently concluded that a worker "loading and unloading airplanes" could not take advantage of the Section 1 exemption because she was "not engaged in an aircraft's actual movement in interstate commerce."  *Eastus v. ISS Facility Servs., Inc*., No. 19-20258, 2020 WL 2745545, at *5 (5th Cir. May 27, 2020).

Under that standard, rideshare drivers are not a class of workers engaged in interstate commerce because they are not, as a class, providing transportation between states.  Over **98%** of all rides using the Lyft platform in the United States remain within the same state.  *See* Declaration of Ian Muir ¶ 5.  *Cf. Capriole,* 2020 WL 2563276, at *7 (citing "evidence that only 2.5% of 'all trips fulfilled using the Uber Rides marketplace in the United States between 2015

17

and 2019 . . . started and ended in different states").  Providing interstate transportation is not a characteristic common to rideshare drivers as a class.  *See Rogers*, 2020 WL 1684151, at *6 (work of drivers using the Lyft platform "predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself").

Plaintiff may argue that she seeks relief for drivers using the Lyft platform *in D.C.*, who "routinely" cross state lines.  Compl. ¶¶ 49-57, 70-72.  But "the fact that some [rideshare drivers] cross state lines in the course of their duties does not mean that the class of workers as a whole is engaged in interstate commerce."  *Rogers*, 2020 WL 1684151, at *5.  To be sure, "some drivers (especially those who live near state borders)" take riders across state lines on some occasions— but that kind of sporadic and incidental interstate activity on the part of a subset of class members is not enough for the "class" itself to be "engaged in . . . interstate commerce."  *Id.* at *6.  Nobody would say that rideshare drivers are a class of workers who are engaged in driving orange cars; some drivers certainly do, but that is not a characteristic that the class widely shares.  As the *Rogers* court explained, even if some pizza delivery drivers deliver pizzas across state lines, "no pizza delivery person belongs to a 'class of workers engaged in foreign or interstate commerce.'"  *Id.* at *5 (quoting 9 U.S.C. § 1).  Interstate rideshare rides "occur by happenstance of geography," and they therefore simply do not "alter the intrastate transportation function performed by the class of workers."  *Id.* at *6.

Were the rule otherwise, Section 1's exemption would "swallow the general policy requiring the enforcement of arbitration agreements."  *Hill*, 398 F.3d at 1290; *see generally Allied-Bruce*, 513 U.S. at 272.  Almost every class of transportation workers likely includes some workers who cross state lines.  At least some taxi drivers, city bus drivers, and pizza delivery drivers in some metropolitan areas cross state lines.  That does not mean that the entire

18

nationwide classes of taxi drivers, of city bus drivers, and of pizza delivery drivers are engaged in interstate commerce for purposes of the transportation worker exemption.  Otherwise, the narrow experience of a few workers in one geographic area would create a broad, industry-wide exemption.  That would "stretch[]" the exemption "past the breaking point," *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 505-06 (4th Cir. 2002) (deciding whether to apply the Section 1 exemption if a worker was "assigned to even a single transportation-related job during [worker's] entire tenure at the company"), making it capacious and sprawling where Congress intended it to be "narrow" and "precise," *Circuit City*, 532 U.S. at 118-19.

Applying the transportation worker exemption to an entire class on the ground that some members provide transport across state lines would also be inconsistent with the purposes of Section 1.  Congress enacted Section 1 to address labor disputes with classes of workers widely and directly "engaged" in interstate commerce because those disputes could have highly disruptive effects on interstate commerce.  "Section 1's exemption was intended to reach workers who would, by virtue of a strike, 'interrupt the free flow of goods to third parties in the same way that a seamen's strike or railroad employee's strike would.'"  *Vargas v. Delivery Outsourcing, LLC*, No. 15-CV-03408, 2016 WL 946112, at *3 (N.D. Cal. Mar. 14, 2016) (citation omitted).

