**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CASSANDRA OSVATICS, on behalf of
herself and all others similarly situated,

                Plaintiff,

    v.

LYFT, INC.,

                Defendant.

Civil Action No. 1:20-cv-01426-KBJ

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL
INDIVIDUAL ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION**

## **TABLE OF CONTENTS**

BACKGROUND ................................................................................................................. 3

I.    Factual Background ................................................................................................. 3

    A.    Plaintiff and the Class of D.C. Drivers Regularly Engage in Interstate Travel to Perform the Work of a Lyft Driver in the District of Columbia. ........................... 3

    B.    Lyft Has Instituted a Take-It-Or-Leave-It Terms of Service Agreement and a Mandatory Arbitration Clause with a Class Waiver. ................................................ 4

    C.    Plaintiff's May 2020 "Access" to the Lyft App. .................................................... 6

II.    Procedural History ................................................................................................. 7

ARGUMENT ................................................................................................................... 7

I.    D.C. Lyft Drivers Are Not Subject to Arbitration Under the FAA. ................................. 7

    A.    Legal Standard ..................................................................................................... 8

    B.    The FAA Exempts Workers Engaged in Interstate Transportation of Goods *and* Passengers. ...................................................................................................... 9

    C.    The FAA Section 1 Exception Applies to D.C. Lyft Drivers. ............................ 13

        1.    D.C. Lyft Drivers Are Transportation Workers Engaged in Interstate Commerce. ..................................................................................... 13

        2.    The Same Result Holds True if the Court Applies the *Lenz* Test. ............ 16

        3.    Plaintiff Belongs to a Class of D.C. Lyft Drivers Engaged in Interstate Commerce. ..................................................................................... 18

        4.    In the Alternative, the Court Could Find That All Lyft Drivers Are Also Transportation Workers. ................................................................ 21

II.    D.C. Law Also Requires Denial of Lyft's Motion. ......................................................... 22

    A.    Legal Standard. ................................................................................................... 22

    B.    Lyft's TOS Specifically Provides That Only Federal Law (Not State Law) Applies to Its Arbitration Clause, and Nowhere Mentions D.C. Law. ................. 23

    C.    The RUAA Does Not Apply to Mandatory Consumer Arbitration Contracts...... 25

    D.    Lyft's TOS Is Unenforceable Because It Is Contrary to D.C. Public Policy. ........ 27

E.     Lyft's Arbitration Clause Is Unconscionable Under D.C. Law............................ 30

III.   Lyft Has Not Met Its Burden to Show That Plaintiff Agreed to Lyft's TOS and
       Mandatory Arbitration Clause. ........................................................................... 32

       A.     Legal Standard. .................................................................................... 32

       B.     Lyft Has Not Proved a Binding Contract to Arbitrate Was Formed...................... 33

IV.    In the Alterative, Plaintiff Requests Limited Targeted Discovery. ................................. 36

CONCLUSION.......................................................................................................... 38

## TABLE OF AUTHORITIES

**CASES**                                                             **PAGE(S)**

*3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*,
   922 A.2d 439 (D.C. 2007) ...................................................................................34

*Adduci v. Krane*,
   No. 13 Civ. 1104, 2015 WL 471701 (D.D.C. Feb. 4, 2015)....................................................27

*Adkins v. Labor Ready, Inc.*,
   185 F. Supp. 2d 628 (S.D.W. Va. 2001)...................................................................20

*Adkins v. Labor Ready, Inc.*,
   303 F.3d 496 (4th Cir. 2002) ........................................................................19, 20

*Affordable Elegance Travel, Inc. v. Worldspan, L.P.*,
   774 A.2d 320 (D.C. 2001) ...............................................................................25

*Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*,
   537 F. Supp. 2d 1 (D.D.C. 2008)........................................................................36

*Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*,
   531 F.3d 863 (D.C. Cir. 2008) .......................................................................8, 33

*Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*,
   No. 05 Civ. 151, 2006 WL 1793295 (D.D.C. June 28, 2006) .............................................8, 33

*Allen v. Allen*,
   133 A.2d 116 (D.C. 1957) ...............................................................................34

*Am. Postal Workers Union v. U.S. Postal Serv.*,
   823 F.2d 466 (11th Cir. 1987) ................................................................10, 14, 17

*Andrew v. Am. Import Ctr.*,
   110 A.3d 636 (D.C. 2015) ........................................................................ *passim*

*Aral v. EarthLink, Inc.*,
   36 Cal. Rptr. 3d 229 (Cal. App. 2005) .................................................................31

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)....................................................................................23

*Austin v. DoorDash, Inc.*,
   No. 17 Civ. 12498, 2019 WL 4804781 (D. Mass. Sept. 30, 2019)....................................16, 17

*Bacashihua v. U.S. Postal Serv.*,
   859 F.2d 402 (6th Cir. 1988) ...........................................................................14

*Bekele v. Lyft, Inc.*,
   918 F.3d 181 (1st Cir. 2019) ..........................................................................34

*Bell v. Ryan Transp. Serv., Inc.*,
   176 F. Supp. 3d 1251 (D. Kan. 2016) .......................................................16, 17

*Bennett v. Fun & Fitness of Silver Hill, Inc.*,
   434 A.2d 476 (D.C. 1981) ............................................................................30

*Benton v. Laborers' Joint Training Fund*,
   121 F. Supp. 3d 41 (D.D.C. 2015) ...........................................................35, 36

*Borgonia v. G2 Secure Staff, LLC*,
   No. 19 Civ. 914, 2019 WL 1865927 (N.D. Cal. Apr. 25, 2019) .........................19

*Brunner v. Lyft*,
   No. 19 Civ. 4808, 2019 WL 6001945 (N.D. Cal. Nov. 14, 2019).........................34

*Camara v. Mastro's Rests. LLC*,
   952 F.3d 372 (D.C. Cir. 2020) ...............................................................33, 35

*Capriole v. Uber Techs., Inc.*,
   No. 20 Civ. 2211, 2020 WL 2563276 (N.D. Cal. May 14, 2020) ................2, 15, 20

*Carl v. Children's Hosp.*,
   702 A.2d 159 (D.C. 1997) ............................................................................29

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Cartage Co.*,
   84 F.3d 988 (7th Cir. 1996) ..........................................................................14

*Christie v. Loomis Armored US, Inc.*,
   No. 10 Civ. 2011, 2011 WL 6152979 (D. Colo. Dec. 9, 2011)............................16

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001)...................................................................9, 11, 12, 18

*Coady v. Cross Country Bank*,
   729 N.W.2d (Wis. 2007).............................................................................30

*Cole v. Burns International Security Services*,
   105 F.3d 1465 (D.C. Cir. 1997)............................................................12, 28, 29

*Conservation Force v. Salazar*,
   916 F. Supp. 2d 15 (D.D.C. 2013) ................................................................36

*Cooper v. QC Fin. Servs., Inc.*,
   503 F. Supp. 2d 1266 (D. Ariz. 2007) ...........................................................30

*Cunningham v. Lyft, Inc.*,
  No. 19 Civ. 11974, 2020 WL 1503220 (D. Mass. Mar. 27, 2020) ................................. *passim*

*Doughty v. Underwriters at Lloyd's, London*,
  6 F.3d 856 (1st Cir. 1993) ........................................................................................12

*Easterday v. USPack Logistics LLC*,
  No. 15 Civ. 7559 (D.N.J. June 29, 2016)..................................................................24

*Eastus v. ISS Facility Servs., Inc.*,
  960 F.3d 207 (5th Cir. 2020) .............................................................................17, 19

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002)...................................................................................................12

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018)..........................................................................................23, 24

*Forrest v. Verizon Commc'ns, Inc.*,
  805 A.2d 1007 (D.C. 2002) .......................................................................................32

*Fuentes v. Rush Truck Ctrs. of Cal., Inc.*,
  No. 18 Civ. 10446, 2019 WL 3240100 (C.D. Cal. Mar. 11, 2019) ..........................18

*Gentry v. Super. Ct.*,
  165 P.3d 556 (Cal. 2007) ..........................................................................................30

*George Wash. Univ. v. Scott*,
  711 A.2d 1257 (D.C. 1998) .......................................................................................22

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010)...................................................................................................33

*Green Tree Fin. Corp.-Ala. v. Randolph*,
  531 U.S. 79 (2000)..................................................................................................8, 9

*Grice v. Uber Techs., Inc.*,
  No. 18 Civ. 2995, 2020 WL 497487 (C.D. Cal. Jan. 7, 2020) ...........................13, 15

*Hamrick v. Partsfleet, LLC*,
  411 F. Supp. 3d 1298 (M.D. Fla. 2019)....................................................................24

*Haynes v. Kuder*,
  591 A.2d 1286 (D.C. 1991) .......................................................................................36

*Heller v. Rasier, LLC*,
  No. 17 Civ. 8545, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020) .................................13

*Hill v. Rent-A-Center, Inc.*,
    398 F.3d 1286 (11th Cir. 2005) ..........................................................................19

*Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*,
    702 F.3d 954 (7th Cir. 2012) .......................................................................14, 22

*Jacobsen v. Oliver*,
    555 F. Supp. 2d 72 (D.D.C. 2008) ....................................................................27

*Kauffman v. U-Haul Int'l, Inc.*,
    No. 16 Civ. 4580, 2018 WL 4094959 (E.D. Pa. Aug. 28, 2018)..........................18

*Keeton v. Wells Fargo Corp.*,
    987 A.2d 1118 (D.C. 2010) ...............................................................................36

*Kowalewski v. Samandarov*,
    590 F. Supp. 2d 477 (S.D.N.Y. 2008)............................................................13, 17

*Kramer Assocs., Inc. v. Ikam, Ltd.*,
    888 A.2d 247 (D.C. 2005) .................................................................................33

*Lenz v. Yellow Transp., Inc.*,
    431 F.3d 348 (8th Cir. 2005) .................................................................10, 11, 17

*Lepera v. ITT Corp.*,
    No. 97 Civ. 1461, 1997 WL 535165 (E.D. Pa. Aug. 12, 1997)...........................11

*Lewis v. District of Columbia*,
    791 F. Supp. 2d 136 (D.D.C. 2011)...............................................................35, 36

*Masurovsky v. Green*,
    687 A.2d 198 (D.C. 1996) .................................................................................32

*Mendoza v. Uber Techs. Inc.*,
    No. 19 Civ. 9741, 2020 WL 2563273 (C.D. Cal. Mar. 25, 2020) .........................15

*Mondou v. N.Y., New Haven & Hartford R.R. Co.*,
    223 U.S. 1 (1912).................................................................................................9

*Muhammad v. Cty. Bank of Rehoboth Beach*,
    912 A.2d 88 (N.J. 2006).....................................................................................30

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019).............................................................................8, 9, 12, 33

*O'Connor v. Uber Techs., Inc.*,
    No. 13 Civ. 3826, 2013 WL 6407583 (N.D. Cal. Dec. 6, 2013) ..........................31

*Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*,
    325 F. Supp. 2d 1252 (D. Utah 2004) ...................................................................18

*Palcko v. Airborne Express, Inc.*,
    372 F.3d 588 (3d Cir. 2004) ..........................................................................11, 16, 19, 24

*Parker v. K & L Gates, LLP*,
    76 A.3d 859 (D.C. 2013) .................................................................................32

*Pelly v. Panasyuk*,
    413 P.3d 619 (Wash. Ct. App. 2018) .................................................................25

*Pennsylvania Public Utility Commission v. United States*,
    812 F.2d 8 (D.C. Cir. 1987) ............................................................................15

*Powers v. Fox Television Stations, Inc.*,
    923 F. Supp. 21 (S.D.N.Y. 1996) .....................................................................13

*Randle v. Metro. Transit Auth. of Harris Cty.*,
    No. 18 Civ. 1770, 2018 WL 4701567 (S.D. Tex. Oct. 1, 2018) ...............................13

*Rickard v. Teynor's Homes, Inc.*,
    279 F. Supp. 2d 910 (N.D. Ohio 2003) ..............................................................28

*Rittmann v. Amazon.com, Inc.*,
    383 F. Supp. 3d 1196 (W.D. Wash. 2019) ................................................. *passim*

*Rogers v. Lyft, Inc.*,
    No. 20 Civ. 1938, 2020 WL 1684151 (N.D. Cal. Apr. 7, 2020) ...............11, 15, 20

