**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CASSANDRA OSVATICS, on behalf of
herself and all others similarly situated,

               Plaintiff,

v.

LYFT, INC.,

               Defendant.

Case 1:20-cv-01426-KBJ

**LYFT'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL INDIVIDUAL**
**ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      THE PARTIES FORMED A VALID AGREEMENT TO ARBITRATE ......................... 1

II.     THE SECTION 1 EXEMPTION IS INAPPLICABLE AND THE FAA
        REQUIRES ENFORCEMENT OF THE ARBITRATION AGREEMENT..................... 4

        A.      The relevant class of workers does not engage in interstate commerce ................ 5

                1.      The relevant class of workers is rideshare drivers .................................. 5

                2.      Rideshare drivers are not engaged in interstate commerce................... 10

        B.      Section 1 does not apply to workers who, like rideshare drivers, transport
                passengers rather than goods. .............................................................................. 14

        C.      There is no basis for discovery on FAA issues.................................................... 15

III.    D.C. LAW REQUIRES ENFORCEMENT OF THE ARBITRATION
        AGREEMENT ......................................................................................................... 17

        A.      If Plaintiff Is FAA-Exempt, The D.C. RUAA Applies........................................ 17

        B.      The Arbitration Agreement Is Enforceable Under D.C. Law ............................. 20

CONCLUSION.................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................ 27

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*,
  531 F.3d 863 (D.C. Cir. 2008) ...............................................................................................16

*Allied-Bruce Terminix Companies, Inc. v. Dobson*,
  513 U.S. 265 (1995)...............................................................................................7, 9, 13

*Atchison, Topeka & Santa Fe Ry. Co. v. Buell*,
  480 U.S. 557 (1987).............................................................................................................13

*Atwood v. Rent-A-Ctr. E., Inc.*,
  2016 WL 2766656 (S.D. Ill. May 13, 2016)........................................................................18

*Bacashihua v. U.S. Postal Serv.*,
  859 F.2d 402 (6th Cir. 1988) ................................................................................................7

*Bekele v. Lyft, Inc.*,
  199 F. Supp. 3d 284 (D. Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019)............................23

*Booker v. Robert Half Int'l, Inc.*,
  315 F. Supp. 2d 94 (D.D.C. 2004), *aff'd*, 413 F.3d 77 (D.C. Cir. 2005)..................................3

*Bradley v. Nat'l Collegiate Athletic Ass'n*,
  2020 WL 2800604 (D.D.C. May 29, 2020).........................................................................23

*Brady Ctr. to Prevent Gun Violence v. U.S. Dep't of Justice*,
  410 F. Supp. 3d 225 (D.D.C. 2019) ....................................................................................13

*Byars v. Dart Transit Co.*,
  414 F. Supp. 3d 1082 (M.D. Tenn. 2019) ...........................................................................19

*Camara v. Mastro's Restaurants LLC*,
  952 F.3d 372 (D.C. Cir. 2020) ..............................................................................................5

*Capriole v. Uber Techs., Inc.*,
  2020 WL 2563276 (N.D. Cal. May 14, 2020) .....................................................................17

*Cavallo v. Uber Techs., Inc.*,
  2017 WL 2362851 (D.N.J. May 31, 2017) ....................................................................20, 21

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001)........................................................................................... *passim*

ii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Cole v. Burns Int'l Sec. Servs.*,
 105 F.3d 1465 (D.C. Cir. 1997) ...................................................................14, 18

*Diaz v. Michigan Logistics Inc.*,
 167 F. Supp. 3d 375 (E.D.N.Y. 2016) .................................................................18

*Easterday v. USPack Logistics LLC*,
 No. 15 Civ. 7559 (D.N.J. June 29, 2016)............................................................19

*Eastus v. ISS Facility Servs., Inc.*,
 960 F.3d 207, 211 (5th Cir. 2020) ......................................................................14

*Epic Sys. Corp. v. Lewis*,
 138 S. Ct. 1612 (2018)........................................................................................25

*Fuentes v. Rush Truck Centers of California, Inc.*,
 2019 WL 3240100 (C.D. Cal. Mar. 11, 2019).......................................................8

*In re Grand Jury Investigation*,
 916 F.3d 1047 (D.C. Cir. 2019) ..........................................................................15

*Green Tree Fin. Corp.-Ala. v. Randolph*,
 531 U.S. 79 (2000)................................................................................................5

*Hamrick v. Partsfleet, LLC*,
 411 F. Supp. 3d 1298 (M.D. Fla. 2019) ..............................................................19

*Heller v. Rasier, LLC*,
 2020 WL 413243 (C.D. Cal. Jan. 7, 2020) ..........................................................17

*Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*,
 702 F.3d 954 (7th Cir. 2012) ..............................................................................11

*Johansson v. Cent. Properties, LLC*,
 320 F. Supp. 3d 218 (D.D.C. 2018) .....................................................................22

*Kauffman v. U-Haul Int'l, Inc.*,
 2018 WL 4094959 (E.D. Pa. Aug. 28, 2018) .......................................................18

*Kowalewski v. Samandarov*,
 590 F. Supp. 2d 477 (S.D.N.Y. 2008)............................................................14, 15

*Lenz v. Yellow Transportation, Inc.*,
 431 F.3d 348 (8th Cir. 2005) ..........................................................................13, 14

iii

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Levin v. Caviar, Inc.*,
146 F. Supp. 3d 1146 (N.D. Cal. 2015) ...............................................7

*Loewen v. Lyft, Inc.*,
129 F. Supp. 3d 945 (N.D. Cal. 2015) ...............................................23

*Magana v. DoorDash, Inc.*,
343 F. Supp. 3d 891 (N.D. Cal. 2018) ...............................................21

*Marmet Health Care Ctr., Inc. v. Brown*,
565 U.S. 530 (2012)...........................................................................6

*Michel v. Parts Auth., Inc.*,
2016 WL 5372797 (E.D.N.Y. Sept. 26, 2016) ..................................18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)..............................................................................16

*Mumin v. Uber Techs., Inc.*,
239 F. Supp. 3d 507 (E.D.N.Y. 2017) ...............................................21

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019).........................................................................22

*People of State of New York ex rel. Pennsylvania R. Co. v. Knight*,
192 U.S. 21 (1904)............................................................................12

*Peterson v. Lyft, Inc.*,
2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) ..................................23

*Randle v. Metro. Transit Auth. of Harris Cnty.*,
2018 WL 4701567 (S.D. Tex. Oct. 1, 2018).....................................15

*Rittmann v. Amazon.com, Inc.*,
383 F. Supp. 3d 1196 (W.D. Wash. 2019)......................................18, 19

*Rogers v. Lyft, Inc.*,
2020 WL 1684151 (N.D. Cal. Apr. 7, 2020) ...............7, 10, 11, 12, 17

*Ruiz v. Millennium Square Residential Ass'n*,
156 F. Supp. 3d 176 (D.D.C. 2016) ..................................................23

*Samenow v. Citicorp Credit Servs., Inc.*,
253 F. Supp. 3d 197 (D.D.C. 2017) ..................................................24

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Serv. Employees Int'l Union Local 32BJ v. Diversified Servs. Grp., Inc.*,
    958 F. Supp. 2d 166, 172 (D.D.C. 2013) .................................................................2

*Singh v. Uber Techs. Inc.*,
    939 F.3d 210 (3d Cir. 2019)...............................................................................5, 15

*Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*,
    170 F.3d 191 (D.C. Cir. 1999) ..........................................................................18

*TK Servs., Inc. v. RWD Consulting, LLC*,
    263 F. Supp. 3d 64 (D.D.C. 2017) ......................................................................5

