# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CASSANDRA OSVATICS, *on behalf of herself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>LYFT, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 20-cv-1426 (KBJ)

## <u>MEMORANDUM OPINION</u>

Plaintiff Cassandra Osvatics worked as a driver for the ride-sharing company Lyft, Inc. in the Washington, D.C. metropolitan area from November of 2015 to June of 2018. (*See* Compl., ECF No. 2, ¶¶ 7–10.) In May of 2020, Osvatics filed a putative class-action lawsuit against Lyft, alleging that Lyft was engaged in a continuous violation of District of Columbia law by failing to provide paid sick leave to its drivers in the District. (*See id.* ¶¶ 79, 90–99.) According to Lyft, however, Osvatics had agreed to the company's Terms of Service for its drivers, which require any disputes between Lyft and its drivers to be resolved by arbitration on an individual basis rather than through the filing of a lawsuit. (*See* Decl. of Neil Shah in Supp. of Def.'s Mot. ("Shah Decl."), ECF No. 6-2, ¶¶ 8, 13.)

Before this Court at present is Lyft's motion to compel individual arbitration of Osvatics's claim and to stay the instant proceedings pending any arbitration between the parties. (*See* Def.'s Mot. to Compel Individual Arbitration and Stay Proceedings Pending Arbitration, ECF No. 6; Def.'s Mem. in Supp. of Mot. to Compel Individual

Arbitration and Stay Proceedings Pending Arbitration ("Def.'s Mot."), ECF No. 6-1.)
Lyft contends that the arbitration agreement and the associated class waiver in its
Terms of Service are valid, and thus the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1
*et seq.*, requires this Court to enforce the arbitration agreement by compelling Osvatics
to submit this dispute to individual arbitration.  (*See* Def.'s Mot. at 9–10.)[1]  Osvatics
responds, in part, that the FAA does not apply to her agreement with Lyft given section
1 of the statute, which provides that the "contracts of employment" of any "class of
workers engaged in . . . interstate commerce" are categorically exempt from the FAA's
coverage.  (*See* Pl.'s Opp'n to Def.'s Mot. to Compel Individual Arbitration and Stay
Proceedings Pending Arbitration ("Pl.'s Opp'n"), ECF No. 20, at 19 (quoting 9 U.S.C.
§ 1).)

On March 31, 2021, this Court issued an Order that **GRANTED** Lyft's motion to
compel arbitration.  (*See* Order, ECF No. 47.)  This Memorandum Opinion explains the
reasons for that Order.  In short, and as explained fully below, this Court has concluded
that Osvatics is bound by Lyft's arbitration agreement and that the section 1 exemption
does not apply to rideshare drivers such as Osvatics.  Therefore, the FAA requires this
Court to compel arbitration of the instant dispute.

## I.   BACKGROUND

### A.   Lyft's Terms Of Service

Lyft operates a ride-sharing mobile application that enables customers who seek
rides to specified destinations to hail drivers willing to drive them to those destinations.

---

[1] Page number citations to the documents that the parties and the Court have filed refer to the page
numbers that the Court's electronic filing system automatically assigns.

(*See* Compl. ¶¶ 17–18; *see also* Shah Decl. ¶ 3.)  To become a Lyft driver, an individual must download the Lyft application, register as a driver, and agree to Lyft's Terms of Service.  (*See* Shah Decl. ¶¶ 4–5.)  Prospective drivers presented with the Terms of Service can scroll through the text of the agreement, and they must ultimately click the "I Agree" button at the bottom of the screen before they can begin offering rides through the Lyft application.  (*See id.* ¶¶ 7–9.)  Lyft periodically updates these Terms of Service, and drivers are required to consent to the updated terms in order to continue offering rides through Lyft's application.  (*Id.* ¶ 6.)

The most recent version of Lyft's Terms of Service to which Osvatics allegedly agreed is dated November 27, 2019.  (*See* Ex. A to Suppl. Decl. of Neil Shah ("2019 Terms of Service"), ECF No. 28-3, at 2.)  The second and third paragraphs of the agreement read as follows:

> PLEASE BE ADVISED: THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND LYFT CAN BE BROUGHT (<u>SEE SECTION 17 BELOW</u>).  THESE PROVISIONS WILL, WITH LIMITED EXCEPTION, REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING.  AS A DRIVER OR DRIVER APPLICANT, YOU HAVE AN OPPORTUNITY TO OPT OUT OF ARBITRATION WITH RESPECT TO CERTAIN CLAIMS AS PROVIDED IN SECTION 17.

> By entering into this Agreement, and/or by using or accessing the Lyft Platform you expressly acknowledge that you understand this Agreement (including the dispute resolution and arbitration provisions in Section 17) and accept all of its terms.  IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MAY NOT USE OR ACCESS THE LYFT PLATFORM OR ANY OF THE SERVICES PROVIDED THROUGH THE LYFT PLATFORM.  If you use the Lyft Platform in another country, you agree to be subject to Lyft's terms of service for that country.

(*Id.*)  The underlined phrase contains a hyperlink to Section 17 of the Terms of Service. (*See* Shah Decl. ¶ 7.)

Section 17 is titled "Dispute Resolution and Arbitration Agreement[.]"  (2019 Terms of Service at 14.)  It provides that, with exceptions not relevant here, "ALL DISPUTES AND CLAIMS BETWEEN US . . . SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION SOLELY BETWEEN YOU AND LYFT." (*Id.*)  It continues: "[t]hese Claims include, but are not limited to, any dispute, claim or controversy, whether based on past, present, or future events, arising out of or relating to" many categories of disputes, including "any city, county, state or federal wage-hour law[.]"  (*Id.*)  Section 17 also contains a delegation clause, which provides that "[a]ll disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement) shall be decided by the arbitrator," with certain exceptions not relevant here.  (*Id.*)  And it contains the following language waiving the driver's right to institute a class action: "YOU UNDERSTAND AND AGREE THAT YOU AND LYFT MAY EACH BRING CLAIMS IN ARBITRATION AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT ON A CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE BASIS[.]"  (*Id.* at 15.)

Importantly for present purposes, Section 17 of the Terms of Service also contains a subsection titled "Opting Out of Arbitration for Driver Claims That Are Not In a Pending Settlement Action."  (*Id.* at 18.)  That subsection provides that drivers "may opt out of arbitration with respect to . . . Driver Claims, other than those in a Pending Settlement Action, by notifying Lyft in writing of your desire to opt out of

4

arbitration for such Driver Claims . . . within 30 days of the date this Agreement is executed by you[,]" so long as "you have not previously agreed to an arbitration provision in Lyft's Terms of Service where you had the opportunity to opt out of the requirement to arbitrate." (*Id.*)  Finally, the Terms of Service further specifies that "[t]his agreement to arbitrate . . . is governed by the Federal Arbitration Act" (*id.* at 14); however, the remainder of the Terms of Service "shall be governed by the laws of the State of California without regard to choice of law principles" (*id.* at 21).

### B.   Procedural History

Osvatics filed the instant lawsuit against Lyft on May 29, 2020.  (*See* Compl. ¶ 6.)  The complaint asserts one legal claim: that Lyft drivers are "employees" of Lyft within the meaning of the District of Columbia's Accrued Safe and Sick Leave Act, D.C. Code § 32-531.01 *et seq.*, and that Lyft thus violated that statute by failing to provide paid sick leave to Lyft drivers in the District.  (*See id.* ¶¶ 90–99.)  Moreover, the complaint seeks to assert similar claims on behalf of a class consisting of "all drivers who work or worked for Lyft in the District of Columbia for at least 90 days between when Lyft began operating in the District of Columbia and the date of final judgment in this matter[.]"  (*Id.* ¶ 79.)  For relief, the complaint requests monetary damages, a declaration that Lyft's practices regarding sick leave violate District of Columbia law, and an order enjoining Lyft from continuing its allegedly unlawful practices.  (*See id.*, Prayer for Relief.)