Railroads "totally dominate[d]" the country's interstate transportation system at the time of the FAA's passage, forming a "vital link in our nation's commerce."  *Baker v. United Transp. Union, AFL-CIO*, 455 F.2d 149, 153-54 (3d Cir. 1971).  Labor disputes involving railroad employees thus "typically present[ed] problems of national magnitude," because they "paralyze[d] transportation in an entire section of the United States."  *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 381 (1969) (describing rail and air service); *Bhd. of Ry.*

*& S. S. Clerks, Freight Handlers, Express & Station Emp., AFL-CIO v. Fla. E. Coast Ry. Co.*,
384 U.S. 238, 245 (1966).  To address that problem, Congress had at the time of the FAA's
passage already enacted special legislation governing labor disputes in shipping and railroads
and envisioned developing others.  *See Circuit City*, 532 U.S. at 121; *see New Prime, Inc. v.
Oliveira*, 139 S. Ct. 532, 537 (2019).  Congress "did not wish to unsettle" those mechanisms for
resolving labor disputes among workers who could effectively shut down interstate commerce by
requiring them to submit their disputes to private arbitration.  *Circuit City*, 532 U.S. at 121.

There is no reason to think that Congress would have had any concern that workers like
rideshare drivers who typically provide local transportation would similarly freeze the channels
of interstate commerce, and therefore no reason to think that Congress would have exempted
workers like rideshare drivers from the FAA's strong policy in favor of resolving disputes in
private arbitration.  A strike among rideshare drivers would hardly "paralyze" interstate
transport.  *Bhd. of R.R. Trainmen*, 394 U.S. at 381.  Thus, Congress has never created special
dispute-resolution legislation applying specifically to rideshare drivers, and there is no indication
that it will ever do so.  *See, e.g., Heller*, 2020 WL 413243, at *8 ("Plaintiff is not in an
employment relationship which was already regulated by Congress before the advent of the
FAA, like railroad workers and seamen. . . . There was no such pre-existing or developing
regime for local car drivers."); *Grice*, 2020 WL 497487, at *8 (same).

In short, considered as a class, drivers who use the Lyft platform provide intrastate
transportation in all but **2% of rides** in the United States, and thus as a class are not engaged in
interstate commerce.  Plaintiff's allegations that she and some other drivers in one metropolitan
area sometimes crossed state lines when using the Lyft platform does not alter that conclusion.

c.  **Driving passengers to and from airports or train stations is irrelevant.**

It is irrelevant that Plaintiff and other drivers who use the Lyft platform might pick up and drop off passengers traveling interstate at airports, Union Station, and bus terminals.  Compl. ¶¶ 58-68.  Rideshare *drivers* are not "engaged in interstate commerce" merely because their *riders* might sometimes be engaged in interstate travel.  "[N]umerous courts have found that rides to and from the airport do not constitute interstate commerce."  *Mendoza*, 2020 WL 2563273, at *4; *see also Grice*, 2020 WL 497487, at *9 ("declin[ing] to read the exemption as applying to drivers that transport only persons within a metro area, even if sometimes to and from an airport"); *Capriole*, 2020 WL 2563276, at *7 (rejecting argument that "Uber drivers are engaged in interstate commerce because they play a central role in transporting people to and from airports").  Indeed, another district court has specifically rejected the argument that "the fact that Lyft drivers frequently pick up and drop off people at airports and train stations mean[s] that they are, as a class, 'engaged in' interstate commerce."  *Rogers*, 2020 WL 1684151, at *6.

These decisions are correct because the FAA looks to whether the "class of *workers* [is] engaged in . . . interstate commerce," 9 U.S.C. § 1 (emphasis added), not whether the workers are transporting *other* people engaged in interstate activity.  *Compare* 9 U.S.C. § 1, *with* Compl. ¶ 68 (alleging that when picking riders up at airports or train stations, drivers "transport people who themselves are engaged in interstate activity").  Even if a driver picking up a passenger at Dulles airport arriving from Los Angeles could be said to be affecting or involved in interstate commerce, "[t]he plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'"  *Circuit City*, 532 U.S. at 118; *see also Allied-Bruce*, 513 U.S. at 273-74 (explaining that Section 2's "'involving' is broad and is indeed the functional equivalent of 'affecting'").  As already explained above, to

be "engaged in" interstate commerce, a worker must be directly "occupied" in such commerce themselves.  *See supra* at p. 16.

> **d.    The sole district court precedent to the contrary is incorrect for numerous reasons.**

One district court has disagreed, concluding that Lyft drivers' provision of rides to airports makes them "part of the chain of interstate commerce."  *Cunningham v. Lyft, Inc.*, No. 19-CV-11974, 2020 WL 1503220, at *7 (D. Mass. Mar. 27, 2020), *appeal pending* (1st Cir. No. 20-1373).  No other court has reached the same conclusion, which is wrong for several reasons.