*Ross v. Blake*,
    136 S. Ct. 1850 (2016) ...................................................................................10

*Samuels v. S. Hills Ltd. P'ship*,
    289 F. Supp. 3d 26 (D.D.C. 2017) ....................................................................29

*Saxon v. Sw. Airlines Co.*,
    No. 19 Civ. 403, 2019 WL 4958247 (N.D. Ill. Oct. 8, 2019) ...................................14

*Scott v. Cingular Wireless*,
    161 P.3d 1000 (Wash. 2007) ............................................................................30

*Selden v. Airbnb*,
    No. 16 Civ. 933, 2016 WL 6476934 (D.D.C. Nov. 1, 2016) .....................................34

*Sharp v. Ward*,
    No. 01 Civ. 2184, 2004 WL 1835102 (D.C. Super. Ct. Aug. 16, 2004) .....................27

*Sienkaniec v. Uber Techs., Inc.*,
   401 F. Supp. 3d 870 (D. Minn. 2019) ............................................................................ *passim*

*Singh v. Uber Techs., Inc.*,
   939 F.3d 210 (3d Cir. 2019) ........................................................................................... *passim*

*SJ Enters., LLC v. Quander*,
   207 A.3d 1179 (D.C. 2019) ..................................................................................................33, 34

*Specht v. Netscape Comms. Corp.*,
   306 F.3d 17 (2d Cir. 2002) ........................................................................................................31

*State ex rel. Dunlap v. Berger*,
   567 S.E.2d 265 (W. Va. 2002) ..................................................................................................30

*Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am. (U.E.) Local 437*,
   207 F.2d 450 (3d Cir. 1953) ..............................................................................................14, 16

*United States v. Oakar*,
   111 F.3d 146 (D.C. Cir. 1997) ..................................................................................................12

*United States v. Yellow Cab Co.*,
   332 U.S. 218 (1947) ....................................................................................................................15

*U.S. ex rel. Head v. Kane Co.*,
   668 F. Supp. 2d 146 (D.D.C. 2009) ..........................................................................................27

*Vargas v. Delivery Outsourcing, LLC*,
   No. 15 Civ. 3408, 2016 WL 946112 (N.D. Cal. Mar. 14, 2016) ..............................................20

*Veliz v. Cintas Corp.*,
   No. 03 Civ. 1180, 2004 WL 2452851 (N.D. Cal. Apr. 5, 2004) ..............................................13

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
   489 U.S. 468 (1989) ....................................................................................................................24

*Waithaka v. Amazon.com, Inc.*,
   404 F. Supp. 3d 335 (D. Mass. 2019) ................................................................................16, 36

*Ward v. Express Messenger Sys., Inc.*,
   413 F. Supp. 3d 1079 (D. Colo. 2019) ...............................................................................16, 19

*Zamora v. Swift Transp. Corp.*,
   No. 07 Civ. 400, 2008 WL 2369769 (W.D. Tex. June 3, 2008) ...............................................19

**STATUTES**

Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2018)......................................28

Federal Arbitration Act, 9 U.S.C. §§ 1-16........................................................... *passim*

Forced Arbitration Injustice Repeal Act, H.R. 1423, 116th Cong. (2019)....................................28

Revised Uniform Arbitration Act, D.C. Code Ann. §§ 4401-4432  .................................... *passim*

**OTHER AUTHORITIES**

Alison Frankel, *3,420 Lyft Drivers Claim the Company Won't Pay Arbitration Fees to Launch Their Cases*, Reuters (Dec. 18, 2018), https://www.reuters.com/article/legal-us-otc-lyft/3420-lyft-drivers-claim-the-company-wont-pay-arbitration-fees-to-launch-their-cases-idUSKBN1OD2KC ...................29

Comm. on Pub. Safety & the Judiciary, Rep. on Bill 17–50 (D.C. 2007)......................................28

David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration*, 1991 Wis. L. Rev. 33 (1997) ..........................................................................28

Imre S. Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements*, 19 Cardozo J. Conflict Resol. 653 (2018)..........................................................28

Jean R. Sternlight, *Panacea or Corporate Tool? Debunking the Supreme Court's Preference for Binding Arbitration*, 74 Wash. U. L.Q. 637 (1996)..........................................28

Restatement (Second) of Contracts § 178 (2009) ........................................................27

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of Cassandra Osvatics |
| B | Order Denying Defendant's Motion to Compel Arbitration, *Easterday v. USPack Logistics LLC*, No. 15 Civ. 7559 (D.N.J. June 29, 2016) |

Defendant Lyft, Inc.'s ("Lyft's") Motion to Compel Individual Arbitration and Stay Proceedings Pending Arbitration is a multi-billion dollar company's attempt to escape judicial scrutiny of its systemic failure to provide sick leave to thousands of its employees as required under D.C. law (the D.C. Accrued Safe and Sick Leave Act), in the middle of the greatest national health emergency our country has faced in the modern era.[1]

This motion involves a straightforward application of Section 1 of the Federal Arbitration Act ("FAA"), which specifically excludes workers involved in interstate transportation from forced arbitration.  Plaintiff and the class she seeks to represent are interstate workers.  During her time working for Lyft, Plaintiff, a Maryland resident, frequently drove into the District of Columbia and neighboring Virginia to transport passengers to places of employment, airports, D.C.'s Union Station, and other destinations in the metropolitan area.  Lyft even defines the geographic area where D.C. Lyft drivers work as the District of Columbia and parts of Maryland and Virginia.  ECF No. 2 (Class Action Complaint ("Compl.")) ¶¶ 50-51, 55.  For D.C. Lyft drivers, trips across state lines are simply a routine and daily part of the job.

Lyft largely turns a blind eye to these allegations, arguing instead that Section 1's interstate commerce exception applies only to the transportation of goods, not passengers, and the proper framework for analysis is "all rideshare drivers" (not even all Lyft drivers) anywhere in the United States.  But this first proposed limitation is nowhere in the statutory language, contradicts the well-established understanding of "commerce" both at the time the FAA was enacted and today, and was roundly rejected by the only appellate court to be squarely presented with the question.  *Singh v. Uber Techs., Inc.*, 939 F.3d 210 (3d Cir. 2019).  The second requires that the Court ignore that Plaintiff brings a claim under D.C. law on behalf of D.C. workers *only*

---

[1]     *See* ECF No. 6 (Lyft's Memorandum of Law in Support of Its Motion to Compel Individual Arbitration and Stay Proceedings Pending Arbitration ("Mot. Compel")).

1

and credit Lyft's untested and self-serving statement that rideshare drivers nationwide do not cross state boundaries over Plaintiff's well-pleaded allegations of interstate travel.  Highlighting the overreach of its request, in effect Lyft asks that this Court hold, as a *per se* rule, that every unnamed rideshare company in the country is outside the Section 1 exemption.  But even Lyft's own authority explains that a court's review should be limited to the alleged interstate travel of the class actually before it.  *See, e.g.*, *Capriole v. Uber Techs., Inc.*, No. 20 Civ. 2211, 2020 WL 2563276, at *9 (N.D. Cal. May 14, 2020) (evaluating interstate travel of Massachusetts class pleaded in complaint), *appeal filed* (No. 20-16030).

Perhaps recognizing the weakness of its arguments under the FAA, Lyft also argues that arbitration should be compelled pursuant to D.C.'s Revised Uniform Arbitration Act ("RUAA"). But Lyft provides only generic and ultimately unpersuasive reasons for why the RUAA would apply, ignoring that: (1) Lyft's agreement expressly requires that arbitration is "governed" by the FAA, and not any state law; (2) Lyft's arbitration agreement is self-defined as a "consumer" contract, which the RUAA specifically renders unenforceable; (3) D.C. maintains a strong public policy, articulated in the RUAA and by the D.C. Court of Appeals in *Andrew v. American Import Center*, 110 A.3d 636 (D.C. 2015), that prevents the enforcement of mandatory adhesive contracts like Lyft's, especially when they contain a class waiver; and (4) the agreement is unconscionable under D.C. law pursuant to the standard articulated in *Andrew*.

Finally, Plaintiff's arbitration agreement also cannot be enforced under either the FAA or the RUAA because Lyft cannot establish that a valid contract was even formed.  Lyft *only* moves to compel arbitration pursuant to an agreement it concedes was put into place almost two years *after* Plaintiff stopped working for Lyft (and which, for that matter, is riddled with cutoff sentences and illegible lines).  As Plaintiff's declaration submitted in support of this opposition

explains, Plaintiff stopped working for Lyft in 2018 because Lyft refused to enact remedial measures to ensure her safety after repeated sexual harassment from male riders.  She had no intention to enter into an agreement to arbitrate with Lyft at the point and received no consideration for any agreement foisted onto her then.

For these reasons, and as further explained below, Plaintiff respectfully requests that Lyft's motion to compel arbitration be denied in its entirety.

## **BACKGROUND**

### I.    **Factual Background**

### A.    **Plaintiff and the Class of D.C. Drivers Regularly Engage in Interstate Travel to Perform the Work of a Lyft Driver in the District of Columbia.**

Lyft drivers in the D.C. metropolitan area routinely "engage in interstate commerce by transporting riders across state lines in return for compensation from Lyft."  Compl. ¶ 49.  As Lyft recognizes, the D.C. metropolitan area extends from the District of Columbia into adjacent counties in Maryland and Virginia.  *Id.* ¶¶ 50-51, 55.  Lyft trips often cross state lines in the area because, for example, residents of the D.C. metropolitan area are likely to work in a jurisdiction other than which they live, and the District of Columbia's major airports are all located outside the District of Columbia.  *Id.* ¶¶ 53-55, 58-59.  In addition, many Lyft rides originate or conclude at Union Station in the District of Columbia, which is a "central hub for interstate rail and bus travel," including the Maryland Area Regional Commuter ("MARC") daily commuter line.  *Id.* ¶¶ 63-68.

Lyft recognizes the importance and value of these interstate trips in the D.C. region.  The service area it highlights for the District of Columbia includes neighboring counties in Maryland and Virginia.  *Id.* ¶ 52.  It also markets Lyft rides as the "go-to airport ride to and from [Reagan

National Airport ("DCA")] or [Dulles International Airport ("IAD")]" – both of which are located in Virginia.  *Id.* ¶ 61; *see id.* ¶ 58.

Lyft has specific rules for D.C. drivers, which reflect the multi-state realities of work in the District of Columbia.  *See id.* ¶¶ 33, 56.  "[P]ursuant to Lyft's policies and practices a driver can be dispatched for pickups in the District of Columbia [only] if they have a driver's license from the District of Columbia, Maryland, or Virginia."  *Id.* ¶ 56.  Drivers must also be specifically approved by Lyft to work in the D.C. metropolitan area.  *See id.* ¶ 33.  Further, Lyft provides tailored instructions to its drivers regarding the process for how its D.C. drivers are to pick up or drop off riders at regional airports (*e.g.*, DCA and IAD).  *Id.* ¶ 62.

Plaintiff's own experience as a Lyft driver is typical of that of Lyft drivers in the D.C. region.  *Id.* ¶ 72.  She estimates that, "when driving for Lyft, she spent at least 50% of her time in the District of Columbia, at least 20% of her time in Virginia, and at least 20% in Maryland."  *Id.* ¶ 69.  Because she resides in Maryland, when Plaintiff drove for Lyft, "she repeatedly began her day of work for Lyft by taking a Maryland resident into the District of Columbia, and ended her day of work for Lyft by returning a Maryland resident from the District of Columbia to Maryland."  *Id.* ¶ 71.  Plaintiff's Lyft rides included trips from the District of Columbia and Maryland to IAD and DCA in Virginia and from the District of Columbia and Virginia to Baltimore-Washington International Thurgood Marshall Airport in Maryland.  *Id.* ¶ 60.  Many of her other Lyft rides originated or concluded at Union Station.  *Id.* ¶ 63.

## B.  Lyft Has Instituted a Take-It-Or-Leave-It Terms of Service Agreement and a Mandatory Arbitration Clause with a Class Waiver.