*United States v. Am. Bldg. Maint. Indus.*,
    422 U.S. 271 (1975) ..........................................................................................12

*United States v. United Verde Copper Co.*,
    196 U.S. 207 (1905)...........................................................................................6

*United States v. Yellow Cab Co.*,
    332 U.S. 218 (1947)..........................................................................................12

*Waithaka v. Amazon.com, Inc.*,
    2020 WL 4034997 (1st Cir. July 17, 2020) ........................................11, 12, 15, 19

*Ward v. Express Messenger Sys., Inc.*,
    413 F. Supp. 3d 1079 (D. Colo. 2019)................................................................8

**STATE CASES**

*3511 13th St. Tenants' Association v. 3511 13th St., N.W. Residences, LLC*,
    922 A.2d 439 (D.C. 2007) ..................................................................................3

*Andrew v. Am. Import. Ctr.*,
    110 A.3d 626 (D.C. 2015) .......................................................................23, 24, 25

*Arafa v. Health Express Corp.*,
    2020 WL 3966956 (N.J. July 14, 2020)...............................................................19

*Brooks v. Rosebar*,
    210 A.3d 747 (D.C. 2019) ..................................................................................2

*Dyer v. Bilaal*,
    983 A.2d 349 (D.C. 2009) ..................................................................................2

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Keeton v. Wells Fargo Corp.*,
  987 A.2d 1118 (D.C. 2010) ............................................................................24

*Moore v. Waller*,
  930 A.2d 176 (D.C. 2007) ...............................................................................24

*Rogers v. Lyft, Inc.*,
  2020 WL 2532527 (Cal. Super. Apr. 30, 2020)...............................................20

*SJ Enterprises, LLC v. Quander*,
  207 A.3d 1179 (D.C. 2019) ...........................................................................2, 3

*Strauss v. NewMarket Glob. Consulting Grp., LLC*,
  5 A.3d 1027 (D.C. 2010) ...................................................................................2

*Urban Investments, Inc. v. Branham*,
  464 A.2d 93 (D.C. 1983) .................................................................................23

**FEDERAL STATUTES**

9 U.S.C. § 1 .................................................................................................. *passim*

**STATE STATUTES**

D.C. Code § 16-4401(3)...............................................................................20, 22

D.C. Code § 16-4403(d)...................................................................................20

**OTHER AUTHORITIES**

Restatement (Second) of Contracts § 2 (1981) ..................................................2

Restatement (Second) of Contracts § 75 (1981) ...............................................3

Plaintiff agreed to arbitrate her claims against Lyft on an individual basis, and she has offered no valid reason why she should not be held to that agreement.  First, she says that when she assented to the arbitration agreement, she had an unexpressed, subjective intention not to actually offer rides through the Lyft App again and thus no intention to form a valid agreement with Lyft.  But contracts are not formed or defeated based on the unexpressed, subjective intentions of the parties.  It is what Plaintiff objectively communicated that matters, and that communication—"I Agree"—formed a valid contract.  Moreover, she had agreed to the exact same arbitration provision numerous times before, when she did provide rides, and those prior agreements would require arbitration if the most recent agreement were deemed invalid.

Second, Plaintiff contends that neither the FAA nor state law requires enforcement of the arbitration agreement.  As to the FAA, Plaintiff's argument rests on an atextual and unsupported reading of Section 1 that would create an expansive and malleable exception to a statute that the Supreme Court has emphasized must be construed broadly.  And D.C. law, which applies here if the FAA does not, would require arbitration.  Plaintiff's arguments to the contrary are premised on the contention that the agreement here made arbitration mandatory.  It did not.  Lyft's Terms of Service gave Plaintiff the right to opt out of arbitration; her failure to avail herself of that opportunity does not transform Lyft's agreement into a contract of adhesion.

## I.   THE PARTIES FORMED A VALID AGREEMENT TO ARBITRATE

Plaintiff argues that the arbitration agreement in the 2019 Terms of Service ("Terms") is not enforceable because, even though she voluntarily clicked "I Agree" when presented with the Terms, Shah Decl. ¶ 8, she did not intend to drive using the Lyft platform again at that time.  Opp'n 33-34.  Plaintiff's argument that her supposed private, subjective intent precluded the formation of a contract is baseless.  And, in any event, Plaintiff previously entered into an

arbitration agreement with Lyft that remains binding.  Shah Decl. ¶ 13.

First, the test for formation of a contract is "whether the parties' *objective* acts manifested agreement."  *Brooks v. Rosebar*, 210 A.3d 747, 751 (D.C. 2019) (emphasis added); *see, e.g.*, *Strauss v. NewMarket Glob. Consulting Grp., LLC*, 5 A.3d 1027, 1032 (D.C. 2010) (contract formation requires "an objective manifestation of the parties' intent to be bound"); Restatement (Second) of Contracts § 2 comment b (1981) ("manifestation of intention" means "external expression of intention as distinguished from undisclosed intention").  Thus, in D.C. as elsewhere, a party cannot escape from a signed, written contract simply by later claiming that she secretly intended all along to remain free of any obligation.  *See Dyer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009) ("[R]egardless of the parties' actual, subjective intentions, the ultimate issue is whether, by their choice of language . . . , they objectively manifested a mutual intent to be bound contractually."  (alterations in original) (citation omitted); *Serv. Employees Int'l Union Local 32BJ v. Diversified Servs. Grp.*, Inc., 958 F. Supp. 2d 166, 172 (D.D.C. 2013) (same).  Because Plaintiff manifested unequivocal, objective consent to the 2019 Terms by clicking "I Agree," any private, subjective intention on her part not to enter into a contract or to resume driving on the Lyft platform can have no bearing whether a contract was formed.[1]

The sole case on which plaintiff relies, *SJ Enterprises, LLC v. Quander*, 207 A.3d 1179 (D.C. 2019), does not suggest otherwise.  In *Quander*, the court found that a landlord's email to a tenant "evinced an intent to waive [a] deadline" in a lease and would be treated as a "modification of [the] enforceable contract that exist[ed] between the parties," despite the landlord's testimony that her subjective intention was to communicate something very different:

---

[1] Plaintiff does not point to any fact suggesting that Lyft knew that Plaintiff did not intend to use the Lyft platform again or had not kept up with the requirements for D.C. drivers.

that "the lease is over and you're in a holdover status." *Id.* at 1184-85 (citations and brackets omitted). Plaintiff's unexpressed subjective intent is similarly of no import here.[2]

Second, Plaintiff argues that she received no consideration for assenting to the 2019 Terms because she lacked the subjective intent to provide any more rides through the Lyft platform. Opp'n 34. Again, Plaintiff is wrong. The only case on which she relies, *3511 13th St. Tenants' Association v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439 (D.C. 2007), itself holds that "[a] promise is a sufficient consideration for a return promise." *Id.* at 443 (citation omitted). Here, in exchange for Plaintiff's agreement to the 2019 Terms, Lyft promised that she would be able to continue to use the Lyft App—and that "promised performance" was itself "consideration." Restatement (Second) of Contracts § 75 (1981). Moreover, the parties' mutual promises to arbitrate any disputes with each other independently constitute sufficient consideration to support the agreement to arbitrate. Cases are legion finding that bilateral agreements to arbitrate like the one in the 2019 Terms are supported by sufficient consideration. *See, e.g.*, *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 101-02 (D.D.C. 2004) (stating that federal courts "have consistently concluded that arbitration agreements contain adequate consideration" and collecting cases), *aff'd*, 413 F.3d 77 (D.C. Cir. 2005).