On June 16, 2020, Lyft moved to compel individual arbitration of Osvatics's claim and to stay the instant lawsuit pending any arbitration of Osvatics's claim on an individual basis.  (*See* Def.'s Mot. at 9–10; *see also* Def.'s Reply in Supp. of Mot. to Compel Individual Arbitration and Stay Proceedings Pending Arbitration ("Def.'s

Reply"), ECF No. 28, at 8.)  As cause, Lyft maintains that, according to its business records, Osvatics accepted Lyft's Terms of Service for drivers on four separate occasions—on October 4, 2015; October 30, 2016; May 4, 2018; and May 4, 2020 (Def.'s Mot. at 11 (citing Shah Decl. ¶ 13))—and, pursuant to the embedded arbitration provision, Osvatics's legal claim must be resolved through arbitration on an individual basis rather than class-action litigation, per the FAA.  (*See id.* at 18–20.)  Lyft also contends that section 1 of the FAA, which exempts the employment contracts of certain transportation workers from the FAA's coverage, does not apply to the arbitration agreement between Osvatics and Lyft, both because that exemption covers only workers who transport goods rather than passengers (*see id.* at 34–36), and because Lyft drivers as a class are not "engaged in . . . interstate commerce" within the meaning of the statute (*see id.* at 22–34).  Further, even if the FAA does not apply, Lyft asserts that the District of Columbia's Revised Uniform Arbitration Act, D.C. Code § 16-4401 *et seq.*, similarly requires this Court to compel arbitration of this dispute and stay the instant proceedings.  (*See id.* at 37–39.)

In her brief in opposition to Lyft's motion, Osvatics contends that she is not bound by Lyft's Terms of Service, including its arbitration provision, essentially because she had stopped driving for Lyft and did not intend to resume driving for the company when she most recently accepted the Terms of Service in May of 2020.  (*See* Pl.'s Opp'n at 43–47.)  Osvatics also argues that the arbitration agreement at issue here is not enforceable under the FAA because D.C. area Lyft drivers—or, in the alternative, all Lyft drivers nationwide—are engaged in interstate commerce such that they fall within the section 1 exemption.  (*See id.* at 18–33.)  Finally, Osvatics asserts that the

arbitration agreement is also not enforceable under District of Columbia law.  (*See id.* at 33–43.)[2]

This Court held a hearing on Lyft's motion on January 14, 2021.  (*See* Min. Entry of Jan. 14, 2021.)  In addition, both before and after the motion hearing, the parties filed multiple notices of supplemental authority and responses thereto.  (*See* ECF Nos. 21, 29, 30, 32, 33, 35, 36, 38, 39, 41, 42, 43, 44, 45).  Lyft's motion to compel arbitration and stay the instant proceedings pending arbitration is now ripe for decision.

## II.   STATUTORY FRAMEWORK AND LEGAL STANDARD

### A.   The Federal Arbitration Act And The Section 1 Exemption

Congress enacted the FAA in 1925 "in response to a perception that courts were unduly hostile to arbitration."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). The FAA establishes "a liberal federal policy favoring arbitration" and reflects "the fundamental principle that arbitration is a matter of contract[.]"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). Accordingly, the FAA requires courts to "place arbitration agreements on an equal footing with other contracts" and "enforce them according to their terms[.]"  *Id.*; *see also* 9 U.S.C. § 2 (providing that certain arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").  The statute also "establishes procedures by which federal courts implement" this "substantive rule."  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S.

---

[2] The District of Columbia, through its Attorney General, filed an amicus brief in support of Osvatics's contention that Lyft's arbitration agreement would be unenforceable under District of Columbia law. (*See* Amicus Curiae Br. of D.C. in Supp. of Pl.'s Opp'n, ECF No. 24, at 10.)

63, 68 (2010).  Specifically, section 4 of the FAA permits litigants to seek a court order "directing the parties to proceed to arbitration in accordance with the terms of the agreement[,]" *see* 9 U.S.C. § 4, and section 3 of the statute requires courts to stay litigation "until such arbitration has been had in accordance with the terms of the agreement" if the court concludes that the action involves "any issue referable to arbitration[,]" *see id.* § 3.

Notably, however, these enforcement mechanisms do not "extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).  Rather, "antecedent statutory provisions limit the scope of the court's powers under §§ 3 and 4." *Id.*  Section 2 of the FAA provides that the statute applies only to arbitration agreements that are set forth as a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce[.]"  9 U.S.C. § 2; *see also id.* § 1 (defining "commerce" to include "commerce among the several States" and "between the District of Columbia and any State").  Moreover, as particularly relevant here, section 1 contains a further limitation on the FAA's coverage: it specifies that "nothing" in the FAA "shall apply to contracts of employment of seamen, railroad employees, *or any other class of workers engaged in foreign or interstate commerce*." *Id.* § 1 (emphasis added).  The italicized language is sometimes referred to as the "residual clause[,]" *see, e.g.*, *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 16 (1st Cir. 2020), or the "transportation worker exemption[,]" *see, e.g.*, *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 907 (9th Cir. 2020).  And the Supreme Court has held that "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration[,]" even if a delegation

clause in the arbitration agreement purports to give the arbitrator the authority to decide that threshold question. *See New Prime*, 139 S. Ct. at 537–38.

The history of the section 1 exemption is "quite sparse[,]" *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001), but the Supreme Court has surmised that the purpose of section 1's "very particular qualification" was that "Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers[,]" including seamen and railroad workers, by the time it adopted the FAA in 1925, *New Prime*, 139 S. Ct. at 537; *see also Circuit City*, 532 U.S. at 121. Thus, Congress apparently excluded seamen and railroad employees from the FAA because "it did not wish to unsettle established or developing statutory dispute resolution schemes covering" those workers. *Circuit City*, 532 U.S. at 121. Section 1's residual clause similarly reflects Congress's "concern with transportation workers and their necessary role in the free flow of goods"; indeed, through the residual clause, Congress "reserv[ed] for itself more specific legislation for" other categories of workers engaged in foreign or interstate commerce. *Id.* For instance, Congress amended the statutory grievance procedures for railroad employees to extend to "air carriers and their employees" a decade after the FAA's enactment. *See id.*

B.     **Motions To Compel Arbitration**

Under D.C. Circuit precedent, courts in this jurisdiction evaluate motions to compel arbitration under the summary judgment standard of Federal Rule of Civil Procedure 56. *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865

(D.C. Cir. 2008); *see also Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020); *Jin v. Parsons Corp.*, 966 F.3d 821, 827 (D.C. Cir. 2020).[3]

Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56). Because "the party seeking to enforce an arbitration agreement" bears "the burden of proving that" the other party "agreed to arbitrate[,]" *Camara*, 952 F.3d at 373, "[t]he party seeking to compel arbitration must first present evidence sufficient to demonstrate an enforceable agreement to arbitrate[,]" *Ruiz v. Millennium Square Residential Ass'n*, 466 F. Supp. 3d 162, 168 (D.D.C. 2020) (internal quotation marks and citation omitted). The burden then "shifts to the non-moving party to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in" Rule 56. *Id.* (internal quotation marks and citation omitted). The court must grant summary judgment with respect to the formation of an arbitration agreement if "the pleadings and the evidence show that there is no genuine issue as to any material fact