*First*, the *Cunningham* court did not even try to define the relevant "class of workers" or to look at their activity as a whole.  Instead, the *Cunningham* court concluded that plaintiffs were "part of the chain of interstate commerce" based on the fact that "Plaintiffs' passengers traveling to or from Logan International Airport" may have been traveling interstate.  *Cunningham*, 2020 WL 1503220, at *7.  The court's focus on an individual plaintiffs' activity is contrary to Section 1's text.

*Second*, the *Cunningham* court incorrectly relied on the fact that "some of Plaintiffs' *passengers* are in continuity of motion in interstate travel."  2020 WL 1503220, at *7 (emphasis added).  That was error because the transportation worker exemption turns on whether the "class of *workers* [is] engaged in . . . interstate commerce," 9 U.S.C. § 1 (emphasis added).

*Third*, by relying on a supposed "continuity of motion," the *Cunningham* court applied a test from case law that did not apply Section 1 of the FAA.  The *Cunningham* court relied on *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943), for the proposition that "goods remain in interstate commerce where there is a practical continuity of movement."  2020 WL 1503220, at *7.  But *Walling* was a case about whether workers were "employees who [were] engaged in commerce" under the Fair Labor Standards Act of 1938 ("FLSA").  52 Stat. 1060,

1062-63, §§ 6(a), 7(a).

Cases interpreting the FLSA should not be used to construe "engaged in interstate . . . commerce" for purposes of the FAA's transportation worker exemption because courts must apply that exemption "with reference to the statutory context in which it is found and in a manner consistent with [the statute's] purpose." *Circuit City*, 532 U.S. at 118. *Cf. U.S. v. American Bldg. Maint. Indus.*, 422 U.S. 271, 277 (1975) ("The phrase 'in commerce' does not . . . necessarily have a uniform meaning whenever used by Congress."). As an exemption to the FAA that "'seeks broadly to overcome judicial hostility to arbitration agreements," the transportation worker exemption must "be afforded a narrow construction" and a "precise reading." *Circuit City*, 532 U.S. at 118-19. By using the "continuity of movement" test, the *Cunningham* court improperly replaced Section 1's narrow standard for "engaged in . . . interstate commerce" with a broad one. *See Walling*, 317 U.S. at 567 (Congress enacted the FLSA to extend to the "farthest reaches of the channels of interstate commerce"); *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 (D.D.C. 2010) (FLSA is "broadly construed").

*Fourth*, even if a "continuity of movement" test were the right one to apply, Supreme Court decisions make clear that a worker is in a "continuity of movement" in interstate commerce only if the worker is part of an *integrated* interstate trip. Rideshare drivers are not part of any integrated trip when they pick up or drop off riders at an airport (or other hub). Rather, a rideshare driver's provision of local transportation (like a taxi driver's) is independent of any other travel—that is, it is not a "constituent part of the interstate movement." *United States v. Yellow Cab Co.*, 332 U.S. 218, 231-32 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

The Supreme Court's decision in *Yellow Cab*, a Sherman Act case, is highly instructive.[7]
*See Rogers*, 2020 WL 1684151, at *6 (*Yellow Cab* "helps show why Lyft drivers are not . . .
'engaged in' interstate commerce").  *Yellow Cab* considered whether transportation by taxicabs
to and from railroad stations in Chicago—a hub for interstate rail travel—constituted movement
in interstate commerce.  The Court held that taxi rides that passengers hailed on their own "to
transport themselves and their luggage" to or from railroad stations as part of their interstate
journey were not in interstate commerce.  *See* 332 U.S. at 230.  Such taxi transportation, the
Court explained, was "too unrelated to interstate commerce to constitute a part thereof."  *Id.*; *see
id.* at 233 ("[W]hen local taxicabs merely convey interstate train passengers between their homes
and the railroad station in the normal course of their independent local service, that service is not
an integral part of interstate transportation.").  The Court observed that "[t]he traveler has
complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train,
private automobile, his own two legs, or various other means of conveyance."  *Id.* at 231-32.
And any taxi ride "is contracted for" and paid for "independently of the railroad journey and may
be utilized whenever the traveler so desires."  *Id.* at 232.  Thus, "[f]rom the standpoints of time
and continuity, the taxicab trip may be quite distinct and separate from the interstate journey.  To
the taxicab driver, it is just another local fare."  *Id.*  Accordingly, the Court ruled, the cab's
"relationship to interstate transit is only casual and incidental."  *Id.* at 231.