Lyft unilaterally determines its Terms of Service of Agreement ("TOS") and provides no opportunity for individual drivers or riders to negotiate or modify any terms.  *See* ECF No. 6-2 (Declaration of Neil Shah ("Shah Decl.")) ¶ 1 (stating that Lyft "updates its Terms of Service

4

Agreement" and simply "communicates its updates . . . to users, and by which users (both drivers and riders) consent"); Ex. A[2] (Declaration of Cassandra Osvatics ("Osvatics Decl.")) ¶ 8 ("It was my understanding throughout my tenure driving for Lyft that I could not negotiate or change any terms of my employment.  I never knew or heard of any other driver or user being able to do so either."); *see also generally* ECF No. 6-3, Ex. A (Lyft Terms of Service ("TOS")).

Lyft's TOS is presented on a "take-it-or-leave it" basis, as a condition of use of Lyft's platform, either as a driver or as a rider.  TOS at 1 ("IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MAY NOT USE OR ACCESS THE LYFT PLATFORM OR ANY OF THE SERVICES PROVIDED THROUGH THE LYFT PLATFORM."); Osvatics Decl. ¶ 8.

Lyft reserves for itself alone "the right to modify the terms and conditions" of the TOS, as well as "any information on pages referenced in the hyperlinks" – information which is not itself visible within the four corners of the TOS – "from time to time" as it sees fit, and asserts that "such modifications shall become effective upon posting."  TOS § 2.  "Continued use" – standing alone absent any further manifestations of consent – "of the Lyft Platform or Rideshare Services after any such changes shall constitute . . . consent of such changes."  *Id.*

Lyft's TOS includes a mandatory arbitration clause.  *Id.* § 17.  Acceptance of the TOS includes acceptance of its arbitration agreement.  *Id.*  Lyft's arbitration clause purports to require any arbitration between Lyft and a user to take place on an individual basis, and explicitly states that "class arbitrations and class actions are not permitted."  *Id.* § 17(a) (initial capitals removed) & (b).  The arbitration clause also purports to bar membership in any class action against Lyft filed by another driver, unless that class action has been settled and the parties have filed for

---

[2]      Unless otherwise indicated, all exhibits are attached to the Declaration of Christopher M. McNerney.

preliminary approval with the responsible court.  *Id.* § 17(i) (Driver Claims in a Pending Settlement).

Lyft's arbitration clause seeks to encompass "claims between" users and "Lyft's service providers, including but not limited to background check providers and payment processors[.]" *Id.*  The clause purports to cover "any dispute, claim or controversy, whether based on past, present, or future events, arising out of or relating to: this Agreement and prior versions thereof[.]"  *Id.*

In its second full sentence, Lyft's arbitration clause states that it is "governed by the Federal Arbitration Act[.]"  *Id.* § 17(a).  Neither the arbitration clause nor any other section of the TOS ever makes a reference to the D.C. Revised Uniform Arbitration Act or District of Columbia law.  *See generally id.*  Except with respect to the arbitration clause, the TOS specifies that it "shall be governed by the laws of the State of California[.]"  *Id.* § 21.

For both Lyft riders and drivers, "[a]ny arbitration conducted pursuant to this Arbitration Agreement shall be administered by the American Arbitration Association ("AAA") pursuant to its Consumer Arbitration Rules[.]"  *Id.* § 17(d).

### C.    Plaintiff's May 2020 "Access" to the Lyft App.

Plaintiff worked as a Lyft driver from approximately November 2015 to approximately June 2018.  Osvatics Decl. ¶ 1.  Plaintiff worked for Lyft to earn money to support herself and pay for day-to-day expenditures, including food, rent, and household supplies.  *Id.* ¶ 4.

Plaintiff stopped driving for Lyft in June 2018 in large part due to Lyft's failure to take appropriate remedial measures to ensure her safety in the face of sexual harassment from male riders.  *Id.* ¶ 2.   She also stopped driving for Lyft because of the poor pay she received.  *Id.* ¶ 3.

When Plaintiff purportedly accessed the Lyft App in May 2020, she had no intention to resume her employment as a Lyft driver.  *Id.* ¶ 5.  She had not logged in to the Lyft App in years,

and only checked to see what information about her time as a driver the Lyft App contained. *Id.* ¶ 7. While Lyft requires drivers in the D.C. metropolitan area to meet certain eligibility requirements, including possession of a Transportation Network Operator license and performance of a yearly vehicle safety inspection, Plaintiff has not kept current with these requirements since her tenure with Lyft ended – highlighting that she did not intend to resume employment. *Id.*

When Plaintiff logged-in to the App, she does not recall agreeing to any forms or arbitration provisions. *Id.* Even so, Plaintiff understood, even during her tenure driving for Lyft, that she could not negotiate or change any terms of her employment. *Id.* ¶ 8. She never knew or heard of any other driver or user being able to do so either. *Id.* If she actually had the opportunity to negotiate Lyft's terms of service, she would not have agreed to arbitration or a waiver of her rights to participate in a class action. *Id.*

## II.      Procedural History

On May 29, 2020, Plaintiff filed this putative class action on behalf of herself and all other similarly situated drivers who work or worked for Lyft in the District of Columbia for at least 90 days. ECF No. 2. She alleges that Lyft violated the D.C. Accrued Safe and Sick Leave Act by failing to provide paid sick leave to herself and members of the proposed class, who are Lyft's employees within the meaning of the statute. *Id.* On June 16, 2020, Lyft moved to compel Plaintiff's claims to arbitration and stay the proceedings pending arbitration. ECF No. 6.

## ARGUMENT

## I.      D.C. Lyft Drivers Are Not Subject to Arbitration Under the FAA.

The FAA does not apply to the claims of Plaintiff and other D.C. Lyft drivers because they are engaged in interstate transportation, and thus fall within the FAA Section 1's well-established exemption to arbitration for workers engaged in interstate commerce.

A.      **Legal Standard**

Section 1 states that "nothing" in the FAA "shall apply" to "contracts of employment of

seamen, railroad employees, or any other class of workers engaged in foreign or interstate

commerce." 9 U.S.C. § 1. As a result, such workers cannot be compelled into arbitration

through the FAA, and the Court first must determine whether the "parties' contract falls within

the [FAA's] ambit or § 1's exclusion . . . of certain 'contracts of employment[.]'" *New Prime*

*Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019). Courts apply a motion to dismiss standard in

deciding whether the Section 1 exemption applies where, as here, "the complaint and

incorporated documents provide a sufficient factual basis for deciding the issue."[3] *Singh*, 939

F.3d at 218. To the extent that the Court decides that the complaint and incorporated documents

are insufficient to resolve the question, the parties should be entitled to discovery before further

adjudication. *Id.*; *see infra* Argument § IV.

Crucially, the FAA's "liberal" presumption in favor of arbitration does not apply at all to

this threshold question, because the application of the FAA has yet to be established. *See New*

*Prime*, 139 S. Ct. at 537 (referring to the "antecedent statutory" inquiry). The Court "must be

satisfied that . . . [Section 1] does not apply before making any order that the parties proceed to

arbitration[.]" *Singh*, 939 F.3d at 218. While the party seeking arbitration ordinarily bears the

burden of proof, the party resisting arbitration bears the burden to show Section 1 does not apply.

*See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting

---

[3]      Although the D.C. Circuit has held that a motion for summary judgment standard is appropriate when considering a motion to compel arbitration, the application of that standard is based on the premise that the issue presented is one of whether an agreement to arbitrate was formed. *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008) (describing a motion to compel arbitration as a "request for '"summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate'" (quoting *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, No. 05 Civ. 151, 2006 WL 1793295, at *3 (D.D.C. June 28, 2006))). As explained by *Singh*, the motion to dismiss standard is more appropriate when deciding the issue of Section 1's application. *See Singh*, 939 F.3d at 218.

arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.");

*Singh*, 939 F.3d at 231-32 (Porter, J. concurring) ("Singh bears the burden on remand to show why the District Court should not compel arbitration under the FAA, which may create inefficient incentives in discovery.").

In *New Prime*, the Supreme Court reaffirmed 8-0 the ongoing validity and force of Section 1's exemption from the FAA.  139 S. Ct. at 537 ("[A]uthority [to compel arbitration under the FAA] doesn't extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration.").

### B.    The FAA Exempts Workers Engaged in Interstate Transportation of Goods *and* Passengers.

The language of the Section 1 exemption is expansive and emphatic.  *See* 9 U.S.C. § 1 (using the words "nothing" and "any").  While the Supreme Court has clarified that the residual phrase "any other class of workers engaged in foreign or interstate commerce" is limited to "contracts of employment of transportation workers," as opposed to all contracts of employment, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001),[4] it has never limited "transportation workers" to just those who transport goods and not persons.  In fact, in *New Prime* the Supreme Court specifically noted that shipboard surgeons who tended injured sailors were "seamen" engaged in interstate commerce for purposes of Section 1 and "railroad employees" may have included anyone who "directly contribut[ed]" to railroad operations, 139 S. Ct. at 542-43; *see also Mondou v. N.Y., New Haven & Hartford R.R. Co.*, 223 U.S. 1, 9 (1912) (explaining in a case predating the FAA that "[t]he term 'commerce' comprehends more than the mere exchange of

---

[4]      Section 1 applies to both employees and independent contractors.  *New Prime*, 139 S. Ct. at 538-44.  Lyft cannot – and does not – contend that Plaintiff's status as an employee or independent contractor is relevant to the Section 1 analysis.

goods," but rather "[i]t embraces commercial intercourse in all its branches, including transportation of passengers").

In line with the statutory text, the Third Circuit expressly held that Section 1 applies to workers "who transport passengers, so long as they are engaged in interstate commerce or work so closely related thereto as to be in practical effect part of it." *Singh*, 939 F.3d at 218. *Singh* is the only court of appeals case to analyze this precise issue (goods versus passengers), and it did so specifically in the context of a rideshare company.[5] Its holding is in accord with the commonsense observation that if the text is our guide, the workers cited in Section 1 – seamen, railroad employees, and other transportation workers – have always engaged in the transport of passengers as well as goods. *See id.* at 221-22; *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("Statutory interpretation, as we always say, begins with the text . . . ."). This "was the dominant understanding of 'commerce' when Congress passed the FAA in 1925." *Singh*, 939 F.3d at 229 n.2 (Porter, J., concurring) (citing contemporary dictionaries defining "commerce" as transportation of goods *and* passengers).

Plaintiff's interpretation of Section 1 also is consistent with those of well-reasoned district courts across the country that have analyzed the issue. These courts too have recognized that by its plain meaning Section 1's use of "commerce" applies to both goods and passengers. *See Cunningham v. Lyft, Inc.*, No. 19 Civ. 11974, 2020 WL 1503220, at *6 (D. Mass. Mar. 27, 2020) ("[T]he court finds no basis in the statute or in precedent that limits Section 1 to workers who transport goods and that categorically excludes workers who transport passengers as Lyft contends."), *appeal filed* (No. 20-1379); *Sienkaniec v. Uber Techs., Inc.*, 401 F. Supp. 3d 870,

---

[5]    In *Lenz v. Yellow Transportation, Inc.*, the Eighth Circuit also implicitly rejected a reading of Section 1 that would limit its application to workers who move goods by noting that bus drivers could also be included.  431 F.3d 348, 351 (8th Cir. 2005) (quoting *Am. Postal Workers Union v. U.S. Postal Serv.*, 823 F.2d 466, 473 (11th Cir. 1987)).

871 (D. Minn. 2019) ("[T]he [§ 1] exemption applies to the interstate transport of both goods and people . . . ."); *Lepera v. ITT Corp.*, No. 97 Civ. 1461, 1997 WL 535165, at *7 (E.D. Pa. Aug. 12, 1997) ("It is simply nonsensical to exclude from coverage those workers engaged in the direct transportation of goods, but not those engaged in the direct transportation of persons.").[6]

In its brief, Lyft argues that "commerce" means the transportation of goods only, and not the transportation of persons. Mot. Compel. at 26-28. But this is an artificial limitation that is not in the statutory language, is not supported by any controlling case law, and was expressly rejected by the only court of appeals to analyze the issue, in addition to at least four district courts from across the country. "[I]f Congress wanted the residual clause [of § 1] to cover only employees who physically transport goods, it could have phrased the residual clause differently." *Lenz*, 431 F.3d at 352 n.2; *accord Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593-94 (3d Cir. 2004).[7]

Lyft's argument largely relies on misconstruing language in *Circuit City* it concedes is dicta, including a strategic removal of a predicate "for instance" from its lead citation to the case. *Compare* Mot. Compel at 26, *with Circuit City*, 532 U.S. at 112 ("Most Courts of Appeals conclude the exclusion provision is limited to transportation workers, defined, *for instance*, as those workers '"actually engaged in the movement of goods in interstate commerce."'" (emphasis added)). As *Singh* explains, this language is clearly just one *example* of how some courts have

---

[6]        Even *Rogers v. Lyft, Inc.*, relied upon heavily by Lyft, rejected the goods/passengers distinction Lyft asks the Court to embrace. *See* No. 20 Civ. 1938, 2020 WL 1684151, at *5 (N.D. Cal. Apr. 7, 2020) ("The traditional tools of statutory interpretation all point in the same direction: Section 1 is not limited to classes of workers who transport goods in interstate commerce."), *appeal filed* (No. 20-15700).