Thus, Plaintiff and Lyft formed a valid agreement to arbitrate when Plaintiff clicked "I Agree" to Lyft's 2019 Terms. A complete copy of the 2019 Terms is attached to this reply. *See* Supplemental Declaration of Neil Shah ("Supp. Shah Decl.") Ex. A. The 2019 Terms were also attached to Lyft's original motion to compel, *see* Shah Decl. Ex. A, but some text was inadvertently cut off on certain pages. That unintended error has in no way affected Plaintiff's

---

[2] Plaintiff's argument to the contrary appears to be primarily a vehicle for Plaintiff to put forward the inaccurate and conclusory assertion that Lyft failed to respond to her reporting being sexually harassed by riders. Although the evidence would show that Lyft took appropriate action in accordance with its protocols, the issue is irrelevant here.

3

ability to respond to Lyft's motion or otherwise prejudiced her.  Notably, Plaintiff herself has had full access at all times to the 2019 Terms through the Lyft App and online.  *See* Supp. Shah Decl. ¶ 11.  Plaintiff's counsel also never approached Lyft's counsel to ask for a corrected copy.

Finally, even if Plaintiff's meritless argument that the 2019 Terms do not bind her could be credited, Plaintiff nevertheless remains bound by her earlier agreement to arbitrate any disputes with Lyft (as noted in Lyft's motion).  Plaintiff does not dispute that she agreed to prior versions of Lyft's Terms—in 2015, 2016, and 2018—and to the arbitration terms contained therein.  Shah Decl. ¶ 13.  She also does not contest that she never opted out of those prior agreements to arbitrate, despite having had the opportunity to do so.  *Id.*  Because Plaintiff's own position is that the 2019 Terms do not bind her, her repeated assertion that the prior Terms lack force on the ground that they have been "superseded" (Opp'n 35, 36 n.30) is groundless.[3]

Lyft has now attached those prior versions of the Terms to put the matter of contract formation beyond doubt.  This Court should reject Plaintiff's contention that Lyft is not entitled to do so.  Lyft's motion noted the earlier versions of the Terms and Plaintiffs' assent to them, and Lyft could not possibly have anticipated Plaintiff's inexplicable contention that the 2019 Terms are not binding because she harbored some secret, unexpressed desire to remain unbound.  Lyft is entitled to respond to Plaintiff's argument, which she raised for the first time in her opposition to Lyft's motion, and Plaintiff has suffered no prejudice as a result.[4]

## II.   THE SECTION 1 EXEMPTION IS INAPPLICABLE AND THE FAA REQUIRES ENFORCEMENT OF THE ARBITRATION AGREEMENT

Plaintiff argues that she falls within the residual clause of the Section 1 exemption, which

---

[3] Plaintiff also admits that she continued driving through the Lyft Platform until at least June 2018, so her contract-formation defense is inapplicable to the prior Terms.  Opp'n 33.

[4] No discovery is needed to resolve the contract-formation issue; all of the items that Plaintiff requests on that issue (Opp'n 37-38) are attached to the Supplemental Shah Declaration.

covers certain "class[es] of workers engaged in . . . interstate commerce."  As she admits, she

bears the burden to show that the exemption is applicable.  Opp'n 8-9 (citing *Green Tree Fin.*

*Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)).  She has not met that burden.[5]  Section 1 does

not apply here for two independently sufficient reasons:  (A) rideshare drivers like Plaintiff do

not engage in interstate commerce under Section 1, and (B) the exemption covers only workers

who, unlike rideshare drivers, are focused on transporting goods, not passengers.

### A.  The relevant class of workers does not engage in interstate commerce

#### 1.  The relevant class of workers is rideshare drivers

Section 1 provides that the FAA does not cover "contracts of employment of seamen,

railroad employees, or any other class of workers engaged in . . . interstate commerce."  9 U.S.C.

§ 1.  Thus, Section 1's application turns not on whether the particular plaintiff (or plaintiff group)

before the court engaged in interstate commerce, but rather on whether the *class of workers* to

which a plaintiff belongs is so engaged.  A straightforward statutory analysis dictates that for

Section 1 purposes the "class of workers" here is rideshare drivers.  Mot. 14-15.  Plaintiff urges

the Court to focus instead on the particular "plaintiffs before [it]," Opp'n 19; *see id.* at 13-16,

treating the putative Rule 23 class that Plaintiff has self-selected—individuals who have used the

Lyft App to provide rides in D.C.—as the basis for the Section 1 analysis.  That approach

contravenes the text of Section 1, finds no support in the case law, and is entirely irrational.

---

[5] Plaintiff suggests that, in assessing the Section 1 question, this Court should limit its review to "the complaint and incorporated documents."  Opp'n 8 (quoting *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 218 (3d Cir. 2019)).  That is wrong.  This is not a motion to dismiss, and it is entirely proper to consider "the pleadings *and* the evidence" in deciding motions to compel.  *TK Servs., Inc. v. RWD Consulting, LLC*, 263 F. Supp. 3d 64, 69-70 (D.D.C. 2017) (emphasis added); *see also, e.g., Camara v. Mastro's Restaurants LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020).  A court's decision to grant a motion to compel on the face of the complaint can be reviewed under a motion to dismiss standard, *see, e.g., Singh*, 939 F.3d at 218, but a court cannot ignore affidavits submitted in support of the motion and deny the motion.

a. *The text of Section 1.*  Plaintiff's opposition is all but silent on the text of Section 1—unsurprisingly, because her suggested approach reads the "class[es]" of workers named in Section 1 out of the statute.  The statute specifically lists "seamen" and "railroad employees" and then includes more generally "any *other* class of workers" engaged in interstate commerce.  9 U.S.C. § 1 (emphasis added).  That structure requires those "general words" to be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (citation omitted) (interpreting Section 1); *see also, e.g.*, *United States v. United Verde Copper Co.*, 196 U.S. 207, 213 (1905) (refusing to "eliminate[]" Congress's "intentional use of the word 'other'").

The group that Plaintiff seeks to represent in this particular case is not "similar in nature," *Circuit City*, 532 U.S. at 115, to seamen and railroad employees.  Those classes are not subsets of workers specific to a particular litigation, a particular geographic area, or a particular company.  Rather, they are classes that exist independently of any given suit and span the United States.  Plaintiff's argument thus contravenes the Supreme Court's directive "to give effect" to the linkage between the classes of workers named in Section 1 and the residual clause.  *Id.*

More generally, Plaintiff's argument that the litigant in any particular case can self-define a "class of workers" for Section 1 purposes is inconsistent with the Supreme Court's instruction that Section 1 "be afforded a narrow construction" and "precise reading."  *Circuit City*, 532 U.S. at 118-19.  Section 1 is a limited exception to a statute that "reflects an emphatic federal policy in favor of arbitral dispute resolution."  *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012).  It is therefore particularly important to interpret Section 1 in a way that does not unduly deprive parties of the "real benefits" of "enforcement of arbitration provisions."  *Circuit City*, 532 U.S. at 122-23.  And while Plaintiff contends that this Court can simply ignore the

FAA's policy in favor of arbitration here on the ground that Section 1 presents a "threshold question," Opp'n 8, the Supreme Court has already held that Section 1 *itself* must be construed "in a manner consistent with the FAA's purpose" of "'overcom[ing] judicial hostility to arbitration agreements.'" *Circuit City*, 532 U.S. at 118 (quoting *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 272 (1995)).

  **b.** ***Section 1 case law.*** Plaintiff's argument about the relevant "class of workers" under Section 1 fares no better as a matter of precedent. As discussed above, Plaintiff's approach is irreconcilable with *Circuit City*, and the other cases that Plaintiff cites are no more helpful to her.