---

[3] Osvatics agrees that the summary judgment standard governs the question of whether the parties formed an arbitration agreement (*see* Pl.'s Opp'n at 44), but she contends that "the motion to dismiss standard" of Rule 12(b)(6) "is more appropriate when deciding the issue of Section 1's application[,]" relying on a Third Circuit decision that similarly considered whether the section 1 exemption applies to rideshare drivers (*see id.* at 19 n.3 (citing *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 218 (3d Cir. 2019))). But not even the Third Circuit applies a different standard to those questions. As to both issues, it appears that the law in the Third Circuit is that "the motion to dismiss standard applies if the complaint and incorporated documents provide a sufficient factual basis for deciding the issue[,]" but "where those documents do not, or the plaintiff responds to the motion with additional facts that place the issue in dispute," the court should permit "limited discovery" and then evaluate the motion to compel arbitration under the summary-judgment standard. *See Singh*, 939 F.3d at 218–19. The D.C. Circuit has not adopted such a hybrid standard in analyzing whether the parties formed an agreement to arbitrate. *See, e.g.*, *Jin*, 966 F.3d at 827. Regardless, and in any event, this Court would reach the same conclusion regarding section 1's applicability under the motion to dismiss standard, insofar as it concludes that Osvatics does not belong to a class of workers engaged in interstate commerce, even accepting as true all the allegations in Osvatics's complaint, and without considering the exhibits attached to Lyft's motion. *See infra* Part III.B.3.

and that the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted).

Once the existence of a valid arbitration agreement has been established, however, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Sakyi v. Estée Lauder Cos.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018) (quoting *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)). Thus, the party claiming that section 1 exempts an arbitration agreement from the FAA's coverage bears the burden of proving that the exemption applies. *See, e.g.*, *Singh*, 939 F.3d at 231–32 (Porter, J., concurring in part and concurring in the judgment).

## III.   ANALYSIS

As explained above, Osvatics seeks to avoid arbitration of her claim against Lyft on essentially three grounds. First, Osvatics asserts that she is not bound by the arbitration clause in Lyft's Terms of Service because she no longer intended to drive for Lyft when she most recently agreed to the Terms of Service. (*See* Pl.'s Opp'n at 43–47.) Second, Osvatics argues that the FAA and its enforcement provisions do not govern the arbitration agreement here because Lyft drivers (in the D.C. area or nationally) comprise a "class of workers engaged in . . . interstate commerce" under the section 1 residual clause. (*See id.* at 18–33.) Third, assuming that the FAA does not apply, Osvatics contends that the law of the District of Columbia would not permit enforcement of the arbitration agreement. (*See id.* at 33–43.)

For the reasons detailed below, this Court finds that Osvatics's express agreement to abide by Lyft's Terms of Service, along with her failure to opt out of the

arbitration agreement at any time, is sufficient to establish a binding agreement between Osvatics and Lyft concerning the submission of disputes to arbitration in lieu of litigation, and this Court agrees with the majority of courts that have considered the section 1 issue that rideshare drivers are not encompassed by section 1's residual clause, such that their employment contracts are subject to the FAA. Therefore, this Court concludes that it must compel arbitration and stay the instant proceedings under the FAA, and accordingly does not reach whether arbitration should be compelled under District of Columbia law if the FAA did not apply.[4]

### A. Osvatics Is Bound By The Arbitration Provision In Lyft's Terms Of Service

Because "arbitration is a matter of contract[,]" *Rent-A-Ctr.*, 561 U.S. at 67, the "threshold issue" for a court faced with a motion to compel arbitration is whether the parties entered into a valid and binding arbitration agreement, *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 138 (D.D.C. 2011); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). Moreover, "[w]hen deciding whether the parties agreed to arbitrate a dispute, courts apply 'ordinary state-law principles that govern the formation of contracts.'" *Slaughter v. Nat'l R.R. Passenger Corp.*, 460 F. Supp. 3d 1, 6 (D.D.C. 2020) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

---

[4] Osvatics does not appear to contend that District of Columbia law precludes enforcement of the parties' arbitration agreement *even if* the FAA applies to that agreement. (*See* Pl.'s Opp'n at 33 ("If the FAA does not apply, Lyft's Motion to Compel must also be denied under D.C. law.").) Thus, this Court has no occasion to decide whether the FAA preempts District of Columbia law to the extent that the arbitration agreement would be unenforceable under District of Columbia law due to the District's public policy or unconscionability. (*See id.* at 38, 41; *cf.* Def.'s Mot. at 20.)

Here, the parties agree that District of Columbia common law governs the contract-formation inquiry.  (*See* Pl.'s Opp'n at 44; Def.'s Reply at 9.)  And under the District's common law, "[a] contract is formed when there is an offer, an acceptance, and valuable consideration" exchanged between the parties.  *Dixon v. Midland Mortg. Co.*, 719 F. Supp. 2d 53, 57 (D.D.C. 2010) (citing *Paul v. Howard Univ.*, 754 A.2d 297, 311 (D.C. 2000)).  In other words, the parties must "express[] an intent to be bound, agree[] to all material terms, and assume[] mutual obligations sufficient to create an enforceable contract." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1004 (D.C. 2008).

In this Court's view, Osvatics has not identified a genuine dispute of material fact about whether the parties here formed a valid arbitration agreement.  To start, Lyft has met its initial burden to show that each of the elements of contract formation are satisfied with respect to the arbitration provision in Lyft's Terms of Service.  Lyft's internal business records indicate that Osvatics agreed to Lyft's Terms of Service as a driver on four occasions: on October 4, 2015; October 30, 2016; May 4, 2018; and May 4, 2020.  (Shah Decl. ¶ 13.)  It is well established that Lyft's method of obtaining drivers' assent to its Terms of Service—presenting the terms of the agreement and requiring users to click "I Agree" before they can access the service (*see id.* ¶¶ 7–9)— constitutes a valid means of offer and acceptance.  *See, e.g.*, *Selden v. Airbnb, Inc.*, No. 16-cv-933, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016); *see also Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010–11 (D.C. 2002).  Additionally, according to Lyft's records, Osvatics never opted out of the arbitration with Lyft pursuant to the opt-out provision in the Terms of Service.  (Shah Decl. ¶ 13; Suppl. Decl. of Neil Shah

in Supp. of Def.'s Mot., ECF No. 28-1, ¶ 9.)  The parties also exchanged adequate consideration: in return for Osvatics's assent to the arbitration clause, Lyft provided Osvatics access to its application as a driver, and Lyft further agreed to arbitrate any disputes between the parties.  *See, e.g.*, *3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 443 (D.C. 2007) (explaining that "[a] promise is a sufficient consideration for a return promise" (internal quotation marks and citation omitted)); *see also Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 101 (D.D.C. 2004) (observing that federal courts "have consistently concluded that arbitration agreements contain adequate consideration . . . and therefore are enforceable"), *aff'd*, 413 F.3d 77 (D.C. Cir. 2005).