Adopting the same distinction, the D.C. Circuit has explained that "a limousine service
which primarily (but not exclusively) serviced airline passengers was not in interstate
commerce."  *Pennsylvania Pub. Util. Comm'n v. United States*, 812 F.2d 8, 11 (D.C. Cir. 1987)

---

[7] Notably, the Sherman Act (at issue in *Yellow Cab*) is broadly construed, *see Yellow Cab*, 332 U.S. at 226, but the transportation worker exemption in the FAA is narrowly construed, *see Circuit City*, 532 U.S. at 118-19.  Thus, if rideshare drivers would not be engaged in interstate commerce under *Yellow Cab*, then they surely cannot be under the FAA.

(citing *Mateo v. Auto Rental Co.*, 240 F.2d 831, 834 (9th Cir. 1957)).  By contrast, "the movement of transient airline flight crews between an airport in one state and temporary hotel accommodations in the same state" was "interstate in nature" where there was "an explicit contract between United Airlines and [the shuttle company] for the transportation of United's personnel."  *Id.* at 9, 11.

Under the *Yellow Cab* analysis, rideshare drivers taking passengers to or from an airport (or other hub) are not part of a continuity of movement in interstate commerce.  *See Rogers*, 2020 WL 1684151, at *7.  A passenger making the first or last leg of a journey through an airport or train station has "complete freedom to arrive at or leave" the airport through use of the Lyft platform or any other means of transportation.  *Yellow Cab*, 332 U.S. at 232.  If she chooses Lyft, then she does so "independently" of booking her tickets for other travel, and the airline or railroad makes no arrangement of any kind with Lyft.  *Id.*; *cf. Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 173 (1922) (stating that "[t]he instances are many where a local shipment follows quickly upon an interstate shipment and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began").  Her trip using Lyft may be separated in time from her airplane or train ride, *Yellow Cab*, 332 U.S. at 232, which might itself be an intrastate one—a flight from Norfolk, Virginia to Dulles Airport, for instance. Whether a rider goes to an airport or any other location, from a driver's perspective, "it is just another local fare."  *Id.*  Because drivers who use the Lyft platform do not have any "special arrangement" that would make them "an integral step" in a rider's interstate journey, any transportation service they provide to and from airports is not "part of the stream of interstate commerce."  *Id*. at 228-29, 232; *see also Capriole*, 2020 WL 2563276, at *9 ("Uber drivers do not perform an integral role in a chain of interstate transportation").  "Like the drivers in Yellow

Cab," drivers using Lyft's Platform to bring passengers to airports have a "'relationship to interstate transit [that] is only casual and incidental.'"  *Rogers*, 2020 WL 1684151, at \*7 (quoting *Yellow Cab*, 332 U.S. at 231).

*          *          *          *

In sum, considered as a class, rideshare drivers are engaged in local, not interstate, transportation.  Neither the presence of some class members who provide transportation across state lines nor drivers' provision of rides to or from transportation hubs brings rideshare drivers within the Section 1 exemption.  The FAA therefore requires enforcement of Plaintiff's arbitration agreement with Lyft.

> **2.     Section 1 of the FAA Does Not Exempt Contracts With Workers Engaged in the Transport of Passengers Rather than Goods.**

Section 1 also does not apply to rideshare drivers like Plaintiff for an entirely independent reason:  those drivers transport people, not goods.  As the Supreme Court explained in *Circuit City*, the D.C. Circuit and other circuit courts have defined ""transportation workers" for purposes of Section 1 as workers who are "'actually engaged in the movement of *goods* in interstate commerce.'"  532 U.S. at 112 (quoting *Cole*, 105 F.3d at 1470-72) (emphasis added).

That limitation comports with the text of Section 1.  Again, the meaning of "any other class of workers engaged in . . . interstate commerce" is significantly informed by the words that precede it:  "seamen" and "railroad employees."  *Circuit City*, 532 U.S. at 114.  The scope of the Section 1 residual clause must "be controlled and defined by reference to th[ose] enumerated categories of workers."  *Id.*  Congress expressly listed seamen and railroad employees because, when the FAA was enacted, they were "member[s] of an industry that primarily involves the actual, physical movement of goods through interstate commerce."  *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 484 (S.D.N.Y. 2008).  And "Congress' demonstrated concern with

26

transportation workers and their necessary role in the free flow of *goods* explains the linkage to

the two specific, enumerated types of workers identified in the . . . portion of the sentence" that

precedes the residual clause.  *Circuit City*, 532 U.S. at 121 (emphasis added).  It therefore makes

sense to limit the residual clause in Section 1 to classes of workers primarily engaged in the

transportation of goods through interstate commerce.  Doing so also properly gives Section 1 a

narrow construction, consistent with the FAA's overarching policy in favor of arbitration.  *Id.* at

118.