[7]        Lyft's concession that the definition of "commerce" in Section 2 of the FAA includes the transportation of passengers further "undermines its contention that 'commerce' in § 1 does not also include passenger-transportation activities." *Singh*, 939 F.3d at 230 (Porter, J., concurring) ("Otherwise, Uber would be unable to invoke the FAA in the first place."); *cf.* Mot. Compel at 7-8.

defined "transportation workers." *Singh*, 939 F.3d at 223 (quoting *Circuit City*, 532 U.S. at 112). If commerce was limited to transport of "goods," there would be no need of a "for instance" in the *Circuit City* decision. Lyft also quotes language describing transportation workers' "necessary role in the free flow of goods," but this language also does not articulate a categorical limitation of Section 1 to goods and is immediately followed by a recognition that employees of air carriers (which transport passengers and goods) would also fall within the Section 1 carveout. *See Circuit City*, 532 U.S. at 121.[8]

Lyft cites to the D.C. Circuit's decision in *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C. Cir. 1997), but *Cole* predated *Circuit City*, and was concerned with the same question of whether Section 1 applies to all contracts of employment, or just workers involved in transportation (there, a train station security guard). *Id.* at 1469-70; *cf. Singh*, 939 F.3d at 223 & 224 n.8 (recognizing that many courts using language of transportation of goods, including *Cole*, "did not have the question of passengers versus cargo before it, and simply used 'goods' as a convenient shorthand to discuss interstate commerce"). Like *Circuit City*, the *Cole* decision did not have reason to actually analyze whether Section 1 applies to goods *and* passengers.

---

[8]    While Supreme Court dicta may be entitled to "great weight" when warranted, Mot. Compel. at 27, this is not an instance where the Supreme Court's pronouncement is clear and indicative of how it might rule in the future. *See Singh*, 939 F.3d at 223 (dicta that are "*well-considered*" may guide rulings); *cf. United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) ("'[C]arefully considered' language of the Supreme Court, even if technically dictum, generally must be treated as authoritative' . . . ." (emphasis added) (quoting *Doughty v. Underwriters at Lloyd's, London*, 6 F.3d 856, 861 n.3 (1st Cir. 1993)). *Circuit City* did not actually analyze the issue of whether Section 1 excludes passengers, and only mentioned "goods" two times in the entire majority opinion. Strikingly, since *Circuit City* the Supreme Court has repeatedly interpreted the Section 1 exemption, and referred to its application to transportation workers, without distinguishing between passengers and goods. *See New Prime*, 139 S. Ct. at 538 ("In *Circuit City*, we acknowledged that 'Section 1 exempts from the [Act] . . . contracts of employment of transportation workers.'" (alteration in original) (quoting *Circuit City*, 532 U.S. at 119))); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) ("Employment contracts, except for those covering workers engaged in transportation, are covered by the FAA").

Lyft's remaining citations to district court cases are no more persuasive.  In all but one, the plaintiffs did not actually allege they engaged in interstate commerce.  *See Heller v. Rasier, LLC*, No. 17 Civ. 8545, 2020 WL 413243, at *7 (C.D. Cal. Jan. 7, 2020) (rejecting argument that the "*intrastate* transportation of *passengers*" constituted an activity "within the flow of interstate commerce" (first emphasis added)); *Grice v. Uber Techs., Inc.*, No. 18 Civ. 2995, 2020 WL 497487, at *8-9 (C.D. Cal. Jan. 7, 2020) (substantively same as to local transport);[9] *Randle v. Metro. Transit Auth. of Harris Cty.*, No. 18 Civ. 1770, 2018 WL 4701567, at *4 (S.D. Tex. Oct. 1, 2018) (substantively same as to local transport).  *Kowalewski v. Samandarov* is notable chiefly as an outlier that concludes that the "involvement of physical goods [is] an indispensable element to being 'engaged in commerce in the same way that seamen and railroad workers are[.]'" 590 F. Supp. 2d 477, 484 (S.D.N.Y. 2008) (footnote omitted) (quoting *Powers v. Fox Television Stations, Inc.*, 923 F. Supp. 21, 23 (S.D.N.Y. 1996))).  But as explained above, this argument is not supported in the text of Section 1, in the traditional role of seamen and railroad workers, or in the definition of commerce, and it cannot be reconciled with the Supreme Court's statement in *New Prime* that "seamen" include workers who had no role in the transportation of goods.

**C.     The FAA Section 1 Exception Applies to D.C. Lyft Drivers.**

      **1.     D.C. Lyft Drivers Are Transportation Workers Engaged in Interstate Commerce.**

Once the question of whether the Section 1's reference to "commerce" applies to transporters of passengers is resolved, the analysis is a straightforward application of decades of caselaw.  If Plaintiff and others similarly situated are engaged in interstate transportation, they

---

[9]     Indeed, while the court in *Grice* acknowledged that the interstate transportation of goods is the "most obvious case" where the Section 1 applies, it did not hold it was the *only* situation in which it could apply.  *Grice*, 2020 WL 497487, at *6 (quoting *Veliz v. Cintas Corp.*, No. 03 Civ. 1180, 2004 WL 2452851 at *3 (N.D. Cal. Apr. 5, 2004)).  As a result, it distinguished *Singh* because the *Grice* plaintiff did "not present evidence or suggest that he ever transported persons (or goods) across state lines, or that he was part of a group that routinely did." *Id.* at *8.

are exempt from the FAA.  *See Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 957 (7th Cir. 2012) (holding that truckers who "occasionally transported loads" across the state border "were interstate transportation workers within the meaning of § 1"); *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Cartage Co.*, 84 F.3d 988, 993 (7th Cir. 1996) (concluding that workers of a company "primarily engaged in local trucking and [which] occasionally transports cartage across state lines" qualify as exempt transportation workers); *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) (applying Section 1 after noting "[i]f any class of workers is engaged in interstate commerce, it is postal workers"); *Am. Postal Workers Union*, 823 F.2d at 473 (same as to postal service workers); *see also Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437*, 207 F.2d 450, 453 (3d Cir. 1953) (referring to precedent holding that "bus line employees" for Pennsylvania Greyhound Lines were encompassed by Section 1); *Saxon v. Sw. Airlines Co.*, No. 19 Civ. 403, 2019 WL 4958247, at *8 (N.D. Ill. Oct. 8, 2019) ("[W]hether a worker crossed state lines is a very important factor [in the § 1 analysis]."); *cf. Sienkaniec*, 401 F. Supp. 3d at 871-72 ("[I]f [the plaintiff Uber driver] transported people across state lines, the Court would find that he is within a 'class of workers engaged in . . . interstate commerce' and that the transportation-worker exemption applies.").

Here, the geography of the D.C. metropolitan area, which extends from the District of Columbia into adjacent counties in Maryland and Virginia, Compl. ¶¶ 50-51, 55, and the nature of work and travel in the region, all but make interstate transportation of passengers a requirement of being a Lyft driver in the D.C. area.  Because D.C. metropolitan area residents often work in a jurisdiction other than which they live, and the area's major airports are all located outside the District of Columbia, interstate Lyft trips are commonplace.  Plaintiff, for

14

example, estimates that, "when driving for Lyft, she spent at least 50% of her time in the District

of Columbia, at least 20% of her time in Virginia, and at least 20% in Maryland." *Id.* ¶ 69. She

also "repeatedly began her day of work for Lyft by taking a Maryland resident into the District of

Columbia, and ended her day of work for Lyft by returning a Maryland resident from the District

of Columbia to Maryland." *Id.* ¶ 71. Plaintiff's Lyft rides included trips from the District of

Columbia and Maryland to IAD and DCA in Virginia and from the District of Columbia and

Virginia to Baltimore-Washington International Thurgood Marshall Airport in Maryland. *Id.*

¶ 60.

Lyft is well aware of the multi-state realities of driving in the District of Columbia, as

reflected by its marketing of easy access to airports in Virginia and its driver requirements

specific to those individuals working for Lyft in the District of Columbia. *See id.* ¶¶ 33, 52, 56,

58, 61-62. Lyft attempts to diminish the significance of Plaintiff's travel to airports as in and of

itself insufficient to establish the Section 1 exemption, but it strategically ignores that this is just

one part of Plaintiff's substantial showing. *See* Mot. Compel at 21.[10]

---

[10]     Notably, none of the cases that Lyft cites in its brief regarding rides to and from airports and train stations addresses the situation here, where the airport rides are likely to require crossing state lines, and where Plaintiff did in fact cross state lines when transporting passengers to and from D.C.-area airports. *Compare* Mot. Compel at 21, *with Capriole*, 2020 WL 2563276, at *7, *9 (rejecting plaintiff's Section 1 argument where only "0.3% of [Uber] trips started and ended in different states" in the Massachusetts region and the interstate rides were "not only incidental – they [were] rare"); *Mendoza v. Uber Techs. Inc.*, No. 19 Civ. 9741, 2020 WL 2563273, at *4 (C.D. Cal. Mar. 25, 2020) ("By his own admission, Plaintiff did not cross state lines. . . . Wholly intrastate transportation offered by taxi companies is purely local activity . . . ."), *report and recommendation adopted*, No. 19 Civ. 9741, 2020 WL 2563047 (C.D. Cal. May 4, 2020); *Grice*, 2020 WL 497487, at *8 ("Plaintiff did not cross state lines: Plaintiff transported persons in and around Alabama."); *Rogers*, 2020 WL 1684151, at *6; *see also United States v. Yellow Cab Co.*, 332 U.S. 218 (1947) (finding insufficient interstate travel for Sherman Act purposes when Chicago cabs "admittedly cross no state lines") (Mot. Compel at 24). For the same reason, the facts here are also stronger than those in *Cunningham*, where the court found that *Lyft* drivers were exempt from the FAA even though one of the plaintiffs never crossed state lines as a rideshare driver and the other only rarely did so. 2020 WL 1503220, at *6-7. Lyft's efforts to discredit *Cunningham*, therefore, are not persuasive. *See* Mot. Compel at 22-26. In turn, Lyft's citation to the D.C. Circuit's decision in *Pennsylvania Public Utility Commission v. United States* is questionable, given that there the court specifically found that a limousine company's transportation of passengers between an airport in one state and hotel in another *was* interstate in nature. 812 F.2d 8, 9 (D.C. Cir. 1987) (finding agency decision was not arbitrary and capricious); *cf.* Mot. Compel at 24-25.

Lyft perplexingly argues that Plaintiff's interstate travel is merely "sporadic" or "incidental," but that argument is untethered from Plaintiff's well-pleaded allegations and Lyft's own acknowledgment of the geographic reality of the D.C. metropolitan area. Mot. Compel at 18; Compl. ¶¶ 33, 52, 56, 58, 61-62. Lyft cannot credibly argue that *actual*, non-incidental interstate transportation falls outside the scope of Section 1.[11] It is also notable that Lyft had the opportunity to provide details about the interstate travel of Lyft drivers specifically in the D.C. metropolitan area, like it did with its purportedly national data, and did not do so here – presumably because such data would support Plaintiff's allegations regarding the interstate nature of her transportation job with Lyft.