  As courts that have actually examined the "class" issue have explained, a focus on whether the particular plaintiffs before the court have "*personally* engaged in interstate commerce is misplaced." *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988). Section 1 looks to "not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce." *Id.*; *see also Rogers v. Lyft, Inc.*, 2020 WL 1684151, at *5 (N.D. Cal. Apr. 7, 2020). Asking only whether "the plaintiffs before the[]" Court have engaged in interstate commerce, Opp'n 19, disregards the statute's use of the phrase "class of workers."[6]

  Plaintiff points to various decisions that have "ask[ed] whether the plaintiff or plaintiffs '*belong*[] to a class of workers'" with contracts exempt from the FAA under Section 1. Opp'n 18 n.13 (emphasis altered) (citation omitted). But that does not address the issue here. Lyft agrees that, to avoid the FAA, Plaintiff must show that she *belongs* to a class of workers that falls within Section 1. That says nothing about how such a class should be defined in the first place.

---

[6] Because the burden of showing that arbitration is not warranted falls on the plaintiff (if the plaintiff is the party opposing arbitration), courts have often relied on the fact that plaintiffs have presented no evidence that they crossed state lines. *See, e.g.*, *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152 (N.D. Cal. 2015).

At most, Plaintiff has identified a few decisions that analyze Section 1 by reference to an individual plaintiff, without acknowledging the statute's use of "class."  In some of these cases, that was likely because—unlike here—it did not matter whether the court considered the individual plaintiff, the group she sought to represent in court, or a general category of workers. For example, in *Fuentes v. Rush Truck Centers of California, Inc.*, 2019 WL 3240100, at *1, *4-5 (C.D. Cal. Mar. 11, 2019), where the plaintiff sought to represent California auto mechanics employed by a truck dealership, the Section 1 exemption was inapplicable regardless of whether the court analyzed the plaintiff, those particular auto mechanics, or all auto mechanics.  And, in other cases, the issue was apparently never raised by the parties or examined by the court.  *See, e.g.*, *Ward v. Express Messenger Sys., Inc.*, 413 F. Supp. 3d 1079, 1085 (D. Colo. 2019). Plaintiff does not cite any case in which the Court confronted the "class" language in Section 1 but insisted on engaging in an analysis of a particular plaintiff (or group of plaintiffs) anyway.

**c.  *Irrationality of plaintiff's approach*.**  Finally, Plaintiff's approach to defining the relevant "class of workers"—*i.e.*, treating Section 1 as turning on whatever particular group happens to be before a court—would yield bizarre, unpredictable results and would not be administrable.  Adopting that approach therefore would do what the Supreme Court has cautioned against:  introduce "complexity and uncertainty . . . into the enforceability of arbitration agreements," thereby "undermining the FAA's proarbitration purposes and breeding litigation from a statute that seeks to avoid it."  *Circuit City*, 532 U.S. at 123 (citation omitted).

If Plaintiff were right, workers performing exactly the same tasks could be treated differently based on accidents of geography.  For example, Plaintiff argues (at 21) that under her approach, drivers operating in D.C. would be treated differently from drivers in the middle of Texas.  The same would presumably be true, under Plaintiff's view, of drivers working in the

8

same state; thus, Plaintiff would exempt from the FAA a rideshare driver who works in Fairfax, but cover one who works in Richmond, because the former would cross state lines more than the latter.  But there is no reason to think that Congress would want to use geographic fortuity to exempt one worker from the FAA's reach while encompassing a different worker carrying out the same tasks.  Section 1 requires defining a "class" of workers, based on their category of employment, and *then* assessing whether that class of workers is engaged in interstate commerce. It does not call for looking for individuals in some location who have the opportunity to cross state lines and then clumping them together into a "class."

That conclusion is inescapable when Congress's purpose in enacting Section 1 is taken into account:  to avoid "unsettl[ing] established or developing statutory dispute resolution schemes covering specific workers."  *Circuit City*, 532 U.S. at 121.  Congress has never created such schemes for workers in particular geographic regions.  Instead, it has acted with respect to *categories* of workers—like seamen and railroad employees—as to whom a labor dispute might broadly disrupt interstate commerce.  *See id.*  It thus makes sense that, say, interstate truckers and local delivery drivers would be treated differently under Section 1.  But it would be anomalous for the FAA to apply differently to pizza delivery drivers in El Paso and pizza delivery drivers in cities further into Texas's interior.  The worker's geographic location is, "from the perspective of the statute's basic purpose," only "happenstance"—and "the validity of an arbitration clause" therefore should not turn on it.  *Allied-Bruce*, 513 U.S. at 278.

Moreover, Plaintiff's approach would invite tremendous mischief by permitting litigants to gerrymander "class" definitions to manipulate Section 1's application.  The same drivers could be subject to the exemption in some cases but not others.  One case might seek to pursue relief for drivers in Northern Virginia, while another seeks relief for all drivers in Virginia.  The

9

application of the Section 1 exemption to the same drivers should not differ based on each plaintiff's tactical choices. If that were the law, then neither a worker nor the party with whom she has a Section 1 "contract of employment" could have any way of knowing at the time they enter into an arbitration agreement whether that agreement would ultimately be enforceable under the FAA. This Court should not endorse an approach that would give rise to such "considerable . . . uncertainty." *Circuit City*, 532 U.S. at 123.

No such difficulties arise when the "class of workers" is properly defined. Plaintiff asserts in passing, in a footnote, that analysis using a nationwide "class of workers" under Section 1 would be too difficult. *See* Opp'n 19 n.14. But Plaintiff does not explain why that would be so. This case belies the assertion, *see, e.g.*, Mot. 17, 20 (data on factual similarities of rideshare drivers), as does Congress's choice to exempt from the FAA seamen and railroad employees without reference to geography or to any group of litigants in any particular case.[7]

### 2.      *Rideshare drivers are not engaged in interstate commerce*

Once properly focused on the class of rideshare drivers in the United States, of which Plaintiff (and everyone in her putative Rule 23 class) is a member, the Section 1 inquiry is straightforward. It is uncontroverted that drivers using rideshare platforms provide only *intra*state service in almost every ride they give. Mot. 17 (only 2% of rides provided using Lyft App are interstate; 2.5% of rides given using Uber platform are interstate). Because that class of workers is not in "the particular business of offering interstate transportation to passengers," it is not engaged in interstate commerce under Section 1. *Rogers*, 2020 WL 1684151, at *6.

### a. *Rideshare drivers as a class do not engage in interstate commerce by crossing state*

---

[7] Plaintiff also tries to focus attention on the fact that Lyft itself, for its own business purposes, has service areas around various urban areas, *see* Opp'n 20-21, that fact has no bearing whatsoever on the proper interpretation of Section 1, and Plaintiff does not offer any contrary reasoning.