Osvatics, in turn, has not met her burden to identify a genuine issue of material fact as to the formation of the arbitration agreement.  She does not contest the accuracy of Lyft's internal records, or argue that she had insufficient notice of the arbitration provision, or assert that she opted out of arbitration with Lyft at any point.  (*See* Pl.'s Opp'n at 44–47.)  Instead, Osvatics claims that she did not "intend[] to be bound" by the 2019 Terms of Service when she accepted that version of the agreement on May 4, 2020.  (*Id.* at 44.)  In particular, Osvatics asserts that she stopped driving for Lyft around June 2018 and "did not seek to use any driver services offered on the Lyft App" when she accessed the application in May of 2020 (Decl. of Cassandra Osvatics ("Osvatics Decl."), ECF No. 20-3, ¶¶ 2, 5); rather, she "merely checked the App to see what information was maintained in it" (*id.* ¶ 7).  Unfortunately for Osvatics, it is black-letter contract law that contract formation depends on whether the parties "*objectively* manifested a mutual intent to be bound contractually[,]" and that a party's

"actual, subjective intentions" are irrelevant.  *Dyer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009) (internal quotation marks and citation omitted).  And it is clear to this Court that Osvatics objectively manifested her intent to enter into a contract with Lyft by clicking the "I Accept" button at the bottom of Lyft's Terms of Service.  Thus, Osvatics's statements regarding her subjective intent are insufficient to create a material factual dispute regarding contract formation.

Notably, even if Osvatics was *not* bound by the 2019 Terms of Service, she would be bound by the 2018 Terms of Service, which she accepted while she was still driving for Lyft (*see* Shah Decl. ¶ 13; Osvatics Decl. ¶ 1), and which would have been the governing version of Lyft's Terms of Service had the 2019 version not superseded it (*see* 2019 Terms of Service at 21).  Osvatics has not identified any material differences between the arbitration provisions contained in the 2018 and 2019 versions of the Terms of Service.  (*See* Tr. of Mot. Hr'g ("Hr'g Tr."), ECF No. 40, at 22:12–20.)  This Court further concludes that Lyft is not foreclosed from relying in the alternative on the 2018 version of the agreement.  Although Lyft's opening brief only sought to compel arbitration under the 2019 Terms of Service, it also plainly alleged that Osvatics accepted Lyft's Terms of Service on four separate occasions, which gave Osvatics sufficient notice that Lyft might also rely on prior versions of the Terms of Service. (*See* Def.'s Mot. at 11.)  Furthermore, Lyft's reply brief expressly referenced the 2015, 2016, and 2018 versions of the agreement as potential bases for compelling arbitration (*see* Def.'s Reply at 11), and this Court gave Osvatics's counsel an opportunity at the motion hearing to address the previous versions of the Terms of Service (*see* Hr'g Tr. at 21:24–22:24).  Thus, it appears that Osvatics is not prejudiced by Lyft's arguably

belated reliance on the 2018 Terms of Service, and the Court will not conclude that Lyft has somehow waived the argument that the 2018 Terms of Service (which is indistinguishable from the 2019 Terms for the instant purposes) is binding on Osvatics.

This Court therefore holds that, as a matter of law, Osvatics entered into a valid arbitration agreement with Lyft under either the 2019 version or the 2018 version of Lyft's Terms of Service.

### B.   Lyft Drivers Are Not A "Class Of Workers Engaged In Foreign Or Interstate Commerce" Exempt From The FAA Under Section 1

The most substantial issue that Lyft's motion presents concerns whether rideshare drivers such as Osvatics make up a "class of workers engaged in foreign or interstate commerce" such that her "contract[] of employment" with Lyft is exempt from the FAA's coverage.  *See* 9 U.S.C. § 1.[5]  A majority of courts faced with this question have concluded that rideshare drivers do *not* fall within the section 1 residual clause.  *See, e.g.*, *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020); *Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919, 932 (N.D. Cal. 2020); *Grice v. Uber Techs., Inc.*, No. 18-cv-2995, 2020 WL 497487, at *9 (C.D. Cal. Jan. 7, 2020); *Hinson v. Lyft, Inc.*, No. 20-cv-2209, 2021 WL 838411, at *7 (N.D. Ga. Feb. 26, 2021); *Aleksanian v. Uber Techs. Inc.*, No. 19-cv-10308, 2021 WL 860127, at *9 (S.D.N.Y. Mar. 8, 2021); *see also In re Grice*, 974 F.3d 950, 959 (9th Cir. 2020) (denying mandamus petition on the ground that the district court did not commit "clear error as a matter of law" in holding that rideshare driver was not subject to section 1 exemption

---

[5] Lyft does not dispute that its Terms of Service agreement qualifies as a "contract of employment" within the meaning of the FAA's section 1 exemption, notwithstanding the parties' apparent disagreement about whether Lyft drivers are employees or independent contractors for purposes of the District's paid sick leave law.  *See New Prime*, 139 S. Ct. at 539 (explaining that section 1 encompasses "not only agreements between employers and employees but also agreements that require independent contractors to perform work").

(internal quotation marks and citation omitted)).  A few courts have reached the opposite conclusion.  *See Cunningham v. Lyft, Inc.*, 450 F. Supp. 3d 37, 47 (D. Mass. 2020); *Islam v. Lyft, Inc.*, No. 20-cv-3004, 2021 WL 871417, at *12 (S.D.N.Y. Mar. 9, 2021); *Haider v. Lyft, Inc.*, No. 20-cv-2997, 2021 WL 1226442, at *4 (S.D.N.Y. Mar. 31, 2021).  And some courts have ordered discovery before reaching a final determination regarding section 1's applicability to rideshare drivers.  *See, e.g.*, *Singh*, 939 F.3d at 227–28; *Gonzalez v. Lyft, Inc.*, No. 19-cv-20569, 2021 WL 303024, at *6 (D.N.J. Jan. 29, 2021); *Sienkaniec v. Uber Techs., Inc.*, 401 F. Supp. 3d 870, 871–73 (D. Minn. 2019).

This Court agrees with the majority approach; accordingly, it finds that the arbitration agreement between Osvatics and Lyft is subject to the FAA.  As explained below, in reaching this conclusion, the Court makes two subsidiary determinations: (1) that the section 1 exemption is not limited to transportation workers who transport goods rather than people, and (2) that the relevant "class of workers" must be assessed at a nationwide level rather than a specific geographic area.

1.   Section 1's Residual Clause Is Not Limited To Workers Who Transport Goods Rather Than Passengers

As previously noted, under section 1, the FAA does not "apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  Lyft vigorously maintains that "[s]ection 1 is limited to transportation workers who transport goods rather than people" (Def.'s Mot. at 35), but this Court concludes that the FAA's section 1 exemption, including its residual clause, encompasses *both* workers who transport

passengers *and* those who transport goods, *see Singh*, 939 F.3d at 219–26; *Rogers*, 452 F. Supp. 3d at 913–15.

To briefly summarize the persuasive reasoning of other jurists who have analyzed this question, "[t]he traditional tools of statutory interpretation" all indicate that "[s]ection 1 is not limited to classes of workers who transport goods in interstate commerce." *Rogers*, 452 F. Supp. 3d at 914.  For one thing, the statutory text does not distinguish between transportation of goods and passengers.  *See Singh*, 939 F.3d at 221 n.4 ("[T]he term 'commerce' does not inhere a goods-versus-passengers distinction.").  And to the extent that the language of the section 1 exemption is to be interpreted by examining "evidence of [a] term's meaning at the time of the [FAA's] adoption in 1925[,]" *New Prime*, 139 S. Ct. at 539, it is clear that "the dominant understanding of 'commerce' when Congress passed the FAA in 1925" extended to the transportation of passengers as well as physical goods, *Singh*, 939 F.3d at 229–30 & n.2 (Porter, J., concurring in part and concurring in the judgment) (citing dictionaries and Supreme Court cases contemporaneous with the FAA's enactment).