Subsequent to *Circuit City*, many courts have agreed that Section 1 is limited to

transportation workers who transport goods rather than people.  *See, e.g., Kowalewski*, 590 F.

Supp. 2d at 484; *Heller*, 2020 WL 413243, at *6-9; *Randle v. Metro. Transit Auth. of Harris*

*Cty.*, No. 18-CV-1770, 2018 WL 4701567, at *4 (S.D. Tex. Oct. 1, 2018) (explaining that

"defining quality of a § 1 transportation worker is moving goods through interstate commerce"

and that exemption did not apply to public transportation worker who transported passengers, not

"goods on behalf of a carrier like a railroad or a vessel like a ship").  While those courts have

acknowledged that the discussion of "goods" in *Circuit City* does not represent the holding of

that case, they have nevertheless recognized that even dicta from the Supreme Court is entitled to

great weight.  *E.g., Kowalewski*, 590 F. Supp. 2d at 484; *see also In re Grand Jury Investigation*,

916 F.3d 1047, 1053 (D.C. Cir. 2019) ("carefully considered language of the Supreme Court,

even if technically dictum, generally must be treated as authoritative") (citation omitted).

A few courts have incorrectly applied Section 1 to workers who transport *passengers*

based on the Third Circuit's recent decision in *Singh v. Uber Techs. Inc.*, 939 F.3d 210 (3d Cir.

2019).  But that decision is unpersuasive.  It never even mentions the key passage in *Circuit City*

describing Section 1 as reflecting a "demonstrated concern with . . . the free flow of goods."

*Circuit City*, 532 U.S. at 121.  And while *Singh* points out that the Railway Labor Act, a statute enacted after the FAA that is mentioned in *Circuit City* as addressing dispute-resolution procedures for transportation workers, covered "sleeping car company[ies]" (*i.e.*, "railway passenger cars"), *Singh*, 939 F.3d at 221, that fact lacks significance.  By noting that the inclusion of "railroad employees" in Section 1 was part and parcel of congressional concern with the flow of "goods," *Circuit City* acknowledged that those employees were heavily devoted at the time to moving goods, not people.  *See Kowalewski*, 590 F. Supp. 2d at 484.  Moreover, any work stoppage or other breakdown in railway passenger transport would have posed a direct threat to the transportation of goods, since passenger railway cars ran on the same lines as freight cars and sometimes transported freight in addition to passengers.  *See, e.g., Lake Shore & M. S. R. Co. v. State of Ohio*, 173 U.S. 285, 288 (1899); *Louisville & N.R. Co. v. E. Tennessee, V. & G. Ry. Co.*, 60 F. 993 (6th Cir. 1894).  The same cannot be said for the transport provided by rideshare drivers like Lyft drivers, which has virtually nothing to do with the transport of goods.

## II.      THE COURT SHOULD STAY THIS ACTION PENDING ARBITRATION.

When a dispute covered under an arbitration clause is brought in a suit in federal court, the court must stay the action upon application of any of the parties.  9 U.S.C. § 3.  The FAA itself provides that where the court is "satisfied that [an] issue involved in such suit or proceeding is referable to arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  *Id.*; *see Concepcion*, 563 U.S. at 344 ("§ 3 requires courts to stay litigation of arbitral claims pending arbitration of those claims 'in accordance with the terms of the agreement'"); *LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 902 (D.C. Cir. 1998) ("Section 3 empowers a district court only to stay an action, leaving to the claimant the choice of arbitrating the claims or abandoning them."); *Pearce v. E.F. Hutton Grp., Inc.*, 828 F.2d 826,

830 (D.C. Cir. 1987) ("if arbitration is indicated by the contract, then a stay is required by the statute"); *White v. Four Seasons Hotels & Resorts*, 999 F. Supp. 2d 250, 262 (D.D.C. 2013) (staying "proceedings on any claim found to be within the arbitration provision and referable to arbitration" based on FAA).  Lyft therefore respectfully requests that the Court stay this action under Section 3 of the FAA.

### III.   THE D.C. UNIFORM ARBITRATION ACT ALSO REQUIRES ARBITRATION AND A STAY.

Even if Section 1 of the FAA exempts the arbitration agreement between Plaintiff and Lyft (which it does not), the D.C. Uniform Arbitration Act ("DCUAA") requires enforcement of the parties' arbitration agreement.  The DCUAA does not contain any exception for workers engaged in interstate transportation.