### 2. The Same Result Holds True if the Court Applies the *Lenz* Test.

The conclusion that Plaintiff and those she seeks to represent are engaged in interstate commerce still holds if this Court chooses to apply the non-exhaustive multi-factor test set out in *Lenz* to determine "whether an employee is so closely related to interstate commerce that he or she fits within the § 1 exemption of the FAA." 431 F.3d at 352; *see, e.g.*, *Cunningham*, 2020 WL 1503220, at *7 (applying *Lenz*); *Austin v. DoorDash, Inc.*, No. 17 Civ. 12498, 2019 WL 4804781, at *3 (D. Mass. Sept. 30, 2019) (same); *Bell v. Ryan Transp. Serv., Inc.*, 176 F. Supp.

---

[11]    Rather, workers may be engaged in interstate commerce even when they *never* cross state lines. *See Palcko*, 372 F.3d at 593-94 (holding that plaintiff's supervision over package shipments made her work "so closely related [to interstate and foreign commerce] as to be in practical effect part of it" even though she herself had "no close contact with channels of interstate commerce" (quoting *Tenney Eng'g, Inc.*, 207 F.2d at 452)); *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 343 (D. Mass. 2019) ("[T]ransporting goods intrastate that have previously moved interstate can be sufficient to apply the [§ 1] exemption."), *appeal filed* (No. 19-1848); *Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196, 1200-02 (W.D. Wash. 2019) (holding that Section 1 applied where plaintiffs "deliver[ed] packaged goods that are shipped from around the country and delivered to the consumer untransformed," even though they made only local deliveries); *Ward v. Express Messenger Sys., Inc.*, 413 F. Supp. 3d 1079, 1087 (D. Colo. 2019) (holding that plaintiffs were Section 1 transportation workers despite "the absence of any indication that Plaintiffs transported goods across state lines"); *Christie v. Loomis Armored US, Inc.*, No. 10 Civ. 2011, 2011 WL 6152979, at *3 (D. Colo. Dec. 9, 2011) (concluding that Section 1 applied to plaintiff driver who transported currency, "a good that is undisputedly in the stream of interstate commerce," even though she failed to show interstate travel).

3d 1251, 1256 (D. Kan. 2016) (same). *But see Eastus v. ISS Facility Servs., Inc.*, 960 F.3d 207, 211 (5th Cir. 2020) (rejecting adoption of the *Lenz* test because "it unduly adds to the complexity of the analysis"); *Kowalewski*, 590 F. Supp. 2d at 482 n.3 (declining to follow the *Lenz* test because its "factors were formulated in a specific context—determining whether a worker one step removed" from actual interstate commerce was covered by the FAA).

The *Lenz* court considered the following factors:

> [F]irst, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties (i.e., a truck driver whose only job is to deliver goods cannot perform his job without a truck).

431 F.3d at 352.[12]

Applying the factors here, Plaintiff and D.C. Lyft drivers work in the transportation industry; they are directly responsible for transporting passengers in interstate commerce and do transport passengers in interstate commerce; their vehicles are essential to Lyft's business model; and, relatedly, there is a clear nexus between their work as Lyft drivers and the vehicles they use to perform those duties. The supervision factor, meanwhile, is irrelevant and the "fifth factor cuts neither for nor against the exclusion as 'on demand' drivers did not exist at the time the FAA was enacted." *Austin*, 2019 WL 4804781, at *3. The impact of a strike by Lyft drivers

---

[12]      While articulating this test, the *Lenz* court implicitly rejected a reading of Section 1 that would limit its application to workers who move goods by noting that bus drivers could also be included. *See id.* at 351 (quoting *Am. Postal Workers Union*, 823 F.2d at 473); *see also Singh*, 939 F.3d at 224 n.8 (highlighting this inconsistency).

would disrupt interstate commerce, including by limiting the transportation options of Maryland and Virginia commuters to the District of Columbia, and so this factor too favors Plaintiff.

      3.      **Plaintiff Belongs to a Class of D.C. Lyft Drivers Engaged in Interstate Commerce.**

Plaintiff brings claims exclusively under D.C. law, on behalf of herself and other similarly situated individuals who drive for Lyft in D.C. and cross state lines as a basic aspect of their job.  Lyft argues that the Court should ignore the specific focus of her well-pleaded allegations, and instead decide whether Section 1 applies to all "rideshare drivers" not just for Lyft but for *all* companies in the United States because that subclass would be "analogous to the classes of 'railroad employees' and 'seamen[.]'"  Mot. Compel at 14-16.  But all *Circuit City* and its progeny require is that the workers at issue are engaged in interstate transportation—like Plaintiffs here.  *See Circuit City*, 532 U.S. at 113-22.[13]  A court does not look at all railroad employees to determine whether Reading Railroad conductors in Pennsylvania are railroad employees, all seamen to determine if an opera singer on Caribbean Cruises is a sailor, or all rideshare drivers to determine whether Plaintiff and other D.C. Lyft drivers are transportation workers.  As Lyft avers, workers fall under the Section 1 exemption when they are, like here, "'actually engaged in the movement' of things between states."  Mot. Compel at 17.  To the extent that the category of "transportation workers" is to be divided into subclasses, it is

---

[13]    *See also Cunningham*, 2020 WL 1503220, at *7 ("*Plaintiffs* are within a class of transportation workers excluded from coverage by Section 1 of the FAA." (emphasis added)); *Fuentes v. Rush Truck Ctrs. of Cal., Inc.*, No. 18 Civ. 10446, 2019 WL 3240100, at *4 (C.D. Cal. Mar. 11, 2019) ("[U]nless *Plaintiff and the putative plaintiff class* fall under the category of 'transportation workers,' the FAA applies to their Arbitration Agreements." (emphasis added)); *Kauffman v. U-Haul Int'l, Inc.*, No. 16 Civ. 4580, 2018 WL 4094959, at *3 (E.D. Pa. Aug. 28, 2018) (in considering whether the Section 1 exemption applies in a given case, courts ask whether the *plaintiff or plaintiffs* "belong[] to a class of workers—namely, transportation workers—whose employment contracts are exempt from the [FAA]" (emphasis added)); *Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*, 325 F. Supp. 2d 1252, 1257 (D. Utah 2004) ("*Plaintiffs*, as persons who, pursuant to the Operating Agreements at issue, actually move items in interstate commerce, are in a class of workers engaged in interstate commerce, or are transportation workers, within the meaning of the exemption." (emphasis added)).

transportation workers who "are engaged in interstate commerce, or in work so closely related thereto as to be in practical effect part of it[,]" and those who are not.  *Singh*, 939 F.3d at 226.[14]

Multiple cases support the understanding that courts focus on the plaintiffs before them when performing the Section 1 analysis.  *See, e.g.*, *Palcko*, 372 F.3d at 594 n.2 (basing its holding on the plaintiff's "particular relations to the channels of interstate commerce" and her position as a direct supervisor of workers engaged in transportation); *Borgonia v. G2 Secure Staff, LLC*, No. 19 Civ. 914, 2019 WL 1865927, at *4 (N.D. Cal. Apr. 25, 2019) (declining to apply the Section 1 exemption where "plaintiffs provide only these ancillary services in a geographic area, confined to [San Francisco International Airport]"); *Ward*, 413 F. Supp. 3d at 1086-87 (basing its holding that plaintiff drivers are transportation workers on the details of the companies for which they drove and made deliveries); *Zamora v. Swift Transp. Corp.*, No. 07 Civ. 400, 2008 WL 2369769, at *4-9 (W.D. Tex. June 3, 2008) (applying the *Lenz* eight-factor test to determine where plaintiff terminal manager "[was] a 'transportation worker' under § 1 of the FAA").

The cases Lyft cites illustrate how little support Lyft actually has for its position.  Mot. Compel at 14-20.  In most, interstate travel was an incidental part of stationary work.  *See Eastus*, 960 F.3d at 212 (plaintiff was engaged in "loading and unloading airplanes"); *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289-90 (11th Cir. 2005) (plaintiff's "interstate transportation activity" was "incidental to [his] employment as an account manager"); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 505 (4th Cir. 2002) (declining to apply the Section 1 exemption

---

[14]    Ultimately, Lyft's argument is premised on a false analogy.  If it is drawing its proposed framework from a comparison with railroad employees and seamen – groups who transport both goods *and* people – then the analogous class of car drivers would be those who transport both goods and persons.  But, within such a large group of workers meaningful factual distinctions would be lost, which highlights that it is an unworkable framework designed to distract from inevitable conclusion that Lyft drivers *in the D.C. metro area* engage in interstate commerce.

19

where the plaintiff was a day laborer who would occasionally be assigned to a "transportation-related job," such as "construction, landscaping, warehousing, catering, moving, hotel, stevedoring, [and] light industrial markets" (quoting *Adkins v. Labor Ready, Inc.*, 185 F. Supp. 2d 628 (S.D.W. Va. 2001))); *Vargas v. Delivery Outsourcing, LLC*, No. 15 Civ. 3408, 2016 WL 946112, at *4 (N.D. Cal. Mar. 14, 2016) ("The evidence in this case, however, does not support the conclusion that Plaintiffs made interstate deliveries even occasionally.").

In *Capriole*, the court looked to evidence of Massachusetts drivers' interstate travel to determine whether Section 1 applied to a Massachusetts class.  2020 WL 2563276, at *9 (finding Section 1 did not apply to Massachusetts class when evidence showed that "interstate rides given by Uber drivers *in Massachusetts* is not only incidental – they are rare" (emphasis added)).  If such a framework were applied here, it would support Plaintiffs' Section 1 exclusion.  *Rogers* arguably has the broadest language in support of Lyft's position, but even *Rogers* must be read in the context of its class: *California* drivers.  *See* 2020 WL 1684151, at *1 (plaintiff raised claims only under California state law on behalf of Lyft drivers who work in California).  While some California drivers might cross state lines, most likely do not, especially given that most of its major cities are well within its state boundaries.  This is a very different reality from that of D.C. Lyft drivers, who routinely cross state lines in a metro area that includes two other states.

The framework advocated by Lyft also is inconsistent with Lyft's approach to its own drivers: Lyft has specifically defined geographic areas where Lyft drivers may work, Compl. ¶ 52 (image from Lyft website that identifies clear boundaries for the D.C. service area), *Drive with Lyft – Cities*, Lyft, https://www.lyft.com/driver/cities (last visited July 9, 2020); specific rules for D.C. metro drivers, *id.* ¶¶ 56-57 (specifying license requirements); and a separate

approval process to drive in the D.C. metro area, *id.* ¶ 33 (referring to approval process for driving in the D.C. area).

Lyft's framework would lead to absurd and unfair outcomes.  For example, some of Lyft's geographic areas are completely within one state, and some, like the District of Columbia, encompass multiple states.  It would be illogical to adopt an understanding of Section 1 that ignored the factual differences in level of engagement in interstate commerce among groups of workers.  It would require, for example, that the Court hold that rideshare drivers like Plaintiff and the D.C. class here are lumped in the same category as rideshare drivers in a city in Texas who only make intrastate trips and require that the Court decide the status of workers not even before it.

Lyft suggests that a standard approach to statutory interpretation would mean that arbitration would be interpreted differently in different states.  Mot. Compel at 16.  But if different groups have different facts, they may well and properly have a different outcome.  Ironically, this standard approach avoids the "concern" that Lyft raises regarding "narrow experience of a few workers in one geographic area [being able to] create a broad, industry-wide exemption."  *Id.* at 19.[15]

### 4.      In the Alternative, the Court Could Find That All Lyft Drivers Are Also Transportation Workers.

While the Court does not need to reach this issue, if it were to decide that the appropriate framework is *all* Lyft drivers, Plaintiff should still prevail.  Lyft claims that because only 2% of Lyft trips across the United States cross state lines, Lyft drivers are not transportation workers.

---

[15]     Lyft's argument that there is "no principled way for a court to decide which geographic unit is appropriate in each case," Mot. Compel at 15-16, makes little sense given that the scope of a class, and thus the scope of analysis, is defined by the federal or state law in play and the class definition.  The argument is disingenuous given that Lyft has clearly defined geographic areas where its drivers work.

Mot. Compel at 20.  This argument rests on the false premise that Section 1 "draw[s] a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely"; "both sorts of worker are 'engaged in foreign or interstate commerce.'"  *Kienstra Precast, LLC*, 702 F.3d at 958 (concluding that truckers were engaged in interstate commerce even though only a "few dozen" of the 1500 to 1750 deliveries made by each worker per year crossed state lines).  Lyft drivers and rideshare drivers across the country are transportation workers intimately involved in interstate commerce, even if only a lesser portion of all their aggregate trips involves crossing state lines (a point Plaintiff does not concede without discovery).