*lines.*  Plaintiff insists that she should prevail even if her view of the relevant class is wrong, contending that Section 1 does not "draw[] a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely."  Opp'n 22 (quoting *Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012)).  But even if that were a correct statement of the law, which it is not, it has no application here.  As Plaintiff admits, *Kienstra* viewed "*each* worker" in the class as having crossed state lines occasionally.  Opp'n 22 (emphasis added) (describing *Kienstra*); *Rogers*, 2020 WL 1684151, at *5 (discussing *Kienstra*).  That is not the case for rideshare drivers:  although drivers using the Lyft App in D.C. may provide interstate rides, few if any drivers using the Lyft App in Honolulu, Anchorage, Austin, or Miami will ever provide interstate rides.  That 2% of all rides given using the Lyft platform are interstate does not mean—as in *Kienstra*—that *all* drivers "cross state lines" at least occasionally.  *Kienstra*, 702 F.3d at 958.  Instead, the work of rideshare drivers "predominantly entails *intrastate* trips."  *Rogers*, 2020 WL 1684151, at *6 (emphasis added).  And "[i]nterstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers."  *Id.*

> **b.  *Rideshare drivers as a class are not part of the "flow" of interstate commerce.***

The First Circuit's recent decision in *Waithaka v. Amazon.com, Inc.*, 2020 WL 4034997 (1st Cir. July 17, 2020), which Plaintiff cited in a notice of supplemental authority filed after her opposition, offers no support to Plaintiff.  *Waithaka* ruled that Section 1 covers "Amazon Flex" drivers, who "locally transport[] goods" ordered on Amazon "on the last legs of interstate journeys" that Amazon organizes.  *Waithaka*, 2020 WL 4034997 at *1.  The court concluded that those Amazon drivers are "within the flow of interstate commerce."  *Id.*

As an initial matter, the facts here are entirely different from *Waithaka*.  Unlike the last-

11

mile Amazon drivers, rideshare drivers are not part of an integrated interstate trip and so are not part of the flow of interstate commerce. Amazon's entire purpose is to arrange for goods to be shipped from their point of origin to the customer's doorstep. The *Waithaka* drivers are an integrated part of that overall, interstate business. Unlike Amazon, however, Lyft does not arrange rides as part of interstate trips, but rather simply provides a platform for drivers and riders to connect for local transportation service. That some riders may happen to use that platform at the beginning or end of an interstate journey taken by air or train does not make the Lyft App or the drivers who use it an integral step in the interstate movement of those passengers. As Lyft's motion explains, under the Supreme Court's decision in *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), that distinction is critical. *See* Mot. 23-26; *Rogers*, 2020 WL 1684151, at *6 ("[*Yellow Cab*] helps show why Lyft drivers are not, at least as a class, 'engaged in' interstate commerce."); *see also People of State of New York ex rel. Pennsylvania R. Co. v. Knight*, 192 U.S. 21, 28 (1904) ("the cab service is an independent local service, preliminary or subsequent to any interstate transportation"). Thus, even under *Waithaka*, Lyft drivers are not within any "continuity" or "flow" of interstate commerce.

In addition, as Lyft's motion states, assessing "continuity" or "flow" of interstate commerce is not the correct analysis here. *See* Mot. 22-23. In concluding otherwise, *Waithaka* relied principally on cases interpreting the Federal Employers Liability Act ("FELA"), *see Waithaka*, 2020 WL 4034997, at *6-8, thereby failing to heed the Supreme Court's instruction that Section 1 must be construed "with reference to the statutory context in which it is found and in a manner consistent with the FAA's purpose." *Circuit City*, 532 U.S. at 118; *see generally, e.g., United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 277 (1975) ("The phrase 'in commerce' does not . . . necessarily have a uniform meaning"). Section 1's text, unlike FELA's,

must be "controlled and defined by reference" to seamen and railroad employees.  *Circuit City*, 532 U.S. at 115.  And, while the FELA requires "liberal construction," *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987) (citation and alteration omitted), the opposite is true of Section 1:  because the FAA "'seeks broadly to overcome judicial hostility to arbitration agreements,'" the Section 1 exemption must "be afforded a narrow construction" and "precise reading."  *Circuit City*, 532 U.S. at 118 (quoting *Allied-Bruce*, 513 U.S. at 272).

Notably, Plaintiff's opposition to Lyft's motion did not argue that a "continuity" or "flow" test is proper here.  Instead, she relied entirely on the distinct argument that she falls under Section 1 because she regularly crossed state lines.[8]  She has accordingly forfeited the argument that drivers are "engaged in . . . interstate commerce" because they allegedly carry passengers who are themselves in the flow of interstate commerce.  Raising that argument in a notice of supplemental authority is raising it too late.  *See, e.g.*, *Brady Ctr. to Prevent Gun Violence v. U.S. Dep't of Justice*, 410 F. Supp. 3d 225, 241 n.3 (D.D.C. 2019).

**c.  *The "Lenz factors" do not aid Plaintiff.***  Finally, Plaintiff's arguments based on the factors set forth in *Lenz v. Yellow Transportation, Inc.*, 431 F.3d 348 (8th Cir. 2005), should be rejected.  The *Lenz* factors do not indicate that a *properly defined* Section 1 class—the class of rideshare drivers in the United States—falls within the scope of Section 1, and Plaintiff does not contend otherwise.  *See* Opp'n 16.[9]  In any event, the *Lenz* factors are misguided and inapposite. As the Fifth Circuit recently recognized, there is no basis for applying a complex eight-factor

---

[8] The opposition notes that "workers may be engaged in interstate commerce even when they *never* cross state lines," Opp'n 16 n.11, but it does not assert—much less explain why—that is true for rideshare drivers like Plaintiff.

[9] That is for good reason:  the small number of factors in *Lenz* that even arguably favor applying Section 1 to that class are factors that will *always* apply to any worker whose job it is to transport things in a vehicle of some kind, whether she works as a truck driver who moves goods across the continental United States or as a pizza delivery driver in Hawaii who never leaves the state.  *See* Opp'n 17-18 (pointing to allegedly applicable factors).

analysis when the plain text of Section 1 compels a straightforward inquiry into whether a common characteristic of a class of workers is providing transportation across state lines.  *See Eastus v. ISS Facility Servs.*, Inc., 960 F.3d 207, 211 (5th Cir. 2020).  No other court of appeals has adopted the *Lenz* factors, and even the Eighth Circuit has never applied them subsequently. Moreover, the factors "were formulated in a specific context—determining whether a worker one step removed from the actual physical delivery of goods fell under the residuary exemption—not at issue" here.  *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 483 n.3 (S.D.N.Y. 2008); *see Lenz*, 431 F.3d at 351-52.  *Lenz* therefore includes factors that are irrelevant to deciding whether a worker that actually carries out some form of transport falls under Section 1.  *See id.* at 352.

### B.     Section 1 does not apply to workers who, like rideshare drivers, transport passengers rather than goods.

Section 1 is also inapplicable here for a separate reason:  rideshare drivers like Plaintiff transport passengers, not goods.  *See* Mot. 26-28.  In responding to that argument, Plaintiff principally attacks a strawman:  "commerce," she says, has long been read to include both goods and passengers, *see* Opp'n 9-10, so "Lyft's argu[ment] that 'commerce' means transportation of goods only, and not the transportation of persons" is wrong, *id.* at 11.  But that is not Lyft's argument.  As Lyft's motion explains, the residual clause as a whole must be interpreted with reference to the enumerated categories of workers—categories that, as the Supreme Court explained in *Circuit City*, demonstrate "concern with transportation workers and their necessary role in the *free flow of goods*," 532 U.S. at 121 (emphasis added).[10]  Accordingly, the residual clause must similarly be limited to workers with a role in the "free flow of goods."  And that is

---

[10]  In addition, as Lyft's motion accurately states (Mot. 26), *Circuit City* noted that the D.C. Circuit—like other circuits—has described the relevant workers as those "'actually engaged in the movement of *goods* in interstate commerce.'" 532 U.S. at 112 (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1470-72 (D.C. Cir. 1997)).

particularly true given that Section 1 must "be afforded a narrow construction." *Id.* at 118.