Statutory context further confirms this result.  The *ejusdem generis* canon of statutory interpretation counsels that, "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (internal quotation marks and citation omitted).  Applying this maxim to section 1 of the FAA, the Supreme Court has instructed that "the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the

enumerated categories of workers which are recited just before it[.]" *Circuit City*, 532 U.S. at 115.  Because "seamen" and "railroad employees" transport passengers as well as goods, it seems unlikely that Congress intended to limit the residual clause to workers who transport only physical goods. *See Singh*, 939 F.3d at 221 (noting the absence of "contemporary statutes or sources that define the terms 'seamen' and 'railroad employees' to only include those who transport goods"); *Rogers*, 452 F. Supp. 3d at 914 ("The ships and trains that transport passengers are staffed by seamen and railroad workers, just like the ones that transport goods.").  Indeed, and notably, the Supreme Court has observed that "shipboard surgeons who tended injured sailors"—and thus were involved in the transportation of people—"were considered 'seamen'" at the time of the FAA's enactment. *New Prime*, 139 S. Ct. at 543.

Against the weight of this interpretive guidance, Lyft primarily relies on dicta from the Supreme Court's decision in *Circuit City* and the D.C. Circuit's decision in *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C. Cir. 1997).  In *Circuit City*, the Supreme Court at several points used the term "goods" when describing the scope of the section 1 residual clause. *See Circuit City*, 532 U.S. at 112 (noting that most courts of appeals had interpreted the residual clause as "limited to transportation workers, defined, for instance, as those workers 'actually engaged in the movement of goods in interstate commerce'" (quoting *Cole*, 105 F.3d at 1471)); *id.* at 121 (explaining that Congress's linkage of the residual clause to the enumerated categories of seamen and railroad employees demonstrated its "concern with transportation workers and their necessary role in the free flow of goods").  Lyft reads that language as endorsing the proposition that the residual clause is necessarily limited

to transportation workers who transport goods rather than people.  (*See* Def.'s Mot. at 34–35.)  But the Supreme Court and the D.C. Circuit made those statements in the context of deciding "whether the residual clause of § 1 covered the contracts of employment of those who were not in the transportation industry at all[,]" *Singh*, 939 F.3d at 224; therefore, those courts "did not have the question of passengers versus cargo before" them, *id.* at 224 n.8, and they "simply used 'goods' as a convenient shorthand to discuss interstate commerce[,]" *id.*  As a result, this Court agrees with the authorities that have concluded that *Circuit City* and *Cole* are neither controlling nor even persuasive on the issue of whether the section 1 residual clause encompasses workers who transport passengers.  *See, e.g.*, *Singh*, 939 F.3d at 223–24; *Rogers*, 452 F. Supp. 3d at 913–14.[6]

Finally, Lyft resorts to "the FAA's overarching policy in favor of arbitration[,]" and thereby suggests that limiting the section 1 residual clause to workers who transport goods "properly gives Section 1 a narrow construction[.]"  (Def.'s Mot. at 35.)  The Supreme Court has emphatically rejected a similar appeal to the FAA's general pro-arbitration policy, explaining that "respecting the qualifications of § 1 . . . respect[s] the limits up to which Congress was prepared to go when adopting the Arbitration Act." *New Prime*, 139 S. Ct. at 543 (internal quotation marks and citation omitted); *see also Rogers*, 452 F. Supp. 3d at 915 (noting that "these general mantras can't will a statute

---

[6] To be sure, several courts (including another court in this jurisdiction) have reached the contrary conclusion, relying on the aforementioned language from *Circuit City* and *Cole*.  *See, e.g.*, *Tyler v. Uber Techs., Inc.*, No. 19-cv-3492, 2020 WL 5569948, at *5 (D.D.C. Sept. 17, 2020) (holding that section 1 "only excludes from the provisions of the [FAA] the employment contracts of workers engaged in the transportation of *goods* in commerce" (quoting *Cole*, 105 F.3d at 1472)); *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 483–84 (S.D.N.Y. 2008) (similar).  This Court respectfully disagrees with that (non-binding) reading of those precedents, for the reasons explained above.

where text, history, and precedent won't take it").  Thus, this Court too gives little weight to Lyft's general policy argument concerning the scope of section 1.

        2.      <u>The Relevant Class of Workers Is Not Limited To Lyft Drivers In The D.C. Area</u>

Osvatics argues that the applicable "class of workers" in the section 1 analysis here is "D.C. Lyft drivers" (*see* Pl.'s Opp'n at 29), but this Court further concludes that, when assessing whether a party belongs to a "class of workers engaged in foreign or interstate commerce" for purposes of the FAA's section 1 exemption, the relevant "class of workers" must be defined at a *nationwide* level, and should not be limited to a particular geographic area within the United States.[7]

This result follows from the text and structure of the section 1 exemption. Again, the Supreme Court has instructed that the residual clause should "be controlled and defined by reference to the enumerated categories of workers which are recited just before it[.]"  *Circuit City*, 532 U.S. at 115.  And the enumerated categories of "seamen" and "railroad employees" contain no geographic limitations.  Thus, the most natural inference is that Congress intended those terms to encompass *all* seamen and railroad employees nationwide.

This means that the "other class of workers" category that is specified in section 1 must also be given a nationwide scope rather than being limited to workers of

---

[7] The Court reaches this conclusion notwithstanding the lack of clarity in Osvatics's complaint concerning the precise contours of Osvatics's proposed class of "D.C. Lyft drivers."  The identified cohort might be coextensive with the putative class in Osvatics's complaint, *i.e.*, "all drivers who work or worked for Lyft in the District of Columbia for at least 90 days between when Lyft began operating in the District of Columbia and the date of final judgment in this matter[.]"  (Compl. ¶ 79.)  Or it might include all Lyft drivers licensed to pick up passengers within Lyft's designated service area for the D.C. metropolitan area.  (*See id.* ¶¶ 52, 56.)  And, indeed, the confusion regarding who qualifies as a "D.C. Lyft driver" for section 1 purposes merely highlights the potential administrability problems with assessing the relevant class of workers at anything other than a nationwide level.

that type within a particular state, metropolitan area, or city.  Consistent with this analysis, several other courts have rejected attempts to limit the relevant class to workers within a particular geographic area.  *See Islam*, 2021 WL 871417, at *7 (noting that "the statute exempts from the FAA 'seamen' and 'railroad employees' at a high level of generality, irrespective of their locations or their specific employers," and explaining that "any other 'class of workers' should be defined in an equally broad fashion"); *see also, e.g.*, *Aleksanian*, 2021 WL 860127, at *7 (rebuffing plaintiff's attempt to "frame the class of workers as 'New York City Uber drivers'" because "[t]here is no basis for defining the class so narrowly").  And while a few courts have apparently assumed that the relevant "class of workers" is limited to workers within a particular state, *see, e.g.*, *Cunningham*, 450 F. Supp. 3d at 46 (noting that Lyft drivers in Massachusetts "enabl[e] their passengers to leave or enter Massachusetts"); *Capriole*, 460 F. Supp. 3d at 932 (observing that "interstate rides given by Uber drivers in Massachusetts [are] not only incidental—they are rare"), those courts did not specifically analyze the appropriate geographic scope of a "class of workers" for section 1 purposes.