Like the FAA, the DCUAA provides that "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."  D.C. Code § 16-4406(a).  As noted, *see supra* Part I.A, Section 17 of the Terms of Service reflects an agreement between Plaintiff and Lyft to "submit to arbitration." Under District of Columbia law, "scrollwrap" agreements like the Terms of Service are enforceable.  *See Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010-11 (D.C. 2002) (enforcing provision of agreement whose terms appeared in a scroll box where consumer clicked an "Accept" button below the box).

The provision encompasses Plaintiff's claim.  Under D.C. law, "[t]o determine whether a particular claim is covered by an arbitration clause, we inquire merely whether the arbitration clause is susceptible of an interpretation that covers the dispute."  *Parker v. K & L Gates, LLP*, 76 A.3d 859, 867 (D.C. 2013) (internal quotation marks omitted).  As noted, Section 17 of the

Terms of Service clearly applies to Plaintiff's claim for sick leave; it requires arbitration of "any

dispute, claim or controversy . . . arising out of or relating to . . .  the Lyft Platform, the

Rideshare Services . . . [,] any payments made or allegedly owed . . . [,] [any] state or federal

wage-hour law . . . , [and] all other federal and state statutory and common law claims."  Shah

Decl., Ex. A, § 17(a).  To the extent that Plaintiff disputes whether the arbitration provision

covers her claim, that dispute is for the arbitrator.  Where, as here, parties "clearly and

unmistakably" agree to delegate to the arbitrator disputes about whether a claim is arbitrable,

D.C. law requires enforcement of that delegation clause.  *Woodland Ltd. P'ship v. Wulff*, 868

A.2d 860, 864 (D.C. 2005) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79

(2002)); *see also* D.C. Code § 16-4404 (no prohibition on waiving D.C. Code § 16-4406(b),

which directs courts to decide "whether an agreement to arbitrate exists or a controversy is

subject to an agreement to arbitrate").

Agreements to arbitrate on an individualized basis are enforceable under D.C. law.  *Cf.*

*Forrest*, 805 A.2d at 1012-13 (enforcing forum selection clause requiring that suit be brought in

Virginia, where class relief would be unavailable, and holding clause was not unreasonable

under D.C. law).  The DCUAA contains a "saving clause" materially identical to the "saving

clause" in the FAA that requires a court to enforce an arbitration agreement "except upon a

ground that exists at law or in equity for the revocation of a contract."  D.C. Code § 16-4406(a);

9 U.S.C. § 2.  As explained above, the FAA would not allow non-enforcement of the arbitration

agreement on the basis of the class waiver.  Thus, D.C. law likewise requires Plaintiff to arbitrate

her claim on an individual rather than class-wide basis.  *See Epic*, 138 S. Ct. at 1622; *cf.*

*Masurovsky v. Green*, 687 A.2d 198, 204 (D.C. 1996) ("Interpretations of the Federal Arbitration

Act are persuasive authority for interpreting the identical provisions of the D.C. Uniform Arbitration Act.").

Finally, where the DCUAA requires enforcement of an arbitration agreement, the court "shall stay any judicial proceeding that involves a claim subject to the arbitration." D.C. Code § 16-4407(f). Accordingly, the DCUAA also requires the Court to stay this case pending the result of any individual arbitration. *See White*, 999 F. Supp. 2d at 250 (staying proceedings on arbitrable claim based on DCUAA).

## CONCLUSION

Defendants respectfully request that the Court compel Plaintiff's lawsuit to individual arbitration and stay Plaintiff's lawsuit pending any individual arbitration.

Respectfully submitted,

*/s/ Elaine J. Goldenberg*
Elaine J. Goldenberg (Bar ID 478383)
elaine.goldenberg@mto.com
Rachel G. Miller-Ziegler (Bar ID 229956)
rachel.miller-ziegler@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW, 7th Floor
Washington, DC 20004
Tel: (202) 220-1100

Rohit K. Singla (*pro hac vice forthcoming*)
rohit.singla@mto.com
Justin P. Raphael (*pro hac vice forthcoming*)
justin.raphael@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

Dated: June 16, 2020

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the attorney of record for any party indicated as non-registered participants on this 16th day of June 2020.

*/s/ Elaine J. Goldenberg*
Elaine J. Goldenberg