Lyft's argument that all rideshare drivers perform little interstate travel also is inconsistent with either a Rule 12(b)(6) or Rule 56 standard: Plaintiff has provided well-pleaded allegations that she and her class of Lyft drivers are engaged in interstate commerce as a routine aspect of their job.  Those allegations either must be credited at this stage or create a triable issue of fact warranting discovery as to the extent that Lyft drivers are engaged in interstate commerce.

## II.     D.C. Law Also Requires Denial of Lyft's Motion.

If the FAA does not apply, Lyft's Motion to Compel must also be denied under D.C. law.

### A.     Legal Standard.

Under D.C. Law, a summary judgment standard applies when the non-moving party challenges the existence or enforceability of an arbitration agreement.  *See Andrew*, 110 A.3d at 627 (remanding for an evidentiary hearing after finding that there was "a triable issue of fact as to the unconscionability of the arbitration agreement"); *cf. George Wash. Univ. v. Scott*, 711 A.2d 1257, 1259 n.3 (D.C. 1998) (equating denial of summary judgment with denial of motion to compel arbitration).

There is no "liberal" presumption in favor of arbitration under D.C. law, and the Supreme

Court's FAA jurisprudence does not apply.  *See Andrew*, 110 A.3d at 635 ("current and frequent

inclusion of arbitration clauses in . . . contracts of adhesion" causes "significant injury" under

D.C. law).  This means that the Supreme Court's statements in *AT&T Mobility LLC v.*

*Concepcion* that when "state law prohibits outright the arbitration of a particular type of claim . .*

*.* [t]he conflicting rule is displaced by the FAA[,]" 563 U.S. 333, 341 (2011), and in *Epic Systems*

*Corp. v. Lewis* that under the FAA arbitration agreements can impose "individualized

proceedings" instead of class actions, 138 S. Ct. 1612, 1619 (2018), are inapplicable to the

RUAA because those principles apply only when plaintiffs are covered under the FAA.

Once the FAA slips away, "policy" questions over the propriety of enforcing arbitration

agreements become "surely debatable."  *Epic*, 138 S. Ct. at 1619.

**B.      Lyft's TOS Specifically Provides That Only Federal Law (Not State Law)**
**         Applies to Its Arbitration Clause, and Nowhere Mentions D.C. Law.**

Lyft cannot compel arbitration under the RUAA because Lyft's arbitration clause is

governed exclusively by the FAA, and the FAA does not apply here.  Lyft's TOS specifically

provides "that the agreement to arbitrate . . . is governed by the Federal Arbitration Act[,]" TOS

§ 17(a), and "[e]xcept as provided with respect to arbitration, the Agreement shall be governed

by the laws of the State of California without regard to choice of law principles."  *Id.* § 21.

There is no textual basis to apply the RUAA and, indeed, neither the TOS nor the arbitration

clause even references D.C. law or the RUAA.  *See generally* TOS § 17.

In *Rittmann*, the court was faced with substantively identical language in an arbitration

clause for Amazon delivery drivers, and declined to apply a state arbitration statute when the

TOS specifically provided that it was governed by the FAA, and the drivers were exempt from

FAA.  383 F. Supp. 3d at 1203.  As the court explained: "These Terms are governed by the law

23

of the state of Washington without regard to its conflict of laws principles.  However, the preceding sentence does not apply to the [Arbitration Provision], which is governed by the Federal Arbitration Act and applicable federal law."  *Id.* at 1202 (emphasis omitted); *see also Epic*, 138 S. Ct. at 1621 (explaining that part of what parties "contracted for" in arbitration was "to specify the rules that would govern their arbitrations").[16]

If "the parties intended [state] law to apply if the FAA was found to be inapplicable, they would have said so[.]"  *Rittmann*, 383 F. Supp. 3d at 1203; *see also Hamrick v. Partsfleet, LLC*, 411 F. Supp. 3d 1298, 1302 (M.D. Fla. 2019) (Because "the Arbitration Provision itself specifically elects to apply the FAA[,] . . . the more specific provision controls, [and] the Arbitration Provision cannot be interpreted pursuant to applicable state law and must rise or fall on the application of the FAA."); *Easterday v. USPack Logistics LLC*, No. 15 Civ. 7559, at *22 (D.N.J. June 29, 2016) (contrasting arbitration in that case with others where the "arbitration agreement itself envisioned the possibility that [the] employment contract would be deemed exempt from the FAA's coverage" and specifically for the application of state law (quoting *Palcko*, 372 F.3d at 596)) (attached as Ex. B).  Lyft's TOS did not specify that D.C. law would apply in the absence of the FAA, and expressly declined to have California law apply to the arbitration clause.

Lyft's omission is especially telling because Lyft had unilateral control over drafting the terms of its TOS[17] and chose for only the FAA to apply.  *See Rittmann*, 383 F. Supp. 3d at 1203

---

[16]     *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* reiterates that the rules of an arbitration depend on what rules are actually specified in the contract – either state or federal.  489 U.S. 468, 479 (1989) ("Where, as here, the parties have agreed to abide by state rules of arbitration [by incorporating the rules into their agreement], enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward.").

[17]     Shah Decl. ¶ 4 ("Lyft Platform requires an individual to . . . consent to the Terms of Service Agreement" including "drivers").

(explaining "touchstone of contract interpretation is parties' intent" (quoting *Pelly v. Panasyuk*, 413 P.3d 619, 629 (Wash. Ct. App. 2018))).  Presumably this was a reasoned decision on Lyft's part because it operates in many states.  Indeed, Lyft itself recognizes that D.C.-area Lyft drivers invariably reside and work in at least three separate states and defines its D.C. metropolitan service area accordingly.  *See, e.g.*, Compl. ¶¶ 34, 52.  But Lyft cannot now change the law "govern[ing]" the arbitration clause to avoid its prior selection.

To the extent there is ambiguity as to what law applies, it "is settled law that any ambiguity in a contract will be construed against the drafter" – here, Lyft.  *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 328 (D.C. 2001); *see also Rittmann*, 383 F. Supp. 3d at 1203.

### C.    The RUAA Does Not Apply to Mandatory Consumer Arbitration Contracts.

Adhesive arbitration contracts like Lyft's are also expressly unenforceable under the express terms of the RUAA.  The RUAA provides that "[a] provision for mandatory binding arbitration within a consumer arbitration agreement is void and unenforceable except to the extent federal law provides for its enforceability."  D.C. Code Ann. § 16-4403(d).  In turn, the RUAA defines a "[c]onsumer arbitration agreement" as "a standardized contract, written by one party, with a provision requiring that disputes arising after the contract's signing shall be submitted to binding arbitration, and the other party is a consumer."  *Id.* § 16-4401(4).  And, the RUAA defines a "[c]onsumer" as "a party to an arbitration agreement who, in the context of that arbitration agreement, is an individual, not a business, who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes, including, but not limited to, financial services, healthcare services, or real property."  *Id.* § 16-4401(3).

There is admittedly little case law on this section of the RUAA, but the plain language is clear – the agreement here fits within its ambit.  First, Lyft's arbitration clause is a provision for mandatory binding arbitration, and so is void and unenforceable under D.C. law if it is a "consumer arbitration agreement."[18]  Second, Lyft's TOS is a standardized contract, written by Lyft and not Plaintiff, that requires that disputes be submitted to binding arbitration, and so it is a "consumer arbitration agreement" if Plaintiff is a "consumer."[19]  Third, Plaintiff is an individual who sought access to the "service" of Lyft's App and payment from Lyft (further "goods or services"), in exchange for her employment, to pay for food, rent, and household supplies (i.e. "for personal, family or household purposes").  *See* Osvatics Decl. ¶ 4.

Lyft will likely argue that its drivers are not "consumers" under the RUAA.  But the RUAA defines "consumer" in "the context of th[e] arbitration agreement," and not by the actual realties of the employment relationship.  Here, Lyft's arbitration clause, TOS more generally, motion, and supporting declaration all assert that Lyft is a purveyor of "services" to consumers, including by providing access to its platform for both riders and drivers.[20]  Lyft also specifically chose that the "consumer" (and not employment) rules would govern arbitration with Plaintiff. *See* TOS § 17(d) ("Any arbitration conducted pursuant to this Arbitration Agreement shall be

---

[18]      *See* TOS at 2 ("IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MAY NOT USE OR ACCESS THE LYFT PLATFORM OR ANY OF THE SERVICES PROVIDED THROUGH THE LYFT PLATFORM."); *id.* at § 17 ("Agreement to Binding Arbitration Between You and Lyft").

[19]      *Id.*; *see also* Shah Decl. ¶ 4 ("Lyft Platform requires an individual to . . . consent to the Terms of Service Agreement" including "drivers").

[20]      TOS at 2-3; *see, e.g.*, Shah Decl. ¶ 3 (describing itself as a "marketplace platform" that matches riders to drivers but does not "hire drivers" and instead offers services including "Lyft's website, technology platform, and mobile phone application"); TOS at 2 ("These Terms of Service . . .  govern[] your use of the Lyft application, website, and technology platform."), 3 ("Drivers and Riders are collectively referred to herein as 'Users,' and the driving services provided by Drivers to Riders shall be referred to herein as 'Rideshare Services.'"); *see also id.* at 3 (describing platform as "provid[ing] a marketplace" matching those seeking transportation to those providing transportation).  Lyft repeatedly describes the Lyft App as a service: "[t]he transaction evidenced in the Lyft Terms of Service is the 'use of the Lyft application, website, and technology platform."  Mot. Compel. at 7 (citing TOS).

administered by the American Arbitration Association ("AAA") pursuant to its Consumer

Arbitration Rules[.]").

>   **D.    Lyft's TOS Is Unenforceable Because It Is Contrary to D.C. Public Policy.**

Lyft's arbitration clause is also unenforceable under the well-established principle that

"[a] court may refuse to enforce a provision in a contract if 'the interest in its enforcement is

clearly outweighed in the circumstances by a public policy against enforcement of such terms.'"

*Adduci v. Krane*, No. 13 Civ. 1104, 2015 WL 471701, at *3 (D.D.C. Feb. 4, 2015) (quoting

*Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 79 (D.D.C. 2008)); *see also Cunningham*, 2020 WL

1503220, at *8-9 (refusing to compel arbitration under Massachusetts law because "class action

waivers, like the one in Lyft's Terms, 'contravene[] Massachusetts public policy'" (citation

omitted)); *U.S. ex rel. Head v. Kane Co.*, 668 F. Supp. 2d 146, 152 (D.D.C. 2009) ("[A] private

agreement is unenforceable on grounds of public policy if its enforcement is clearly outweighed

by a public policy against such terms."); *Sharp v. Ward*, No. 01 Civ. 2184, 2004 WL 1835102, at

*12 (D.C. Super. Ct. Aug. 16, 2004) ("[A] Court can decline to enforce a contract that would be

unsound or against public policy." (citing Restatement (Second) of Contracts § 178(1) (2009))).

The District of Columbia has a developing – but strongly articulated – policy against the

enforcement of adhesive arbitration agreements that companies impose on individuals without

opportunity to negotiate, especially when they contain class waivers.  In 2008, the D.C. Council

passed the RUAA to address the concern that the D.C. Uniform Arbitration Act (D.C.'s then-

current arbitration statute) did not sufficiently protect individuals from adhesive mandatory

arbitration contracts imposed by companies.  The passage of the RUAA was animated by

concern over "a significant increase in the use of arbitration clauses" in "contracts of adhesion"

and that such clauses have been "used to the detriment of consumers."  *Andrew*, 110 A.3d at 634.