As to *that* contention, Plaintiff has little to say.  She asserts that *Circuit City*'s discussion of goods is dictum, Opp'n 11-12 & 12 n.8—but, as Lyft has explained, "even if technically dictum," the Supreme Court's "carefully considered language . . . generally must be treated as authoritative." *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) (citation omitted).  The Supreme Court could have described Section 1 as "demonstrat[ing] concern with transportation workers and their necessary role in the free flow of" *commerce*.  *Contra Circuit City*, 532 U.S. at 121 (using "goods").  That would have been the most natural way to write the opinion because, as Plaintiff admits, the case did not directly raise a question about the types of transportation workers Section 1 covered.  *See* Opp'n 12 n.8.  But instead, the Supreme Court referred to the FAA exemption as involving the movement of goods in commerce.

That understanding of the statute should guide this Court—not the handful of decisions Plaintiff identifies, including the Third Circuit's unpersuasive decision in *Singh v. Uber Technologies Inc.*, *see* Mot. 27-28, or dicta in *Waithaka* (a case that involved *only* goods).  Moreover, Lyft's motion identified decisions (*see id.*) limiting Section 1 to transportation of goods.  Plaintiff's effort to distinguish those decisions seems to boil down to mere disagreement with them—but they do clearly conclude that "[t]he defining quality of a § 1 'transportation worker' is moving goods through interstate commerce," the "same way that seamen and railroad workers" do.  *Randle v. Metro. Transit Auth. of Harris Cnty.*, 2018 WL 4701567, at *4 (S.D. Tex. Oct. 1, 2018); *see Kowalewski*, 590 F. Supp. 2d at 484.

### C.    There is no basis for discovery on FAA issues

Plaintiff requests that the Court permit discovery regarding the work of drivers using the Lyft App.  *See* Opp'n 36-37.  But the FAA permits "only [a] restricted inquiry into factual

issues." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).  As

Plaintiff admits, courts should not permit discovery "where the record is clear as to interstate

travel."  Opp'n 36 n.31.  Because Plaintiff—who bears the burden of proof—has not identified

any genuine issue of material fact regarding the *intra*state character of rideshare drivers' work,

no discovery by Plaintiff is warranted here.  *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*,

531 F.3d 863, 865 (D.C. Cir. 2008).

First, Plaintiff asserts that she needs discovery "to test . . . the basis for" Lyft's statement

that "'**less than 2%**'" of rides on its platform cross state lines because "[i]n Plaintiff's counsel's

experience, data can often be subject to strategic interpretation by the party using it to support

their case."  Opp'n 37 (quoting Muir Decl. ¶ 5).  But the declaration Lyft provided explained the

basis for that number and the methodology used to calculate it.  *See* Muir Decl. ¶¶ 5-6.  If

Plaintiff thought that method was improper, she needed to explain why.  Baselessly impugning

the declarations Lyft submitted does not create a factual dispute—particularly given that the

statistic for Uber rides is so similar to Lyft's statistic.  *See* Mot. 17.

Second, Plaintiff requests discovery "to test Lyft's . . . assertion that all rideshare drivers

for any company . . . are sufficiently alike for the FAA exemption to apply equally."  Opp'n 37.

But it is not any "assertion" by Lyft that requires treating all rideshare drivers alike; it is the text

of the FAA.  *See* pp. 6-7, *supra*.  In any event, if the Court deemed it appropriate to define the

"class of workers" as rideshare drivers using the Lyft App—rather than all rideshare drivers—the

result of the Section 1 analysis would be the same:  Lyft has presented evidence regarding the

overwhelmingly intrastate character of rides on its platform (as on Uber's).  *See* p. 10, *supra*.

Third, Plaintiff requests various statistics regarding (1) the percentage of drivers using the

Lyft platform that have provided interstate rides, (2) the percentage of Lyft trips originating in

D.C. that involve interstate travel, and (3) the percentage of drivers using the Lyft platform in D.C. that have traveled interstate. *See* Opp'n 36.  While Plaintiff says that "the Court could benefit" from this information, she does not claim it is necessary. *Id.*  It is not.  The second and third categories—regarding the activities of drivers operating in the D.C. area—are irrelevant because, as explained, Section 1 looks to general categories of workers, not workers in particular regions.  As for information about the percentage of drivers that have crossed state lines while using the Lyft App, Lyft has already presented evidence showing that the vast majority—about 98%—of rides are interstate.  Drivers who live near state borders plainly account for a large portion of those interstate rides. *E.g.*, *id.* at 14-15; *see also Rogers*, 2020 WL 1684151, at *6.

Other courts provided with little or no more information than what Lyft presented here, and without ordering discovery, have had no difficulty concluding that the Section 1 exemption did not apply in cases involving rideshare drivers. *See, e.g.*, *Capriole v. Uber Techs., Inc.*, 2020 WL 2563276, at *7, *9 (N.D. Cal. May 14, 2020) (concluding that "Uber drivers do not fall within Section 1 exemption"); *Rogers*, 2020 WL 1684151, at *6 (concluding that "Lyft drivers, as a class, are not engaged in interstate commerce"); *Heller v. Rasier, LLC*, 2020 WL 413243, at *6 (C.D. Cal. Jan. 7, 2020).  This Court should do the same.

## III.    D.C. LAW REQUIRES ENFORCEMENT OF THE ARBITRATION AGREEMENT

Because Plaintiff is not exempt from the FAA, this Court should compel arbitration under the FAA and need not reach any D.C. law issues.  But, should the Court conclude otherwise, arbitration should likewise be compelled under D.C. law.

### A.    If Plaintiff Is FAA-Exempt, The D.C. RUAA Applies

Plaintiff argues that Lyft cannot compel arbitration under D.C. law if the FAA does not apply, because "neither the TOS nor the arbitration clause . . . references D.C. law" and there is

17

therefore "no textual basis to apply the RUAA."  Opp'n 23.  But the lack of an express D.C.

choice-of-law provision does not mean that D.C. law is inapplicable.  Rather, if the Court were to

find Plaintiff exempt from the FAA, a standard choice-of-law analysis points to D.C. law—a

conclusion that Plaintiff plainly does not dispute, since she affirmatively argues that D.C. law

should govern contract-formation issues.  *See* Opp'n 33-34; *see generally Stephen A. Goldberg

Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193-95 (D.C. Cir. 1999) (under D.C. choice of law

rules, which D.C. federal courts follow in diversity cases, particular weight is given to "the

efficiency of using [D.C.'s] own" law, as "efficiency concerns tilt the balance in favor of

applying the law of the forum state").  Notably, Plaintiff asserts claims under D.C. law, gave

rides in D.C., and filed her complaint in D.C.

      Courts have frequently explained that if the FAA is inapplicable, an arbitration agreement

to which the plaintiff agreed is nevertheless enforceable under state law.  *E.g.*, *Cole v. Burns Int'l

Sec. Servs.*, 105 F.3d 1465, 1472 (D.C. Cir. 1997).  That is true where, as here, the arbitration

agreement expressly states that the FAA will apply and does not specify the state law that will be

applicable as to the arbitration question if the FAA is not.  For instance, in *Atwood v. Rent-A-Ctr.

E., Inc.*, 2016 WL 2766656, at *3 (S.D. Ill. May 13, 2016), the district court ruled that "even

when the contract says that the Federal Arbitration Act applies and mentions no other law—if the

federal act doesn't apply, the agreement to arbitrate remains viable, and the only question

becomes what state's law applies to the contract to arbitrate."  *Id.*; *see also, e.g.*, *Diaz v.

Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 379-81 (E.D.N.Y. 2016); *Kauffman v. U-Haul

Int'l, Inc.*, 2018 WL 4094959, at *5 (E.D. Pa. Aug. 28, 2018); *Michel v. Parts Auth., Inc.,* 2016

WL 5372797, at *4 (E.D.N.Y. Sept. 26, 2016).

      Plaintiff relies instead on *Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196 (W.D.