It is also clear to this Court that defining the relevant class of workers as limited to a particular geographic area would undermine the underlying purposes of the FAA. In enacting the FAA, Congress sought to create a "*national* policy favoring arbitration[,]" *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (emphasis added), and it thus seems unlikely that Congress would have wanted the applicability of the section 1 exemption—and thus the enforceability of a given arbitration agreement—to vary by geographical region.  *See Islam*, 2021 WL 871417, at

*7 ("[I]t would be illogical if Lyft drivers performing the same work for the same company in different cities were to have completely different rights and obligations under the FAA merely because of a happenstance of geography[.]" (internal quotation marks and citation omitted)); *Sienkaniec*, 401 F. Supp. 3d at 872 (observing that "[t]here is a strong argument that the 'class of workers' to which [plaintiff] belongs is 'all Uber drivers in the United States'" because all "Uber drivers perform the same job for the same company pursuant to the same agreement"); *cf. Southland Corp. v. Keating*, 465 U.S. 1, 15 (1984) (rejecting interpretation of the FAA under which the "right to enforce an arbitration contract" would be "dependent for its enforcement on the particular forum in which it is asserted").  Similarly, if the scope of the relevant class of workers depended on the plaintiff's allegations or proposed class definition, parties would not be able to determine whether their arbitration agreement is enforceable under the FAA until a lawsuit between the parties is filed and a party seeks to enforce the arbitration agreement.  That result would no doubt "undermine[] both the certainty and predictability which arbitration agreements are meant to foster."  *See Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 223 (1st Cir. 1995).

For all these reasons, with respect to the instant lawsuit, this Court rejects Osvatics's attempt to define the applicable "class of workers" for section 1 purposes as "D.C. Lyft drivers[.]"  (*See* Pl.'s Opp'n at 29.)  To the contrary, in this Court's view, the relevant class of workers must be Lyft drivers or rideshare drivers nationwide, as that is the only approach consistent with the FAA's text and purpose.[8]

---

[8] One challenging side question that no court seems to have grappled with to date is whether the relevant class of workers is *Lyft* drivers nationwide or rideshare drivers more generally.  On one hand, the enumerated categories of "seamen" and "railroad employees" appear to contemplate an industry-wide classification rather than a company-by-company determination.  *See* 9 U.S.C. § 1.  On the other

3.      Lyft Drivers As A Class Are Not Engaged In Interstate Commerce

Finally, with respect to the ultimate question of the applicability of the section 1 exemption, this Court concludes that Lyft drivers are not "engaged in . . . interstate commerce" within the meaning of section 1 of the FAA.  *See* 9 U.S.C. § 1.

The Court's analysis begins with an interpretation of the relevant language of section 1.  Again, that provision specifies that the FAA does not "apply to contracts of employment of seamen, railroad employees, *or any other class of workers engaged in foreign or interstate commerce*."  9 U.S.C. § 1 (emphasis added).  The Supreme Court has emphasized that, because the FAA "'seeks broadly to overcome judicial hostility to arbitration agreements,'" the section 1 exemption should "be afforded a narrow construction."  *Circuit City*, 532 U.S. at 118 (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272 (1995)).  In particular, while the words "involving commerce" in section 2 of the FAA "implement[] Congress' intent to exercise [its own] commerce power to the full[,]" *id.* at 112 (internal quotation marks and citation omitted), "[t]he plain meaning of the words '*engaged in* commerce'" in section 1 "is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce[,]'" *id.* at 118 (emphasis added), and reaches "'only persons or activities within the flow of interstate commerce[,]'" *id.* (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)).  Moreover, because the residual clause is "controlled and defined by reference to the enumerated categories of workers which are recited just

---

hand, there may be variations among rideshare services that are potentially material to the section 1 analysis.  *Cf. Rogers*, 452 F. Supp. 3d at 916 (suggesting that Lyft drivers may be exempt under section 1 if "Lyft's focus were the service of transporting people to and from airports").  But the parties here have not argued that Lyft drivers are meaningfully different than drivers for other rideshare services such as Uber; therefore, this Court need not resolve this issue.  And for simplicity's sake, the Court has opted to refer to the relevant class of workers as "Lyft drivers" throughout this Memorandum Opinion.

before it[,]" *id.* at 115, the Supreme Court has held that the section 1 exemption does not encompass "*all* employment contracts"; instead, it "exempts from the FAA only contracts of employment of transportation workers[,]" *id.* at 119 (emphasis added).

Additional principles bearing on the section 1 analysis can be gleaned from lower-court decisions that have interpreted and applied the residual clause.  First, given that the statute speaks in terms of a "class of workers[,]" 9 U.S.C. § 1, the pertinent inquiry is "not whether the *individual* worker actually engaged in interstate commerce, but whether the *class* of workers to which the complaining worker belonged engaged in interstate commerce[,]" *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) (emphases added); *cf. Int'l Bhd. of Teamsters Loc. Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 957 (7th Cir. 2012) (holding that truck drivers for particular company were "interstate transportation workers within the meaning of § 1 of the FAA" even though they only "occasionally transported loads into" a neighboring state).

Second, by its plain terms, the section 1 residual clause only encompasses classes of workers that are "engaged in foreign or interstate commerce."  9 U.S.C. § 1. And whether a worker is "engaged in . . . interstate commerce" turns on whether "interstate movement" is "a central part of the class members' job description." *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 801 (7th Cir. 2020).  Thus, to fall within the scope of the residual clause, the class of workers must "perform[] work analogous to that of seamen and railroad employees, whose occupations are centered on the transport of goods [or persons] in interstate or foreign commerce." *Id.* at 802; *see also Eastus v. ISS Facility Servs., Inc.*, 960 F.3d 207, 210 (5th Cir. 2020) (examining

whether a class of workers was "engage[d] in the movement of goods in interstate commerce in the same way that seamen and railroad workers are" (internal quotation marks and citation omitted)).  Put slightly differently, "a class of workers must themselves be 'engaged *in the channels* of foreign or interstate commerce'" to qualify for the section 1 exemption.  *Wallace*, 970 F.3d at 802 (quoting *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998)); *see also Rittmann*, 971 F.3d at 917 (holding that a class of workers is "engaged in interstate commerce" if those workers "form a part of the channels of interstate commerce"); *Waithaka*, 966 F.3d at 23 (explaining that courts should "assess whether workers' activities include the transportation of goods or people in the flow of interstate commerce").

Third, and relatedly, the applicability of the section 1 residual clause does not depend on whether the class of workers physically crosses state lines.  *See Waithaka*, 966 F.3d at 25 (observing that "crossing state lines" is not "the touchstone of the exemption's test").  Crossing state lines is not a *necessary* condition because, for instance, "workers moving goods or people destined for, or coming from, other states" may be "engaged in interstate commerce[,]" even if the workers are "responsible only for an intrastate leg of that interstate journey[.]"  *Id.* at 22; *Rittmann*, 971 F.3d at 915 (concluding that section 1 "exempts transportation workers who are engaged in the movement of goods in interstate commerce, even if they do not cross state lines").  Conversely, physically crossing state lines also is not *sufficient* to trigger the section 1 exemption; the residual clause does not cover "workers who incidentally transport[] goods interstate[,]" such as "a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town."  *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286,

1289–90 (11th Cir. 2005); *see also Wallace*, 970 F.3d at 800 ("[S]omeone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work.").  All told, then, the "critical factor" underlying the applicability of the section 1 exemption is "[t]he nature of the business for which a class of workers perform[s] their activities" rather than whether the workers actually "cross[] state lines[.]"  *See Grice*, 974 F.3d at 956 (internal quotation marks and citation omitted).