As the D.C. Court of Appeals explained, "the D.C. Council's concern that consumers were being

taken advantage of by being forced to submit to arbitration based on the terms of an adhesion contract entered into with a commercial entity was a motivating factor behind the decision to add several consumer-friendly provisions into the RUAA." *Id.* (citing Comm. on Pub. Safety & the Judiciary, Rep. on Bill 17–50, at 2 (D.C. 2007) ("RUAA Committee Report")). This "concern" is equally applicable to consumers and workers in this context. *See, e.g.*, RUAA Committee Report at 159 (testimony discussing concerns of "consumers and employees" as the same).[21]

In analyzing the RUAA, the D.C. Court of Appeals has articulated several policy reasons for why adhesive contracts should not be enforced against individuals: (i) they "are not, of course, negotiable, such that consumers are often forced into agreeing to arbitrate any claims arising out of the consumer transaction, thus forfeiting the option to resort to the courts," *Andrew*, 110 A.3d at 634; (ii) companies are "repeat players" in arbitral forums such that they maintain an "imbalance in power[,]" *id.* at 637; (iii) "arbitration can be costly and time-consuming, and does not afford the consumer the same process as the courts[,]" *id.* at 635; (iv) judicial review is "extremely limited[,]" *id.* at 636; and (v) class action waivers may be substantively unconscionable when imposed in contracts of adhesion, *id.* at 638. As a result,

---

[21]    Courts, commentators, and policymakers also have long treated the concerns of workers and consumers faced with mandatory arbitration as the same. *See, e.g.*, *Rickard v. Teynor's Homes, Inc.*, 279 F. Supp. 2d 910, 918 n.8 (N.D. Ohio 2003) ("[S]imilar to mandatory arbitration for employees, mandatory arbitration for consumers could be unfair to those consumers who cannot afford to arbitrate because it may also lock them out of the judicial process, leaving them unable to seek any, much less meaningful redress for their injuries."); Arbitration Fairness Act of 2018, S. 2591, 115th Cong. § 3 (2018) ("Most consumers and employees have little or no meaningful choice whether to submit their claims to arbitration. Often, consumers and employees are not even aware that they have given up their rights."); Forced Arbitration Injustice Repeal Act, H.R. 1423, 116th Cong. §§ 1-2 (2019) ("The purposes of this Act are to . . . prohibit agreements and practices that interfere with the right of individuals, workers, and small businesses to participate in a joint, class, or collective action[.]"); Imre S. Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements*, 19 Cardozo J. Conflict Resol. 653 (2018); David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration*, 1991 Wis. L. Rev. 33, 60-61 (1997); Jean R. Sternlight, *Panacea or Corporate Tool? Debunking the Supreme Court's Preference for Binding Arbitration*, 74 Wash. U. L.Q. 637, 679 (1996) (comparing concerns for "'one-shot players' such as employees and consumers" who are each "less able to make informed selections of arbitrators than 'repeat-player' companies"), *cited with approval by Cole*, 105 F.3d at 1476.

"the current and frequent inclusion of arbitration clauses in . . . contracts of adhesion" causes "significant injury." *Id.* at 635.

The concerns that led to the passage of the RUAA, and which were articulated in *Andrew*, apply with equal force to Lyft's TOS, rendering it unenforceable as a matter of public policy. *See Samuels v. S. Hills Ltd. P'ship*, 289 F. Supp. 3d 26, 31 (D.D.C. 2017) (finding contractual obligation could not be enforced against plaintiff after reviewing D.C. regulations reflecting a "strong public policy" against enforcement of the obligation).[22]

First, as Lyft admits, the contract was not negotiable, and was imposed as a requirement to utilize Lyft's services. *See* TOS at 1; Shah Decl. ¶ 5; Osvatics Decl. ¶ 2. Second, Lyft is a repeat player in the arbitral forum, and thus has more power. *See Cole*, 105 F.3d at 1476 (noting empirical evidence showing advantage that "'repeat-player' companies" have in arbitration).[23] Third, Lyft seeks to force individuals into costly and time-consuming individual arbitrations and deny them the efficiencies of aggregate litigation in court. *See* TOS § 17(b) & (i); Mot. Compel at 11-12; *see also Cunningham*, 2020 WL 1503220, at *8-9. This concern applies with special force here, because Plaintiff's sick leave claims will be too expensive to litigate for many individual class members absent the class action mechanism. Fourth, D.C.'s concerns over mandatory arbitration (including where a class action waiver is imposed upon a consumer or

---

[22]     While the issue of whether the agreement was void as a matter of public policy was not before the *Andrew* court, its reasoning, in combination with the legislative history of the RUAA, provide sufficient support for this Court to find that Lyft's contract is unenforceable as a matter of D.C. public policy. *Cf. Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C. 1997) (stating that court will recognize a new "public policy exception when circumstances warrant such recognition").

[23]     Lyft is indisputably a "repeat-player." *See, e.g.*, Alison Frankel, *3,420 Lyft Drivers Claim the Company Won't Pay Arbitration Fees to Launch Their Cases*, Reuters (Dec. 18, 2018), https://www.reuters.com/article/legal-us-otc-lyft/3420-lyft-drivers-claim-the-company-wont-pay-arbitration-fees-to-launch-their-cases-idUSKBN1OD2KC.

worker), are shared by numerous and diverse states across the country.[24]  This is of particular

relevance given the *Andrew* court's own review of "various cases in which other courts found

such clauses barring class actions substantively unconscionable."  110 A.3d at 638.  Fifth, Lyft's

arbitration clause severely limits judicial review and right of appeal.  TOS § 17.

### E.      Lyft's Arbitration Clause Is Unconscionable Under D.C. Law.

Further, Lyft's arbitration clause is unconscionable under D.C.'s procedural and

substantive unconscionability analysis.  *Andrew*, 110 A.3d at 638.  A contract may be

procedurally unconscionable if, among other factors, (1) it is a contract of adhesion or (2) the

person contesting the agreement "lacked meaningful choice" in avoiding the agreement, given

that such clauses were "industry standard."  *Id.* at 637-38.  A contract may be substantively

unconscionable if, among other factors, it includes a class action waiver.  *Id.* at 638.  Both prongs

do not always need to be met; "in an egregious situation, one or the other may suffice."  *Bennett*

*v. Fun & Fitness of Silver Hill, Inc.*, 434 A.2d 476, 481 n.4 (D.C. 1981)

As to procedural unconscionability, Lyft's TOS and arbitration clause are undisputedly

presented on a take-it-or-leave-it basis in a contract of adhesion.  *See* TOS at 1; Shah Decl. ¶ 5;

Osvatics Decl. ¶ 2.  The TOS is "not, of course, negotiable," *Andrew*, 110 A.3d at 635, and

---

[24]      *See, e.g.*, *Muhammad v. Cty. Bank of Rehoboth Beach*, 912 A.2d 88, 100 (N.J. 2006) (identifying that "class action waivers can functionally exculpate wrongful conduct by reducing the possibility of attracting competent counsel to advance the cause of action" and finding such a waiver unenforceable under New Jersey law); *Scott v. Cingular Wireless*, 161 P.3d 1000, 1004, 1008 (Wash. 2007) (applying Washington state law and holding that a class action waiver was unconscionable and violated public policy where the claims may be "too small and too complex factually and legally" to effectively bring on an individualized basis); *Cooper v. QC Fin. Servs., Inc.*, 503 F. Supp. 2d 1266, 1290 (D. Ariz. 2007) (district judge applying Arizona law to find that "the arbitration provision is unconscionable and against public policy because of the prohibition on class-actions"); *Coady v. Cross Country Bank*, 729 N.W.2d, 732, 746-48 (Wis. 2007) (applying Wisconsin law and finding class arbitration waiver procedurally and substantively unconscionable); *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 278 (W. Va. 2002) ("In many cases, the availability of class action relief is a sine qua non to permit the adequate vindication of consumer rights."); *Gentry v. Super. Ct.*, 165 P.3d 556, 564 (Cal. 2007) (finding that class action waivers in arbitration agreements "lead to a de facto waiver [of statutory rights] and would impermissibly interfere with employees' ability to vindicate unwaivable rights and to enforce the overtime laws").

Plaintiff had little meaningful choice in rejecting the contract because mandatory arbitration clauses have become "nearly ubiquitous" in the rideshare industry.  *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, No. 13 Civ. 3826, 2013 WL 6407583, at *6 (N.D. Cal. Dec. 6, 2013) (finding Uber imposes mandatory arbitration agreements on drivers), *rev'd on other grounds by Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016).  Given the strong D.C. policy against contracts of adhesion imposed by corporations onto individuals, *see supra* Argument § II.D, this factor in and of itself should render Lyft's arbitration clause unenforceable.[25]

As to substantive unconscionability, Lyft's arbitration clause undisputedly requires drivers to forfeit their right to bring or participate in any pending class or collective action.  *See* TOS § 17(b) & (i); Mot. Compel at 11-12.  This is a term that is unreasonably favorable to Lyft because it forces individuals into timely and costly individual litigation, prevents individuals from effectively vindicating their rights, and exculpates companies that have engaged in unlawful conduct, and thus is substantively unconscionable.  *See Cunningham*, 2020 WL 1503220, at *8-9; *supra* Argument § II.D (collecting cases); *cf. Andrew*, 110 A.3d at 638 (finding relevant to D.C. unconscionability analysis that numerous other states find class waivers unconscionable).  The *Andrew* court also cast serious doubt on the dubious, but oft-asserted, argument that individual litigants are better off in arbitral forums, explaining that "arbitration can

---

[25]       Lyft claims that Plaintiff could have opted out of the arbitration clause within 30 days of signing, Mot. Compel at 4, but that does not cure the unconscionability under the RUAA because Lyft's TOS still imposes "*pre-dispute* binding mandatory arbitration as a condition of doing business with or working for [a] corporation" – the precise concern that animated the passage of the RUAA, *see* RUAA Committee Report, at 5 (emphasis added).  This legislative history is especially relevant because it provided much of the basis for the *Andrew* court's ruling. *Andrew*, 110 A.3d at 634.  If anything, burying the opt-out provision in over 15,000 words of scrollwrap itself provides yet another element of procedurally unconscionability, and likely renders the opt out provision illusory. *See, e.g.*, *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (Sotomayor, J.) (holding that clickwrap agreements on a take it or leave it basis are procedurally unconscionable); *O'Connor*, 2013 WL 6407583, at *6 (finding rideshare scrollwrap arbitration agreement unconscionable under California law because "[w]hile the Licensing Agreement did afford Uber drivers thirty (30) days to opt out of the arbitration provision, the opt-out provision is buried in the agreement. It is part of the arbitration provision, which itself is part of the larger, overall Licensing Agreement."); *Aral v. EarthLink, Inc.*, 36 Cal. Rptr. 3d 229, 238 (Cal. App. 2005) (holding that clickwrap agreements on a take it or leave it basis are procedurally unconscionable).

31

be costly and time-consuming, and does not afford the consumer the same process as the courts." *Id.* at 635.[26] This too factors into the unconscionability analysis.

In asserting that its arbitration clause does not run afoul of D.C. law, Lyft does not address *Andrew* at all and musters scant D.C. authorities.  *See* Mot. Compel at 29-30.  Most of it predates *Andrew* and the RUAA (sometimes by decades), and thus is inapposite or no longer good law.  *See, e.g., Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007 (D.C. 2002) (regarding enforcement of forum selection clause, not addressing mandatory arbitration, and predating RUAA); *Masurovsky v. Green*, 687 A.2d 198, 204 (D.C. 1996) (significantly predating RUAA and noting only that previously interpretations of FAA can be persuasive authority for D.C. Uniform Arbitration Act, a different statute than the RUAA).[27]

Finally, while *Andrews* remanded the case to the trial court for an evidentiary hearing to specifically determine if the arbitration agreement was unconscionable, the Court need not do so here.  Lyft admits that its TOS is a contract of adhesion that contains a mandatory arbitration clause with a class waiver, *see* Mot. Compel at 12, and the Court can find these terms unenforceable.

## III.   Lyft Has Not Met Its Burden to Show That Plaintiff Agreed to Lyft's TOS and Mandatory Arbitration Clause.

### A.   Legal Standard.

Regardless of whether the FAA or RUAA might apply, "as the party seeking to enforce an arbitration agreement," Lyft also "has the burden of proving" that Plaintiff agreed to arbitrate

---

[26]   Given this language, if directly presented with the question today it is likely that the D.C. Court of Appeals would find such class waivers, especially in consumer and employment contracts of adhesion, substantively unconscionable and exculpatory in violation of D.C. public policy.

[27]   Lyft's only other D.C. authorities, which address the non-disputed issue of whether the claims are covered by the language of the arbitration clause, are also plainly inapposite.  *See, e.g., Parker v. K & L Gates, LLP*, 76 A.3d 859, 867 (D.C. 2013) (involving arbitration dispute between former law firm partner who was not subject to contract of adhesion and class waiver).

under D.C. contract principles (*i.e.*, that an agreement was formed). *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020).