Wash. 2019), but that decision is clearly distinguishable.  Under the terms of the arbitration

agreement at issue in *Rittmann*, "the FAA is inapplicable and the contract clearly indicates" that

Washington state law, *under which the defendant sought to compel arbitration*, "is also

inapplicable." *Id.* at 1203.  Thus, in that case, the moving party tried to invoke Washington law

even though it had "explicitly contracted for Washington law to *not* apply to the Arbitration

Provision." *Id.* at 1202 (emphasis in original).  By contrast, here, nothing in the 2019 Terms

suggests (let alone "clearly indicates") that *D.C. law* would not apply to the arbitration

agreement.  *Rittman* thus has no bearing on this case.  *See, e.g.*, *Byars v. Dart Transit Co.*, 414 F.

Supp. 3d 1082, 1088 (M.D. Tenn. 2019) (distinguishing *Rittmann* on a similar basis).[11]

   In her notice of supplemental authority, ECF No. 21, Plaintiff argued for the first time

that if the Court were to find the Terms enforceable under D.C. law, then a conflict-of-law

analysis would require application of California law based on California public policy.  Plaintiff

has forfeited that argument by raising it too late.  *See* p. 13, *supra*.  Plaintiff is also wrong.

*Waithaka* found that Massachusetts law was relevant (and conflicted with Washington law,

under which Amazon sought to compel arbitration) because the underlying lawsuit involved

Massachusetts plaintiffs, suing in Massachusetts federal court, seeking to enforce "statutory

rights" that "represent[ed] the fundamental public policy of Massachusetts."  2020 WL 4034997,

at *17.  By contrast, Plaintiff (a resident of Maryland) seeks to enforce rights under D.C. law in

---

[11] Plaintiff also cites *Easterday v. USPack Logistics LLC*, No. 15 Civ. 7559, at 22 (D.N.J. June 29, 2016), ECF No. 20-4, but that decision simply invites the parties to address state-law issues in further briefing.  *See id.* at 21.  In any event, the New Jersey Supreme Court has squarely "reject[ed] any argument that the absence of an express invocation [of the New Jersey Arbitration Act] means that it cannot apply." *Arafa v. Health Express Corp.*, 2020 WL 3966956, at *11 (N.J. July 14, 2020).  As for *Hamrick v. Partsfleet, LLC*, 411 F. Supp. 3d 1298 (M.D. Fla. 2019), which is on appeal (11th Cir. No. 19-13339), that case is an outlier.  Its holding—that specifying the FAA applies and remaining silent on state law dictates that no state law can apply, *see id.* at 1302—is irreconcilable even with *Rittman*, *see* 383 F. Supp. 3d at 1203.

D.C. federal court—and Plaintiff does not (and cannot) bring any California law claims.[12]

      **B.**      **The Arbitration Agreement Is Enforceable Under D.C. Law**

      **1.**  ***The provision regarding consumer arbitration agreements is inapplicable here***.  The RUAA provides that "[a] provision for mandatory binding arbitration within a consumer arbitration agreement is void and unenforceable except to the extent federal law provides for its enforceability."  D.C. Code § 16-4403(d).  Plaintiff argues (at 25-26) that the arbitration agreement is not enforceable because she is a "consumer" under the RUAA, that is, "an individual, not a business, who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes, including, but not limited to, financial services, healthcare services, or real property."  D.C. Code § 16-4401(3).

      That argument misconstrues the statutory text.  The relevant provision in the arbitration agreement is not one "for *mandatory* binding arbitration" under D.C. Code § 16-4403(d) (emphasis added), because Plaintiff could have opted out of the requirement that she arbitrate any disputes with Lyft.  *See* Shah Decl. Ex. A, § 17(j); Supp. Shah Decl. Ex. A, § 17(j); Supp. Shah Decl. Ex. C, § 17(j).  The words "mandatory" and "binding" cannot mean exactly the same thing in the statute, or one would be superfluous.  Here, "[m]andatory . . . arbitration" means that the claimant *must* agree to arbitrate; "binding arbitration" means that, having agreed to arbitrate, the claimant is bound by that agreement.  By definition, an arbitration provision that is subject to an opt-out is not "mandatory"; it is optional.  *E.g.*, *Cavallo v. Uber Techs., Inc.*, 2017 WL 2362851, at *6 (D.N.J. May 31, 2017) ("arbitration was not mandatory" where agreement

---

[12] At any rate, at least one California court has found that the arbitration agreement in Lyft's terms of service "is independently enforceable under the California Arbitration Act."  *Rogers v. Lyft, Inc.*, 2020 WL 2532527, at *1 (Cal. Super. Apr. 30, 2020).

contained opt-out provision).[13]  Since Plaintiff chose not to opt out, the provision here is now

one for "binding arbitration" only.  *Id.*

Plaintiff barely acknowledges the opt-out option, and the arguments she does make as to

it are entirely unpersuasive.  First, she asserts without explanation or support that "Lyft's TOS

still imposes pre-dispute binding mandatory arbitration."  Opp'n 31 n.25.  That is wrong.  The

2019 Terms do include an *optional* pre-arbitration negotiation provision, but that is no more

mandatory than the arbitration provisions.  *See* Shah Decl. Ex. A, § 17(k); Supp. Shah Decl. Ex.

A, § 17(k).  Second, she claims that the opt-out provision is "bur[ied] . . . in over 15,000 words

of scrollwrap" and is therefore illusory.  Opp'n 31 n.25.  That, too, is wrong.  As Lyft's motion

explains, Plaintiff was presented with a screen that linked to the arbitration provisions in the

Terms and specifically stated that "AS A DRIVER OR DRIVER APPLICANT, YOU HAVE

AN OPPORTUNITY TO OPT OUT OF ARBITRATION."  Shah Decl. ¶ 7; Supp. Shah Decl.

¶ 12.  Moreover, the second paragraph of the full Terms states now, as it has in previous

versions, that "YOU HAVE AN OPPORTUNITY TO OPT OUT OF ARBITRATION WITH

RESPECT TO CERTAIN CLAIMS AS PROVIDED IN SECTION 17."  Shah Decl. Ex. A, at

1.[14]  Plaintiff's choice not to opt out was therefore a fully informed one.

The fact that the arbitration provision here was not "mandatory" is sufficient to dispose of

Plaintiff's argument.  But, in addition, Plaintiff makes no attempt to grapple with the tensions in

her argument that she is a "consumer" under the particular definition of that term in the D.C.

---

[13] *See also, e.g.*, *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 896 (N.D. Cal. 2018); *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 518 (E.D.N.Y. 2017).

[14] As the exhibits attached to the Supplemental Shah Declaration make clear, when Plaintiff agreed to the 2016 Terms she had an opportunity to opt out of arbitration altogether, both as to those Terms and as to any prior Terms containing an arbitration provision to which she had previously agreed.  Because she did not opt out at that point, every subsequent time she agreed to revised Terms, she had an opportunity to opt out of any revisions to the arbitration agreement.

statute.  If Plaintiff is in fact exempt from the FAA under Section 1 (the only reason D.C. law would be relevant), then she must be a transportation worker with a "contract of employment" with Lyft.  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 533-34 (2019) (Section 1 "contract of employment" includes independent contractors).  In addition, the whole theory of Plaintiff's complaint is that she should be considered a Lyft employee.  Plaintiff does not explain how she could be an employee of Lyft if her use of the Lyft platform as a driver is as a "consumer."  And it is far from apparent how a relationship between Lyft and a consumer could be an employment or independent contractor relationship.  *Cf. Johansson v. Cent. Properties, LLC*, 320 F. Supp. 3d 218, 220-21, 225 (D.D.C. 2018) ("standard" written "employment agreement containing an arbitration provision" is enforceable under D.C. law); *see also* D.C. Amicus Br. 4 n.2.