Applying these principles, this Court concludes that Lyft drivers as a class are not "engaged in . . . interstate commerce" within the meaning of section 1.  Unlike seamen and railroad workers, for whom the interstate movement of goods and passengers over long distances and across state lines is "a central part of the job description[,]" *Wallace*, 970 F.3d at 803, Lyft drivers offer services that are primarily local and intrastate in nature, *see Rogers*, 452 F. Supp. 3d at 916 ("Their work predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself.").  In other words, Lyft drivers are "in the general business of giving people rides, not the particular business of offering interstate transportation to passengers." *Id.*; *see also Capriole*, 460 F. Supp. 3d at 932 ("Uber drivers do not perform an integral role in a chain of interstate transportation."); *Aleksanian*, 2021 WL 860127, at *8 (explaining that "interstate movement of people" is not "a central part of the job description of the class of workers to which" rideshare drivers belong).  Thus, any "[i]nterstate trips" that Lyft drivers take "by happenstance

of geography do not alter the intrastate transportation function performed by the class of workers." *Rogers*, 452 F. Supp. 3d at 916.[9]

Nor is the fact that Lyft drivers frequently transport passengers to and from airports and train stations (before or after those passengers have themselves traveled interstate) determinative of the interstate commerce inquiry, as Osvatics maintains. (*See* Pl.'s Opp'n at 26 & n.10; *see also* Compl. ¶¶ 58–68.)  The Supreme Court has explained that statutory language such as "in commerce" encompasses "only persons or activities within the flow of interstate commerce[,]" which in turn requires some "practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil*, 419 U.S. at 195.

For instance, in *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court assessed whether various alleged conspiracies involving taxicab companies constituted restraints on interstate commerce in violation of antitrust laws. *See id.* at 225.  One such conspiracy involved an agreement not to compete "for contracts with railroads or railroad terminal associations to transport passengers and their luggage between railroad stations in Chicago." *Id.* at 228.  The Supreme Court held that this alleged antitrust violation *did* involve "the stream of interstate commerce" because these taxicab rides constituted "an integral step in the interstate movement[,]" due in large part to the contractual nature of the arrangement between the taxicab

---

[9] Of course, this means that even if the relevant class of workers were limited to D.C. Lyft drivers, as Osvatics contends (*see* Pl.'s Opp'n at 29), the Court would still be compelled to conclude that the frequency with which that class allegedly crosses state lines (*see* Compl. ¶¶ 49–57) is irrelevant to the determination of whether it is exempt under section 1.

companies and the railroads.  *Id.* at 228–29.  And, notably, this circumstance stood in contrast to another alleged antitrust violation, which had involved a conspiracy to limit the total number of licensed taxicabs in Chicago overall.  *See id.* at 230.  The Supreme Court acknowledged that taxicabs often transport people to and from railroad stations, but held that "such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of" the antitrust statute.  *See id.*  Furthermore, the Justices in the majority found it particularly significant that these taxicabs had "no contractual or other arrangement with the interstate railroads[,]" and that this taxicab service was "contracted for independently of the railroad journey[.]"  *Id.* at 231–32.  "[W]hen local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service," the Supreme Court concluded, "that service is not an integral part of interstate transportation."  *Id.* at 233.[10]

This reasoning compels the conclusion that the fact that Lyft drivers occasionally and incidentally transport passengers to and from airports and railroad stations does not mean that such drivers are engaged in interstate commerce for purposes of section 1 of the FAA.  *See Rogers*, 452 F. Supp. 3d at 916–17 (summarizing *Yellow Cab* and concluding that the same analysis applies to "these modern-day taxi drivers").  And this is especially so given the apparently undisputed fact in the instant case that passengers seeking a ride to or from an airport or railroad station use the Lyft application

---

[10] The Supreme Court in *Yellow Cab* was interpreting the Sherman Act, which contains different language regarding commerce than section 1 of the FAA.  *See* 15 U.S.C. § 1 (prohibiting certain agreements "in restraint of trade or commerce"); *id.* § 2 (prohibiting monopolization of "any part of the trade or commerce among the several States").  However, if anything, the phrase "engaged in commerce" as used in section 1 of the FAA is "narrower" than formulations such as "affecting commerce[,]" *see Circuit City*, 532 U.S. at 118, and the language of the Sherman Act is similar to this latter category, *see Yellow Cab*, 332 U.S. at 225.

unilaterally to hail a driver, and there is no evidence that Lyft has a "contractual or other arrangement" with airlines or railways for Lyft drivers to transport passengers who have taken trips with those companies. *Yellow Cab*, 332 U.S. at 231. This makes "Lyft drivers' 'relationship to interstate transit . . . only casual and incidental[,]'" *Rogers*, 452 F. Supp. 3d at 917 (quoting *Yellow Cab*, 332 U.S. at 231), which means that Lyft drivers "lack the requisite 'practical, economic continuity' with interstate air or rail transportation" to qualify as engaging in interstate commerce within the meaning of section 1, *id.* (quoting *Gulf Oil*, 419 U.S. at 195); *see also Aleksanian*, 2021 WL 860127, at *8 (explaining that *Yellow Cab*'s "reasoning is just as applicable" to rideshare drivers); *Hinson*, 2021 WL 838411, at *6 (analogizing Lyft drivers to taxi drivers, who "have been found to have an 'only casual and incidental' relationship to interstate transit" (quoting *Capriole*, 460 F. Supp. 3d at 932)).

In this Court's view, the three district court decisions that have rejected the analysis of *Rogers* and *Hinson*, and have thus held that rideshare drivers *are* exempt from the FAA under section 1, *see Cunningham*, 450 F. Supp. 3d at 47; *Islam*, 2021 WL 871417, at *12; *Haider*, 2021 WL 1226442, at *4, are not persuasive. Starting with *Cunningham*, the court in that case reached its conclusion in reliance on the so-called "*Lenz* factors," which are a non-exhaustive list of factors created by the Eighth Circuit to be considered "in determining whether [a] contract involves a worker engaged in interstate commerce." *Cunningham*, 450 F. Supp. 3d at 46 (citing *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 351–52 (8th Cir. 2005)).[11] But *Lenz* itself involved a

---

[11] Those factors are (1) "whether the employee works in the transportation industry"; (2) "whether the employee is directly responsible for transporting the goods in interstate commerce"; (3) "whether the employee handles goods that travel interstate"; (4) "whether the employee supervises employees who are themselves transportation workers, such as truck drivers"; (5) "whether, like seamen or railroad

30

*customer-service representative* for a trucking company, and the Eighth Circuit made clear that the factors it set out were to be used "in determining whether [such] an employee [of a transportation company] is so closely related to interstate commerce that he or she fits within the § 1 exemption of the FAA[.]"  *See Lenz*, 431 F.3d at 352. Consequently, to the extent that the *Lenz* factors are instructive at all, they are relevant only after a "class of workers engaged in . . . interstate commerce" has been established, and when the court is called upon to assess whether "a worker one step removed from the actual physical delivery of goods" belongs to that class.  *See Kowalewski*, 590 F. Supp. 2d at 482 n.3; *see also Rogers*, 452 F. Supp. 3d at 917 n.3 (declining to consider the *Lenz* factors in determining whether Lyft drivers are a class of workers engaged in interstate commerce); *cf. Eastus*, 960 F.3d at 211 (declining to adopt the *Lenz* factors even to assess the question for which they were designed because "[n]o other circuit has adopted this test" and "it unduly adds to the complexity of the analysis"). [12]

Similarly, this Court disagrees with *Islam*'s and *Haider*'s analyses of section 1's application to Lyft drivers.  The court in *Islam* noted that "[r]idesharing platforms

---

employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA"; (6) "whether the vehicle itself is vital to the commercial enterprise of the employer"; (7) "whether a strike by the employee would disrupt interstate commerce"; and (8) "the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties (i.e., a truck driver whose only job is to deliver goods cannot perform his job without a truck)."  *Lenz*, 431 F.3d at 352.