No presumption in favor of arbitration exists for this threshold question, because the application of the FAA or RUAA has yet to be established. *See New Prime*, 139 S. Ct. at 537; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301-02 (2010). Courts apply a summary judgment standard to the "issue of whether or not there had been a meeting of the minds on the agreement to arbitrate[.]" *Aliron Int'l, Inc.*, 531 F.3d at 865 (quoting *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, No. 05 Civ. 151, 2006 WL 1793295, at *1 (D.D.C. June 28, 2006)).

**B.      Lyft Has Not Proved a Binding Contract to Arbitrate Was Formed.**

Here, Lyft cannot meet its burden to establish formation because it cannot show that Plaintiff intended to be bound by what Lyft claims to be the "binding" 2019 version of the TOS, *see* Mot. Compel at 3, or that there was meaningful, mutual consideration for the formation of a contractual agreement at that time.

First, D.C. law requires that "for an enforceable contract to exist, there must be both (1) agreement as to all the material terms, and (2) intention of the parties to be bound." *SJ Enters., LLC v. Quander*, 207 A.3d 1179, 1182 (D.C. 2019) (quoting *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005)).

Lyft seeks to compel arbitration specifically based on Plaintiff's access to the Lyft App on May 4, 2020 and its operative November 27, 2019 TOS ("2019 TOS"). Mot. Compel at 3. But Plaintiff stopped driving for Lyft in June 2018 in large part due to Lyft's failure to take appropriate remedial measures to ensure her safety in the face of sexual harassment from male riders. Osvatics Decl. ¶ 2. Because of this, she has had no intent to resume her employment with the company. *Id.* ¶ 5. In fact, after she stopped driving for Lyft, Plaintiff also ceased

complying with Lyft's D.C. driver requirements, including keeping a current Transportation

Network Operator license from the state of Maryland, submitting her vehicle to a yearly safety

inspection in Virginia, updating her vehicle and insurance information in the Lyft App (both of

which have changed since she last drove), and failing to display the Lyft driver emblem on her

car. *See id.* ¶ 6; *Washington D.C. Driver Information*, Lyft, https://help.lyft.com/hc/en-

us/articles/115012929787-Washington-D-C-Driver-Information#document (last visited July 11,

2020).   Accordingly, there was no "meeting of the minds" between the parties necessary for

contract formation.  *See, e.g.*, *Quander*, 2017 A.3d at 1182 (finding no contract formation where

party lacked sufficient intent to form agreement to lease agreement, even where she manifested

some indicia of assent in an email communication).[28]

Second, D.C. law also requires consideration for a valid contract to be formed.  *3511 13th*

*St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 442 (D.C. 2007).

Because Plaintiff had no intent to drive for Lyft or use the Lyft App,[29] she was not provided any

consideration for her purported agreement to arbitrate.  *See id.* ("[I]f in fact no consideration was

intended and none given, recital of a consideration cannot make the promise enforceable."

(citation omitted) (quoting *Allen v. Allen*, 133 A.2d 116, 118 (D.C. 1957))).  Lyft cannot

plausibly assert that it intended to provide the benefit of its driver platform, *i.e.*, employment, to

---

[28]     Lyft's cited authorities on this issue, *see* Mot. Compel at 8-10, do not address this specific factual scenario where one party to a click or scrollwrap agreement had no intention to access the services offered by the party seeking to enforce a contractual arbitration agreement, and are therefore inapposite.  In *Selden v. Airbnb*, for example, the plaintiff intended to access a rental property through Airbnb's online platform, but alleged he could not do so because of race discrimination.  No. 16 Civ. 933, 2016 WL 6476934, at *1 (D.D.C. Nov. 1, 2016).  The drivers in Lyft's own cases such as *Bekele v. Lyft*, 918 F.3d 181, 184-190 (1st Cir. 2019), and *Brunner v. Lyft*, No. 19 Civ. 4808, 2019 WL 6001945, at *1 (N.D. Cal. Nov. 14, 2019), also intended to work as drivers for Lyft.

[29]     To the extent that Plaintiff may have accessed the Lyft App in her capacity as a *rider* of Lyft's services, then the arbitration provision is unquestionably "void and unenforceable" under the D.C. RUAA.  *See* D.C. Code Ann. § 16-4403(d) ("A provision for mandatory binding arbitration within a consumer arbitration agreement is void and unenforceable except to the extent federal law provides for its enforceability.").

someone who clearly did not wish to access it (or, as explained above, was not even eligible for it) – and, indeed fails to identify any consideration it purportedly gave Plaintiff in 2020 (*see* Mot. Compel at 6-8).  Similarly, Plaintiff cannot, and does not, purport to have provided any meaningful consideration by way of an offer to drive for Lyft.  There is a failure of consideration on both sides of the agreement.

Lyft may counter that even if no binding agreement to arbitrate was formed in May 2020, Plaintiff is still bound to arbitrate under a prior version of the TOS.  But Lyft bears the burden to prove the existence of an agreement to arbitrate, *see Camara*, 952 F.3d at 373, and (1) did not actually move to compel arbitration under any prior version of the TOS, (2) did not provide the prior versions of the TOS with its Motion, and (3) made only conclusory, passing remarks in its Motion and supporting declaration that are insufficient to demonstrate why Plaintiff should be bound to the prior versions of the TOS.  *See, e.g.*, ECF No. 6-5 (Defendant's Proposed Order for Mot. Compel) (seeking arbitration "in accordance with Lyft's Terms of Service, dated November 27, 2019); Mot. Compel at 3 ("According to Lyft's business records, Plaintiff accepted Lyft's Terms as a driver on four separate occasions"); Shah Decl. ¶ 13 (same) (failing to provide any "business records" to substantiate assertion that Plaintiff signed prior versions of TOS).  In any event, Lyft avers that those versions of the TOS have been superseded.  *See* Mot. Compel at 3 ("The most recent, and thus currently binding Terms of service is dated November 27, 2019." (citing Shah Decl. ¶ 13)).

To the extent Lyft intends to expand its motion in a reply brief, that request should be denied.  Lyft cannot rely on arguments or documents Plaintiff has not had a chance to review and address.  *See Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51-52 (D.D.C. 2015) ("[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments

first raised in a reply brief." (quoting *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011))); *Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 22 (D.D.C. 2013) (party forfeits argument made for the first time in its reply brief).[30]

## IV.   In the Alterative, Plaintiff Requests Limited Targeted Discovery.

Should the Court be inclined to grant Lyft's motion to compel arbitration, Plaintiff requests that the Court first permit limited discovery and an evidentiary hearing pursuant to the FAA and/or RUAA.  *See* 9 U.S.C. § 4; *Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1120 (D.C. 2010) (under D.C. law "a court conduct[s] 'an expedited evidentiary hearing' when parties dispute the validity of the arbitration clause" (footnote omitted) (quoting *Haynes v. Kuder*, 591 A.2d 1286, 1290 (D.C. 1991))).

First, to the extent the Court requires further factual development to determine whether Plaintiff and others similarly situated are sufficiently involved in interstate transportation to warrant an exemption from Section 1, Plaintiff requests the opportunity to seek that discovery. *See, e.g.*, *Singh*, 939 F.3d at 218.[31]

Like in *Sienkaniec*, the Court could benefit "from the development of a factual record" in the form of information like: "the total number of [Lyft] drivers nationwide, and the number of such drivers who have transported a passenger across state lines; the total number of [Lyft] trips that originate in [the D.C. metropolitan area], and the number of such trips that cross state lines; and the total number of [Lyft] drivers in [the D.C. metropolitan area], and the number of such

---

[30]    "Declining to consider arguments made for the first time in a reply brief is particularly appropriate where . . . 'the new argument on Reply is inconsistent with the party's earlier'" position.  *Benton*, 121 F. Supp. 3d at 52 (quoting *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n. 5 (D.D.C. 2008)).  Here, Lyft asserted in its Motion that the 2019 TOS was the superseding "and thus [the] currently binding" version of the TOS.  Mot. Compel at 3.

[31]    While in *Singh* the Third Circuit remanded for factual findings, courts can conclude that § 1 applied without the aid of discovery where the record is clear as to interstate travel – as it is here.  *See, e.g.*, *Cunningham*, 2020 WL 1503220; *Waithaka*, 404 F. Supp. 3d 335; *Rittmann*, 383 F. Supp. 3d 1196.

drivers who have transported a passenger across state lines." *Sienkaniec*, 401 F. Supp. 3d at 872-73.  Such information can be easily produced by Lyft given the declaration of Ian Muir, Lyft's Head of Department of Economics, who states that "[i]n the ordinary course of business, Lyft maintains information about rides given on its platform, including about when and where users begin and end such rides."  ECF No. 6-4 (Declaration of Ian Muir ("Muir Decl.")) ¶ 3.

Plaintiff would also seek discovery targeted to the importance of interstate travel to Lyft's business in the D.C. area, including its marketing of airport travel.  *See, e.g.*, Compl. ¶¶ 58, 61, 62.  To the extent the Court believes it relevant, Plaintiff would seek to test the statements made by Lyft declarant Ian Muir, including the basis for his statement that "**less than 2%**" of Lyft rides in the U.S. involved crossing statements and the underlying data.  Muir Decl. ¶ 5.  In Plaintiff's counsel's experience, data can often be subject to strategic interpretation by the party using it to support their case, when untested through the adversary process.  Relatedly, Plaintiff would seek to test Lyft's self-serving and conclusory assertion that all rideshare drivers for any company (the fully number of which Lyft does not define) are sufficiently alike for the FAA exemption to apply equally to them.

Second, Plaintiff would request a complete version of the TOS that Lyft contends she signed, and if necessary subsequent briefing based on what that document reveals.  *See generally* TOS.  The copy Lyft submitted to the Court is rife with omissions, including sentences half (or more) cut off, *e.g.*, *id.* at 5, 7, 10, 11, 12, 14, 18, 21-22, an entire section with no language included, *id.* § 5 ("Payments"), and clauses of sentences cut off between pages – including, most troublingly, in Section 17 ("DISPUTE RESOLUTION AND ARBITRATION AGREEMENT").  For example:

- Reading the last line of page 16 and the first line of page 17 (describing the disputes subject to arbitration) suggests a seemingly nonsensical clause: ". . . the threatened or actual [page break] secrets . . . .";

- Reading the last line of page 18 and the first line of page 19 (describing the "Rules Governing the Arbitration") does not create a complete sentence: "Notwithstanding the foregoing, if requested by you and if proper based on [page break] Claims, or otherwise preside over any form of representative collective, or class proceeding."; and

- Reading the last line of page 20 and the first line of page 21 (describing "Exceptions to Arbitration") also does not create a complete sentence: "Where these claims are brought in [page break] Arbitration Agreement (including without limitation the waivers provided in Section 17(b)), or of the enforceability of this Arbitration Agreement as to any other dispute, claim, or controversy."

These are but a few examples that illustrate the omission of information potentially relevant to Plaintiff's response to Lyft's motion to compel.

Third, to the extent the Court finds that Plaintiff's purported May 4, 2020 agreement to Lyft's November 27, 2019 TOS is invalid because it lacked consideration, and Lyft contends that Plaintiff is bound by earlier versions of its TOS that Lyft contends she signed on October 4, 2015, October 30, 2016, and May 4, 2018, Plaintiff will seek the opportunity to review those documents (Lyft curiously omitted them from its motion) including any defenses to arbitration they may reveal.

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court deny Lyft's Motion in its entirety.

Dated: July 14, 2020

Respectfully submitted,

*/s/ Christopher M. McNerney*
Christopher M. McNerney (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email:  cmcnerney@outtengolden.com

*/s/ Sally J. Abrahamson*
Sally J. Abrahamson (Bar No. 999058)
Mikael A. Rojas (Bar No. 1034085)
Pooja Shethji (Bar No. 1632574)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, DC 20001
Tel.: (202) 847-4400
Fax: (646) 509-2097
Email: sabrahamson@outtengolden.com
Email: mrojas@outtengolden.com
Email: pshethji@outtengolden.com

*Attorneys for Plaintiff and the Proposed Class*

39