By its terms, D.C.'s law regarding "consumer" arbitration agreements is intended to cover individuals who are purchasing goods or services for personal or family—not business— reasons.  Plaintiff did not obtain access to the Lyft platform "primarily for personal, family, or household purposes," D.C. Code § 16-4401(3); she obtained it to run her own small business giving riders transportation and receiving payment from them.  Because Plaintiff is a user of the Lyft platform, she ultimately has no claim to be an employee.  But, despite being a user of the platform, she is not a "consumer" as defined in D.C. Code § 16-4401(3).

**2.  *The arbitration agreement is not against D.C. public policy or unconscionable*.**
Plaintiff's arguments (and D.C.'s as amicus) that the arbitration agreement is against D.C. public policy and is unconscionable also lack any merit, for many of the same reasons stated above: this was not a contract of adhesion, since Plaintiff could have opted out of the arbitration requirement (including by merely sending an email).

First, the arbitration agreement here is not against D.C. public policy.  Plaintiff asserts

generally that D.C. policy disfavors contracts of adhesion.  That may be so, but is irrelevant here because of the opt-out provision.  Moreover, Plaintiff (like her amicus) primarily relies on the legislative history of the RUAA—but the RUAA disapproved certain contracts of adhesion only under specific circumstances that do not apply here.  *See* pp. 20-22, *supra*; *see also Andrew v. Am. Import. Ctr.*, 110 A.3d 626, 634 (D.C. 2015).  Legislative history cannot be used to ask this Court to expand on the statutory provision that the legislature actually chose to enact; had the legislature wished to legislate more broadly, it would have done so.

Second, the arbitration agreement here is not unconscionable.  With one theoretical exception for "egregious" situations that has never been applied by the D.C. courts, a party asserting an unconscionability defense must show *both* procedural and substantive unconscionability.  *Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 180 (D.D.C. 2016); *see, e.g.*, *Bradley v. Nat'l Collegiate Athletic Ass'n*, 2020 WL 2800604, at *10 (D.D.C. May 29, 2020) (agreeing with *Ruiz* that there are no reported cases of an "egregious" scenario under D.C. law).  Plaintiff cannot show either, especially given that she could have opted out of the arbitration agreement—and certainly, given the availability of the opt-out, she cannot show any "egregious[ness]" here.  *Cf., e.g.*, *Urban Investments, Inc. v. Branham*, 464 A.2d 93, 99-100 (D.C. 1983); *Bradley*, 2020 WL 2800604, at *10.  Multiple courts in other jurisdictions have rejected arguments that Lyft's Terms are unconscionable.[15]

As to the procedural argument, this arbitration agreement is not, as Plaintiff would have it (Opp'n 30-31), a contract of adhesion.  Such a contract requires a powerless counterparty to accept all of its terms, without variance, *see Andrew*, 110 A.3d at 635; here, Plaintiff could have

---

[15] *See Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 298-303 301 (D. Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019); *Peterson v. Lyft, Inc.*, 2018 WL 6047085, at *4-5 (N.D. Cal. Nov. 19, 2018); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 966-67 (N.D. Cal. 2015); Mot. 10.

excised the arbitration terms from her contract with Lyft, although she did not do so.  The D.C.

Court of Appeals previously has rejected a procedural unconscionability argument on the ground

that the plaintiff did not object to a particular provision in a "take it or leave it" contract or

attempt to bargain over that provision.  *See Moore v. Waller*, 930 A.2d 176, 182 (D.C. 2007)

(also noting that plaintiff was not trying to obtain a "necessary" service).  The lack of any

procedural problem is all the more obvious here, where plaintiff needed merely to accept the opt-

out option that she was offered and did not need to engage in any bargaining of any kind.[16]

Both *Keeton v. Wells Fargo Corp.*, 987 A.2d 1118 (D.C. 2010), and *Andrew* are

distinguishable.  In *Keeton*, a used-car buyer entered into a "standardized-form consumer

contract of adhesion" in connection with her car purchase, with "terms prepared in advance by"

the counterparty and no indication that "any of the terms were open to negotiation or were, in

fact, negotiated." *Id.* at 1119, 1120 n.2.  And in *Andrew*, which also involved a contract with a

car dealership, the court considered issues relating to "a consumer who is compelled to arbitrate

with a commercial entity pursuant to an arbitration clause in an adhesion contract," 110 A.3d at

634; *see id.* at 636—one in which the arbitration provision "could not have [been] negotiated."

*Id.* at 637.  Plaintiff here was not compelled to arbitrate, in light of the opt-out option, and she is

not a consumer under the D.C. statutory definition.  Those cases therefore have no bearing.

There is no need for this Court to reach the issue of substantive unconscionability, but

Plaintiff cannot establish such unconscionability either.  Plaintiff rests her argument in that

---

[16] Plaintiff also suggests that "mandatory arbitration clauses" are "'nearly ubiquitous' in the rideshare industry."
Opp'n 31.  But since *this* arbitration clause was not mandatory, that is irrelevant to whether *this* agreement was
procedurally unconscionable.  And, in any event, Plaintiff has not established that no other rideshare companies
currently extend the same opt-out option that Lyft does.  *See Samenow v. Citicorp Credit Servs., Inc.*, 253 F. Supp.
3d 197, 206-07 (D.D.C. 2017) (ruling that plaintiff's contention that arbitration agreements in credit card agreements
are "industry standard" was "wholly unsupported by credible evidence in the record before the Court").

regard on the existence of a class-action waiver in the arbitration agreement that she chose to accept. But there is no D.C. authority finding such a waiver unconscionable. *Cf. Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622-23 (2018) (under FAA, "courts may not allow a contract defense to reshape traditional individualized arbitration by mandating classwide arbitration procedures without the parties' consent"). In *Andrew*, the court remanded for a substantive unconscionability determination. The court relied on the fact that the arbitration agreement was one-way—the corporate party could sue in court, while the consumer could not. 110 A.3d at 638. The agreement in this case does not have that feature. The court also noted that the lower court had "erroneously found that the agreement did not preclude a class action" and that "other courts [have] found such clauses barring class actions substantively unconscionable." *Id.* But *Andrew* did not hold that class-action waivers are substantively unconscionable—let alone such waivers in bilateral arbitration agreements with counterparties who, like Plaintiff, are effectively operating their own businesses.

There is no reason why the waiver in this contract should give rise to any such determination. Plaintiff disregards all of the many plaintiff-friendly terms of the arbitration agreement that she chose to accept. *See* Mot. 5, 6 n.1. Many drivers have arbitrated claims similar to Plaintiff's with Lyft under those provisions, and Plaintiff provides no reason to believe that there was anything unfair about those arbitrations or that the drivers were unable to vindicate in that forum any meritorious claims.

## CONCLUSION

Lyft respectfully requests that the Court compel Plaintiff's suit to individual arbitration and stay the suit pending arbitration.

Respectfully submitted,

*/s/ Elaine J. Goldenberg*
Elaine J. Goldenberg (Bar ID 478383)
elaine.goldenberg@mto.com
Rachel G. Miller-Ziegler (Bar ID 229956)
rachel.miller-ziegler@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW, 7th Floor
Washington, DC 20004
Tel: (202) 220-1100

Rohit K. Singla (*pro hac vice*)
rohit.singla@mto.com
Justin P. Raphael (*pro hac vice*)
justin.raphael@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

Dated:  July 28, 2020

26

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the attorney of record for any party indicated as non-registered participants on this 28th day of July 2020.

*/s/ Elaine J. Goldenberg*
Elaine J. Goldenberg