[12] Even apart from its analytical framework, *Cunningham* mistakenly characterized the "critical question" as whether rideshare drivers "transport passengers that travel interstate[,]" and thus found it particularly significant that Lyft drivers transport passengers to and from airports.  *See Cunningham*, 450 F. Supp. 3d at 46.  Thus, it reasoned that "Lyft drivers are part of the chain of interstate commerce, enabling their passengers to" travel interstate, *id.*, when, as explained above, merely carrying passengers to and from airports is insufficient to be "engaged in" interstate commerce for purposes of the section 1 exemption, *see Rogers*, 452 F. Supp. 3d at 917 (internal quotation marks and citation omitted).

provide hundreds of millions of rides in the United States each year[,]" including "tens of millions of interstate rides[,]" and reasoned that "an individual driver can still expect to cross state lines with some frequency" even if "interstate transportation is not the predominant daily service provided by rideshare drivers[.]" *Islam*, 2021 WL 871417, at *8; *see also Haider*, 2021 WL 1226442, at *3 ("[T]he sheer number of interstate trips rideshare drivers make places them within the flow of interstate commerce." (internal quotation marks and citation omitted)).  But the applicability of the section 1 residual clause does not depend on the aggregate number or frequency of interstate trips taken by a class of workers; instead, what is at issue is whether that class of workers is "engaged *in the channels* of . . . interstate commerce[,]" meaning that interstate transportation is "a central part of the class members' job description" on par with seamen and railroad employees.  *See Wallace*, 970 F.3d at 801–02 (internal quotation marks and citation omitted).  As previously explained, Lyft drivers' interstate rides, no matter how numerous, are merely "incidental" to their local transportation function, *see Hill*, 398 F.3d at 1289, and this is so notwithstanding "the fact that the nationwide class of rideshare drivers frequently transports passengers to airports, train stations, and other hubs of interstate travel[,]" *Islam*, 2021 WL 871417, at *9; *see also Haider*, 2021 WL 1226442, at *4 (same).  Simply stated, the mere transport of passengers to and from hubs of interstate travel, however frequently that may occur, is not enough; instead, to be a class of workers that qualifies for the section 1 exemption, there must be an established link between such intrastate rideshare trips and the channels of commerce that are designed to facilitate passengers' interstate journeys.  *See Rogers*, 452 F. Supp. 3d at 917; *Yellow Cab*, 332 U.S. at 230–33.

Finally, this Court's conclusion that Lyft drivers do not fall within the section 1 exemption is also consistent with *Waithaka* and *Rittmann*, in which the First and Ninth Circuits held that Amazon's "AmFlex" delivery drivers, who locally deliver Amazon packages on the final legs of their interstate journeys, *are* exempt from the FAA under the section 1 residual clause.  *See Waithaka*, 966 F.3d at 13–14; *Rittmann*, 971 F.3d at 907.  As the Ninth Circuit recognized in *Grice*, those holdings were based on both "the interstate nature of Amazon's business" and the fact that Amazon specifically hires AmFlex workers to "complete the delivery of goods that Amazon ships across state lines[,]" circumstances that are not present in the case of rideshare drivers.  *Grice*, 974 F.3d at 957–58 & n.5 (internal quotation marks and citation omitted).

In short, consistent with the persuasive holdings of *Rogers*, *Hinson*, and *Aleksanian*, among other decisions, this Court comfortably concludes that Lyft drivers are not "engaged in . . . interstate commerce" within the meaning of section 1 of the FAA, and, thus, Osvatics's arbitration agreement with Lyft is not exempt from the FAA and its enforcement mechanisms.

### C.     Osvatics Has Not Demonstrated That Discovery Is Warranted

This Court also rejects Osvatics's assertion that additional discovery is necessary before any conclusion can be reached concerning the applicability of the section 1 exemption to Lyft drivers.  Osvatics requests information such as the number of Lyft drivers both nationwide and in the D.C. metropolitan area who have transported a passenger across state lines, as well as the number of Lyft trips that originate in the D.C. metropolitan area and cross state lines.  (*See* Pl.'s Opp'n at 47–48 (citing *Sienkaniec*, 401 F. Supp. 3d at 872–73).)  She also seeks "discovery targeted to the importance of interstate travel to Lyft's business in the D.C. area, including its

marketing of airport travel[,]" and further discovery regarding Lyft's representation that less than 2% of Lyft rides nationwide cross state lines.  (*See id.* at 48 (citing Decl. of Ian Muir in Supp. of Def.'s Mot., ECF No. 6-4, ¶ 5).)  But the Court has not relied on data regarding the proportion of Lyft trips that involve crossing state lines to reach its conclusions about the applicability of section 1, and it is highly unlikely that the other information Osvatics seeks would affect this Court's analysis.

That is, based on known facts, Osvatics does not seriously dispute that trips provided by Lyft drivers are primarily local *in nature*, and there is nothing in the existing record that suggests that further discovery into any precise statistics regarding interstate Lyft rides would alter or impact that characterization.  *See, e.g.*, *Aleksanian*, 2021 WL 860127, at *5 (declining to grant discovery with respect to "information on interstate trips and trips to airports/transportation hubs" and suggesting that such information is not "relevant to deciding the issue of whether Plaintiffs belong to a class of workers 'engaged in interstate commerce'"); *cf. Wolff v. Westwood Mgmt., LLC*, 558 F.3d 517, 521 (D.C. Cir. 2009) (holding that district court did not abuse its discretion in denying discovery because the requesting parties "failed to demonstrate" how the requested discovery "would have assisted them in opposing the motion to compel arbitration").  Thus, the Court concludes that the information that Osvatics hopes to discover is not relevant to the task at hand.

## IV.    CONCLUSION

A court faced with a motion to compel arbitration must determine "(1) whether the parties entered into a binding and enforceable arbitration agreement; and if so, (2) whether the arbitration agreement encompasses the claims that [the] plaintiff raised

in her complaint." *Sapiro v. VeriSign*, 310 F. Supp. 2d 208, 212 (D.D.C. 2004).  Only the first question is at issue here, and this Court has answered in the affirmative, given that Osvatics and Lyft formed a valid arbitration agreement, and that agreement is enforceable under the FAA because it is not exempt under section 1.[13]

Accordingly, in its Order issued on March 31, 2021, this Court **GRANTED** Lyft's motion to compel individual arbitration and stay proceedings pending arbitration pursuant to its authority under the FAA.  *See* 9 U.S.C. §§ 3–4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (explaining that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed").

DATE:  April 22, 2021                    *Ketanji Brown Jackson*
                                          KETANJI BROWN JACKSON
                                          United States District Judge

---

[13] As to the second question, while Osvatics has not disputed that the arbitration agreement covers the claim that she asserts in the instant litigation, Lyft's Terms of Service leave the scope of the arbitration agreement as a matter for the arbitrator, rather than this Court, to decide.  (*See* 2019 Terms of Service at 14.)  *See also Rent-A-Ctr.*, 561 U.S. at 68–69 (observing that "parties can agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy" (internal quotation marks and citations omitted)).